FILED

2023 Sep-18  PM 01:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
<u>EASTERN DIVISION</u>**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:22-cr-417-RDP-NAD** |
| | ) | |
| **KRYSTAL DIANE PINKINS** | ) | |

<u>**TRIAL BRIEF OF THE UNITED STATES**</u>

Comes now the United States of America, by and through its undersigned counsel, and files this Trial Brief to assist the Court in preparing for trial and to identify issues that may require particular attention during the trial.

### I.    CHARGES

Defendant Krystal Diane Pinkins is charged in a 4-count indictment.  Count One charges with malice aforethought, aided and abetted another with the unlawful killing of Victim #1 during a kidnapping and robbery.  Count Two charges aided and abetted another in the unlawful kidnapping of Victim #1 and #2 resulting in the death of Victim #1.   Count Three, charges aided and abetted another in the robbery of Victim #1 and #2.  Count Four charges aided and abetted another who used and carried a firearm during and in relation to a crime of violence causing the death of Victim #1, Count Three, in violation of 18 U.S.C. § 924(c) & 924(j)(1).

### II.    STATEMENT OF FACTS

On August 22, 2022, about Federal Bureau of Investigation (FBI) Agents,

based on a 911 shooting call, responded to the 900 block of wooded area off US Forestry Service Road 600-3, Lineville, Alabama. Upon arrival agents observed a male victim, Victim #1, lying dead from one gunshot wound to the abdomen; the killer, Yasmine Marie Adel HIDER, seated several feet away against a fallen pine tree with four gun-shot wounds; and a witness/victim, Victim #1's girlfriend, Victim #2, being comforted by responding officers. Victim #2 pointed at HIDER and told the responding officers, "She shot him."

Agents obtained information that twenty-two-year-old Victim #1 and twenty-year-old Victim #2 were students from Florida on a hiking trip.

HIDER stated to the responding officers that she and her "family" lived in the woods, and she was asking for a ride to get food. HIDER had four gunshot injuries and was transported to UAB Hospital. Victim #1 was pronounced dead on the scene.

Victim #2 was transported to the Ashland Police Department in Alabama and provided a statement about what happened. Victim #2 stated that she and her boyfriend, Victim #1, were travelling in their vehicle on U.S. Forestry Service Road 600-3 looking for waterfalls near Cheaha State Park. HIDER flagged the couple down and said she needed help with her broken down vehicle, a blue XB Scion. Before getting out of their van, Victim #1 took his pistol and placed it in his waistband just in case they were being robbed. Victim #2 and Victim #1 got out of their van to help HIDER with her vehicle but were unable to get it working. Victim #1 tried using his jumper cables but the Scion would not start. Victim #2 called her dad who was a mechanic. Victim #2's dad sent some You-Tube videos and Victim #2 searched for other videos on her phone that might be helpful. Still, Victim #1 and Victim #2 could not get the Scion to start. Meanwhile, HIDER while sitting in the driver's seat of the Scion, pulled a gun, and got out. She pointed the gun at Victim #1 and Victim #2, ordering them to empty their pockets and to walk further into the woods.

Once they were further into the forest, over a hundred yards from Forestry Service Road 600-3, Victim #2 stated HIDER took Victim #2's cellular telephone and recorded herself (HIDER) asking for Victim #1 and Victim #2's banking information, phone passwords, credit card numbers, and their personal identification numbers. These recordings were retrieved and preserved. At one point, HIDER looked away and lowered her guard, Victim #1 pulled his pistol from his waistband and ordered HIDER to drop her weapon. HIDER said, "are you serious?" She tried to "rack the slide" of the gun and started firing while Victim #1 returned fire falling to the ground. While on the ground Victim #1 said, "you shot me," and fired one last time at HIDER. After the shooting stopped, HIDER said, "Why did you shoot, it wasn't supposed to be like this."

HIDER started calling out to her friend for help, later identified as Krystal Diane PINKINS, who Victim #2 saw nearby in the woods, close to where the shooting took place. After a brief exchange with HIDER and Victim #2, PINKINS ran off into the woods.

Victim #2 retrieved her phone and called 911. While on the phone with 911, Victim #1 began losing consciousness. 911 advised Victim #2 to apply pressure with a cloth and begin chest compressions if he stopped breathing. A distraught Victim #2 removed her shirt to use as the cloth and started chest compressions when Victim #1 stopped breathing. Paramedics arrived and took over attempting to save Victim #1 but he was unresponsive with no pulse and was pronounced dead at the scene Clay County Coroner.

As agents approached HIDER at the scene she asked, "I'm going to do time, right? I just want to know how much time?" This was recorded by the agent's body cam. HIDER was transported to UAB for treatment and survived.

Jacksonville's Center for Applied Forensics responded and processed the scene. All evidence was collected including the firearms involved, shell casings, and

cartridges. The vehicle HIDER was in, an XB Scion, blue in color, was registered to PINKINS. The Scion was towed to the Clay County Sheriff's Office (CCSO) impound lot and was secured as evidence.

The Clay County Coroner pronounced Victim #1 dead at the scene from a gun-shot wound and the Alabama Department of Forensic Sciences (ADFS) performed an autopsy and released a report finding that the manner of death was homicide and the cause of death was gun-shot wounds.

On August 14, 2022, CCSO Investigators interviewed PINKINS, who was advised of her *Miranda* rights. After waiving her *Miranda* rights, PINKINS stated the pistol that HIDER used was hers. PINKINS had given it to HIDER two-to-three days prior to the shooting. PINKINS and HIDER discussed using the firearm to carjack someone to go get food. PINKINS also stated that she and HIDER flagged down an older woman the day before asking the woman to drive to the location of where their blue Scion was broken down, but the woman did not feel comfortable in doing so and left. PINKINS stated the Scion had been broken down for several weeks when the shooting took place.

On August 19, 2022, at UAB Hospital, agents interviewed HIDER, who was advised of her *Miranda* rights. After HIDER waived her rights, she stated she was waiting on the side of the road to get someone to stop so they could take a car to go get food. HIDER also stated PINKINS was with her when she got shot. HIDER asked agents, "Did he die?" and stated, "I didn't want to hurt anybody." HIDER stated, "I took his whole life away, now he can't tell his story." HIDER was asked what was the plan that day and stated, "I was waiting on the side of the road hoping someone would stop so we could take their car to go to the store." Agents asked HIDER if she meant "ride with them" or "take their car," she said, "take their car." When asked who are "we," HIDER stated, me, "Emoni(sp?)" (PINKINS), and PINKINS' son."

HIDER will testify at trial that the plan of HIDER and PINKINS was to "car jack" someone, take their car, and property by force, brandishing the gun, if necessary.

## III.   APPLICABLE LAW

The grand jury charged Krystal Diane Pinkins with four violations of federal law.  Those charges and their elements are set out below.

**COUNT ONE: Murder in the First Degree [18 U.S.C. §1111]**

Maximum Penalty:  Death or by imprisonment for life.

*It is unlawful to murder another person while committing or attempting to commit the crime of kidnapping or robbery within the territorial jurisdiction of the United States. Every murder committed in the perpetration of or attempt to perpetrate any kidnapping or robbery is murder in the first degree.*

Elements:

| | | |
|---|---|---|
| First: | The defendant caused the death of a person, Victim #1; |
| Second: | The death of Victim #1 Cassim Simjee occurred as a consequence of and while the defendant was knowingly and willfully engaged in perpetrating or attempting to perpetrate the crime of kidnapping and robbery as specified in the indictment; and |
| Third: | The killing took place within the territorial jurisdiction of the United States. |

To convict the defendant of murder, the United States also must prove beyond a reasonable doubt that the defendant committed or attempted to commit the crime of kidnapping or robbery.

Elements of kidnapping and robbery: See Counts Two and Three below.

**COUNT TWO: Kidnapping [18 U.S.C. §1201]**

Maximum Penalty:  Death or by imprisonment for life.

*It is unlawful to seize, confine, inveigle, decoy, kidnap, abduct, or carry away and hold for ransom or reward or otherwise any person, and resulting in the death of any person, within the territorial jurisdiction of the United States.*

Elements:

First:    The defendant knowingly and willfully kidnapped, seized, confined, inveigled, decoyed, abducted or carried away the victims, Victim #1 and Victim #2;

Second:   The defendant kidnapped, seized, confined, inveigled, decoyed, abducted or carried away the victims with the intent to secure a ransom, reward, or other benefit and held the victims for that reason;

Third:    The defendant kidnapped, seized, confined, inveigled, decoyed, abducted or carried away the victims within the territorial jurisdiction of the United States and the defendant used a means, facility, or instrumentality of interstate commerce in furtherance of kidnapping the victims[1]; and

Fourth:   The death of Victim #1 occurred as a consequence of and while the defendant was knowingly and willfully engaged in perpetrating or attempting to perpetrate the crime of kidnapping.

Kidnap: means to forcibly and unlawfully hold, keep, detain, and confine that person against the person's will. Involuntariness or coercion related to taking and keeping the victim is an essential part of the crime. Although restraint for an appreciable period against the person's will is required, no asportation or carrying away is necessary. *Chatwin v. United States*, 326 U.S. 455, 460 (1946); *United States v. Howard*, 918 F.2d 1529, 1536 (11th Cir. 1990); *accord United States v. Etsitty*, 130 F.3d 420 (9th Cir. 1997) (not precedential).

---

[1] The Eleventh Circuit has found the use of a cellphone, even without evidence of the interstate routing of calls, sufficient to satisfy the jurisdictional element of section 1201(a)(1). *United States v. McKinley*, 647 F.App'x 957, 961-62 (11th Cir. 2016); *accord United States v. McCormack*, 700 F.App'x 643, 645 (9th Cir. 2017) (not precedential).

Inveigle: means to lure, or entice, or lead the person to do something by making false representations or promises, or using other deceitful means.

The United States does not have to prove the defendants committed the kidnapping for ransom or any kind of personal financial gain. It only has to prove that they intended to gain some benefit from the kidnapping.

## COUNT THREE: Robbery [18 U.S.C. §2111]

Maximum Penalty:  Imprisonment for a term not more than fifteen (15) years. *It is unlawful within the territorial jurisdiction of the United States, by force and violence, or by intimidation, takes or attempts to take from the person or presence of another anything of value.*

Elements:

| | |
|---|---|
| First: | The defendant took or attempted to take; |
| Second: | From the persons or in the presence of the persons, Victim #1 and Victim #2; |
| Third: | By force and violence, or by intimidation; |
| Fourth: | Something of value; and, |
| Fifth: | While in the territorial jurisdiction of the United States. |

## COUNT FOUR: Uses a Firearm in Furtherance of a Crime of Violence [18 U.S.C. §§ 924(c)(1)(A) & 924(j)(1)]

Maximum Penalty: Death or by imprisonment for life.

*It is unlawful for any person - - who, during and in relation to a crime of violence, to use or carry a firearm; and causes the death of a person through the use of a firearm.*

Elements:

| | |
|---|---|
| First: | The defendant committed a crime of violence, the robbery as charged in Count Three; |

Second:    That during and in relation to the robbery, the defendant knowingly used or carried a firearm;

Third:    The death of Victim #1 was caused by the use of a firearm.

**Aiding and Abetting [18 U.S.C. §2]**: The government can establish the defendant's guilt of a crime without evidence that the defendant personally performed every act charged.  A defendant "aids and abets" a crime if the defendant intentionally joins with the person to commit a crime. A defendant is criminally responsible for the acts of another person if the defendant aids and abets the other person. A defendant is also responsible if the defendant willfully directs or authorizes the acts of an agent, employee, or other associate. A person takes an affirmative act in furtherance of an offense, that is, if she acts to help or assist or make possible, any part- thought not necessarily every part- of the crime. An affirmative act includes all assistance rendered by words, acts, encouragement, support, or presence.

## IV.   EVIDENTIARY ISSUES

**Chain of Custody**

To avoid unnecessary delay and reduce the number of witnesses, the United States does not anticipate calling every witness included in the chain of custody with each item of evidence. The witnesses who will testify in the government's case-in chief regarding the recovery of evidence will offer more than adequate testimony as to the chain of custody of each exhibit. These witnesses' testimony will also serve to sufficiently authenticate the evidence. The United States would note, however, that any breaks in the chain of custody merely go to the weight of the evidence rather than to its admissibility. *See United States v. Roberson*, 897 F.2d 1092 (11th Cir. 1990) and *United States v. Lopez*, 758 F.2d 1517, 1521 (11th Cir.1985), *cert. denied*,

474 U.S. 1054, 106 S.Ct. 789 (1986).  Admissibility of evidence is a matter which

lies within the discretion of the district court.  *United States v. Lopez*, 758 F.2d 1517,

at 1521 (11th Cir. 1985).   The chain of custody which the government will offer in

its case in chief will be sufficient to warrant the district court in admitting each item

of evidence.   Any objection by the defense to the chain of custody would go to the

weight rather than the admissibility of the evidence.  *Lopez, supra; p. 1521; United*

*States v. Clark*, 732 F.2d 1536, 1543 (11th Cir. 1984).

**Recordings and Transcripts**

The United States plans to offer into evidence several audio recordings and

the transcripts that accompany them.  Regarding the transcripts prepared from these

recordings, it has been held that, "the parties should make an effort to produce an

'official' or 'stipulated' transcript, one which satisfies all sides.  If such an 'official'

transcript cannot be produced, then each side should produce its own version of a

transcript or its own version of the disputed portions."  *United States v. Hogan*, 986

F.2d 1364, 1376 (11th Cir. 1993)(quoting *United States v. Rosenthal*, 793 F.2d 1214,

1237 38 (11th Cir. 1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377 (1987).

Furthermore, "[a] district court need not find that the transcript is perfectly

accurate prior to its admission, and a defendant's remedy for alleged inaccuracies is

to offer his own transcript with proof as to why it is a better one."  *Hogan*, 986 F.2d

1364, 1376 (11th Cir. 1993).   Following that premise, "each side may put on

evidence supporting the accuracy of its version or challenging the accuracy of the other side's version." *Id*. Finally, *Hogan* also holds that, "[s]ince the jury must always reconcile the discrepancies in the transcript(s) against the recording itself, the district court need not listen to the tape or decide whether a transcript is accurate before the transcript is given to the jury and the recording is played." *Id*.

In the event that a defendant does not submit an alternative transcript, (s)he may challenge the accuracy of the United States' version through cross examination of United States witnesses, however, the transcript may still be made available to the jury with the instruction that the audio or video tape itself is the primary evidence. See *United States v. Garcia*, 854 F.2d 1280, 1283 (11th Cir. 1988). Moreover, the Eleventh Circuit has held that "transcripts may be used as substantive evidence to aid the jury in determining the real issue presented, the content and meaning of the tape recordings." *United States v. Cruz*, 765 F.2d 1020, 1023 (11th Cir. 1985). The court in *Cruz* went on to further state that "'the use of a transcript as a guide is analogous to the use of expert testimony as a device aiding a jury in understanding other types of real evidence.'" *Id*. (quoting *United States v. Onori*, 535 F.2d 938, 947 (5th Cir. 1976)).

The Eleventh Circuit has also approved use of transcripts in the jury room, recognizing "that transcripts are evidence admissible to assist the jury in identifying speakers, see *United States v. Onori*, 535 F.2d 938, 947 (5th Cir. 1976), and, that

absent anything more than a generalized claim of prejudice, we will not find error in the transcripts being allowed in the jury room." *United States v. Nixon*, 918 F.2d 895, 901 (11th Cir. 1990)(citation included); see also *United States v. Costa*, 691 F.2d 1358, 1363 (11th Cir. 1982).

**Admissibility of Duplicate Recordings**

The United States anticipates offering into evidence recordings of Victim #2's 911 call and a statement of the defendant. Additionally, the United States may offer a recording of co-defendant, Yasmine Hider, into evidence. Because of the technology used to record these conversations and statements, the original recordings will not be offered into evidence. Rather, the United States will offer duplicates.

"A 'duplicate' is a counterpart produced by the same impression as the original, or from the same matrix, . . . or by mechanical or electronic re-recording, . . . or by other equivalent techniques which accurately reproduces the original." Fed. R. Evid. 1001(4). "A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Fed. R. Evid. 1003.

Considering the admission of duplicate audio recordings, the Eleventh Circuit has held that Rules 1001(4) and 1003 apply. *United States v. DiMatteo* 716 F.2d 1361, 1368 (11ᵗʰ Cir. 1983), *vacated on other grounds*, 469 U.S. 1101, 105 S. Ct. 769 (1985).

**Expert Testimony- Cause of Death**

The Government and counsel for the defendant have agreed to stipulate to the cause of death and admission of the autopsy report.

**Jurisdiction**

Jurisdiction for Count One, murder in the first degree; Count Two, kidnapping; Count Three, robbery; and Count Four, use of a firearm during and in relation to a crime of violence; is based on federal territorial jurisdiction. Based on the motion of the United States, Doc. 20, and the stipulation of the defendant, Doc. 25, the Court has taken judicial notice of federal territorial jurisdiction. Nevertheless, to make a clean record, the United States will offer brief testimony of Edwin Garner Westbrook and the documents contained in his "Declaration by Custodian of Records," Doc. 20-2, to establish that the location of the murder, kidnapping, robbery, and use of a firearm during a robbery, as alleged in the indictment, occurred on land owned, managed, administered, and policed by the U.S. Forest Service, U.S. Department of Agriculture, giving the United States and this Court federal territorial jurisdiction.

Additionally, jurisdiction for Count Two, kidnapping, is based on the defendant's use of means, facilities, and instrumentalities of interstate commerce, including but not limited to cellphones and two motor vehicles.

## V.    PROPOSED JURY INSTRUCTIONS

The Government filed separately its requests for jury instructions.

Respectfully submitted this the 18th day of September 2023.

PRIM F. ESCALONA
United States Attorney


*/s/ Electronic Signature*
JONATHAN S. CROSS
Assistant United States Attorney


*/s/ Electronic Signature*
JOHN B. FELTON
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been electronically filed with

the Clerk of Court, Northern District of Alabama, on this day, using the CM/ECF

filing system that will send notification of said filing to counsel for the defendants.


*/s/ Electronic Signature*
JONATHAN S. CROSS
Assistant United States Attorney