FILED
2024 Feb-26 AM 08:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

UNITED STATES OF AMERICA,    |    CASE NO. 1:22-cr-417-RDP
                             |
            Plaintiff,       |
                             |
v.                           |
                             |
KRYSTAL DIANE PINKINS,       |
                             |
            Defendant.       |

\* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF TRIAL – VOL. I**

\* \* \* \* \* \* \* \* \*

FOR THE PLAINTIFF:    Jonathan S. Cross
                      John B. Felton
                      UNITED STATES ATTORNEY'S OFFICE
                      1801 Fourth Avenue North
                      Birmingham, Alabama 35203


FOR THE DEFENDANT:    Justin C. Wilson
                      LAPLANTE, MERRITT, FAULKNER & CLAY, LLC
                      1207 Noble Street
                      Anniston, Alabama 36201


     BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES

DISTRICT JUDGE, at Birmingham, Alabama, on Monday, September

25, 2023, commencing at 10:51 a.m.


The proceedings were reported by a stenographic court reporter.

The transcript was produced using computer-aided transcription.

**Transcript prepared by:**
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter

<u>I N D E X</u>

| | PAGE |
|---|---|
| JURY VOIR DIRE | 3 |
| PRELIMINARY INSTRUCTIONS TO JURY | 99 |
| OPENING STATEMENTS | |
|     For the Plaintiff | 113 |
|     For the Defendant | 123 |

<u>WITNESS TESTIMONY</u>

FOR THE PLAINTIFF:                                    <u>PAGE</u>

SAMANTHA HIGGINS
    Direct Examination by Mr. Felton          128
    Cross-Examination by Mr. Wilson           137

INVESTIGATOR AARON SMITH
    Direct Examination by Mr. Felton          139
    Cross-Examination by Mr. Wilson           152

(Proceedings commenced at 10:51 p.m. in open court.)

THE COURT:  All right, folks.  Welcome up.  You know, it takes a little while to arrange and get this random seating order and then get back the seating charts and then get you seated in the right order for purposes of our next session, which I told you was voir dire.

Is the Government ready to proceed with voir dire?

MR. CROSS:  Yes, Your Honor.

THE COURT:  Thank you, Mr. Cross.

Is the defendant ready to proceed?

MR. WILSON:  Yes, Your Honor.

THE COURT:  Thank you.

All right, folks.  We've now heard the lawyers for the two sides are ready to proceed in the United States versus Pinkins, 22-cr-417.  We're about to begin jury selection in this case that's been announced ready.  I remind everyone that the purpose of voir dire is to give the lawyers a full opportunity to inform themselves about the panel so that they may responsibly exercise their duties to their clients.  I told Mr. Wilson because of just the way we're seated today that he can stand over here at the counsel podium and just to get a better view of everyone and to bring his notes up with him.

Our goal today is to select the most fair and impartial jury in this case, and the questions that you'll be

asked are going to be -- will be designed to do just that. The way this is going to proceed is in a moment I'm going to just call the roll by order to make sure we've got the right seating order, and then we're going to have a card go around to give you some information about yourselves to the lawyers. And then I'll ask some questions of the panel and then I'll give the lawyers a chance to ask some questions of the panel.

And then, once we complete this session, you'll go back downstairs, and lunch is on me today. How about that? Actually, it's on the Court but I'm taking full credit for it.

And then the lawyers will inform the Court about what we call their strikes, and the first 12 -- first 13 of you who are not struck will serve on our jury. So that's how we're going to proceed.

All right. So I just want to make sure we have the order set up here. Ms. Clark is right here and Ms. Mullins, Mr. Woods, Ms. Gray, Mr. Hill, and Ms. Adams. So far, so good. Ms. Troy [sic], Ms. Harmon, Mr. Folsom, Ms. Foshee, Mr. Barrentine. Is it Barrentine?

PROSPECTIVE JUROR BARRENTINE: -- tine.

THE COURT: Barrentine. Could have gone either way. And Ms. Myers. By the way, Mr. Barrentine has a very interesting story to tell about his residence. And I'm going to be asking him to be thinking about how do you work out your property taxes in that situation?

Picking up on the first row in the back section there, Mr. Patterson, Ms. -- is it Yitram?

PROSPECTIVE JUROR YITRAM:  Yitram.

THE COURT:  Yitram.  Thank you.  Mr. Broyles, Ms. Davis, Ms. Metts.  Okay.  Behind that, Mr. Peoples, Ms. Vincent.  Let's see.  Mr. Simmons.  Let's see.  Sorry.  Mr. Brand and Ms. Harper.  Thank you.

All right.  Next row, Mr. Gallman, Mr. Poteracki.

PROSPECTIVE JUROR POTERACKI:  Poteracki.

THE COURT:  Poteracki.  I was close.  Thank you.  Mr. McDaniel; is that right?

PROSPECTIVE JUROR MCDANIEL:  Right here.

THE COURT:  Okay.  Mr. Craft and Ms. Bryant over -- so notice where Ms. Bryant is sitting.  Okay.  That was me.  Sorry about that.

MR. FELTON:  Missed one.

THE COURT:  Then picking back up, Mr. Moore, put your hand up so we can make sure we got the right row.  Ms. Moses, Ms. Martin, Mr. White, Mr. Moore -- Ms. Moore.  Sorry.  I need to correct my -- okay.  Michaele Moore.  I got it.  All right.  So understanding that I have 62-year-old eyes.  So, sorry I didn't see you back there.  Ms. Moore.  And then Ms. Huntley is sitting across the way.  Good.  Thank you.

And then last, but certainly not least, Mr. Gonzalez, Mr. Johnson, Mr. Buckner, and Ms. Stephens.  Great.

Great job, Karen.  Thank you.

Okay.  Well, folks, like I said, in a moment I'm going to have you introduce yourselves to the lawyers and the Court by giving us the information on a card that we will pass around.  Before we do that, though, I think it would be appropriate for the lawyers and their respective parties to introduce themselves to you.

So I'm going to start with the Government.  Mr. Cross, do you want to make any appropriate introductions you need to make at this point?

MR. CROSS:  Yes, Your Honor.

My name's Jonathan Cross.  I'm an assistant U.S. attorney.  With me is Brad Felton, assistant U.S. attorney, our paralegal, Kim Murphy, and then special agent with the FBI, Chip Arrington here.

THE COURT:  Okay.  Thank you.

All right.  Mr. Wilson?

MR. WILSON:  Everybody hear me okay?  My name is Justin Wilson.  I'm from Oxford, Alabama.  I have a law practice in Anniston.  You'll see at the table here my client, Krystal Pinkins, and my law partner, Mike LaPlante.  Nice to meet you all.

THE COURT:  All right, folks.  So before we get started, I'm going to remind you of something I told you downstairs.  We're going to ask a bunch of questions today.

No one's trying to pry into your personal information.  The lawyers do have a right to inform themselves about you and your circumstances so they can make the right decisions in this case about who is to serve on the jury in this case.  If there's anything, though, that you get asked that you would prefer to just answer outside the presence of the other panelists, you can just say, "I'd like to answer that later in private," and we will certainly give you that right.  We'll have you stick around after we send everybody downstairs and just hold some short, mini questioning sessions just juror by juror.  I don't know that anything's going to get asked today that you're going to want to do that, but just making sure that you know your right to do just that.

And what I'm going to do is give you just a brief introduction.  And I'm not trying to characterize the case in any way.  I'm just trying to give you an understanding and overview of the allegations the Government's making in this case.

This case generally involves allegations of kidnapping, robbery, felony murder, and using and carrying a firearm as part of a crime of violence; all right?  So those are the four charges that are on trial today.  I'm going to remind you the defendant is considered innocent until proven guilty, so I don't want to -- the only reason I'm telling you about the charges is so you'll understand why you might be

asked certain questions in this case; okay? So that's the -- those are the basic information I needed to get across to you.

Now, we're going to start with Ms. Clark. And, Ms. Clark, all we need you to do for us at this point is to stand and, in a very clear voice, give a high-quality example of exactly how someone should do this.

PROSPECTIVE JUROR CLARK: So I'll just go from the paper?

THE COURT: You just start reading -- start looking at those subjects and give us the information that's on that. And speak into the microphone, please.

PROSPECTIVE JUROR CLARK: Okay. My name is Madalyn Clark. I'm from Albertville, in Marshall County. I worked at Jack's for, like, two years. I got a high school diploma. I don't really have any kind of experience in lawsuits at all. I ain't never been a juror and -- I don't know. My hobbies, hanging out with my family.

THE COURT: Tell us a little bit about your family. Are you single?

PROSPECTIVE JUROR CLARK: Yes.

THE COURT: Okay.

PROSPECTIVE JUROR CLARK: I have a family. It's a little crazy, a little on the wild side.

THE COURT: I think we're all in that category.

PROSPECTIVE JUROR CLARK: It's a little normal.

THE COURT:  Okay.  And how about your hobbies?  What do you like to do when you're not working or hanging out with family?

PROSPECTIVE JUROR CLARK:  I don't know.  I go swimming.  I go bowling.

THE COURT:  Walling?

PROSPECTIVE JUROR CLARK:  Bowling.

THE COURT:  Oh.  I was picturing you were rapelling off the wall.

PROSPECTIVE JUROR CLARK:  That sounds kind of fun, though.

THE COURT:  All right.  Thank you.

All right.  Ms. Mullins.

PROSPECTIVE JUROR MULLINS:  My name is Mackenzie Mullins.  I'm from Lincoln, Alabama.  That's Talladega.  I've been at Starbucks for a year.  I make coffee and help customers.  I have no experience in a lawsuit or as a juror or anything like that.  I like to hike, do crafts, and hang out with my family and my dog.

THE COURT:  Okay.  How about education?  Tell us about that.

PROSPECTIVE JUROR MULLINS:  Oh, sorry.  I go to Jeff State.

THE COURT:  Okay.  Great.  What are you pursuing?  What degree?

PROSPECTIVE JUROR MULLINS:  Biology.  I'm wanting to be a botanist.

THE COURT:  A botanist?

PROSPECTIVE JUROR MULLINS:  Yes, sir.

THE COURT:  Pretty cool.  All right.  Thank you.

All right.  Mr. Woods.

PROSPECTIVE JUROR WOODS:  My name's Savion Woods.  I live in Lincoln, Talladega County.  I have been driving trucks for Midwest Logistics for the last few years.  I have a high school diploma.  I am not married but I'm engaged.  I have no experience in a lawsuit or witness in a lawsuit, no experience as a juror.  And my hobbies, I just play games and watch TV.

THE COURT:  Okay.  Now, I'm going to send a copy of the transcript to your fiancee, but we want you to tell us about her.  Just kidding.  All right.  Thank you.

All right.  And I think -- Karen, you want to take over with Ms. Gray?

PROSPECTIVE JUROR GRAY:  My name is Elizabeth Gray.  I work as a registered nurse.  My employer is Gentiva, but Southern Care New Beacon.  I'm a case manager for hospice. And I have a bachelor's degree and also an associate's degree.

THE COURT:  Where did you go?

PROSPECTIVE JUROR GRAY:  Alabama the first time and then -- I majored in education there.  And then I went back to nursing school and I have an associate's in nursing.  I'm

divorced.  I've never been part of a lawsuit.  I don't have any experience as a juror.  And my hobbies, I guess, I have a 19-year-old that keeps me going all the time, so --

THE COURT:  Where do you live?  I'm sorry.

PROSPECTIVE JUROR GRAY:  Oh, I'm sorry.  I'm from Talladega.

THE COURT:  Talladega.  Thank you.

PROSPECTIVE JUROR HILL:  My name's Ricky Hill.  I'm from Marshall County.  I own a transmission shop in Boaz, owned it for near 30 years.  Don't got a lot of education other than that.  Spouse, she works with me.  Experiences, I have no experience as lawyer or anything to do with it or anything to do with any lawsuits, or I have no experience as a juror.  My hobbies are basically hunting.

THE COURT:  Thank you.  Well, let me just say this:  A few people in here have law degrees.  I wouldn't want them working on my transmission.

PROSPECTIVE JUROR HILL:  Well, my dad said -- my dad said when it was time to go to work and he meant it.

THE COURT:  Yeah, well, there you go.  I'm giving you props for -- that's not easy work, working on transmissions.

PROSPECTIVE JUROR HILL:  I do have a near-five-star rating, too, so --

THE COURT:  There you go, just in case anybody needs transmission work.

PROSPECTIVE JUROR ADAMS:  My name is Yvette Adams.  I am from Lincoln, Alabama, in Talladega County.  I am a waitress at The Ark and have been there forever.  I have some college education.  I am divorced.  I have never been in a lawsuit either as a witness, a juror, a party, or anything.  And I make beer and play Risk.

THE COURT:  There you go, Risk.

PROSPECTIVE JUROR ADAMS:  Play it pretty well, too.

THE COURT:  Okay.  Pass that on down the front of the row -- first seat on my right.

PROSPECTIVE JUROR TREY:  My name is Emilee Trey.  I live in Pell City, St. Clair County.  Right now I work at Little Caesars.  I just started, like, two days ago.  I have a high school diploma.  I'm not married but I am engaged.  I have no experience in a lawsuit or as a juror.  And my hobbies are -- I like to crochet and hang out with my family.

THE COURT:  Thank you.

PROSPECTIVE JUROR HARMON:  I'm Jeanette Harmon.  I'm from Pell City, in St. Clair County.  I am a second-grade teacher at Coosa Valley Elementary School.  I've been there for 22 years.  I have a bachelor's degree.  My husband works at Publix as a sales associate.  I don't have any experience in lawsuits.  I am -- always called as a juror but this is the first time I came into a courtroom.  I enjoy crafts, but also I have two high school kids that play high school sports, so

I'm -- I chase them.

THE COURT:  Thank you.  And where did you get your teaching degree?

PROSPECTIVE JUROR HARMON:  At Jacksonville.

THE COURT:  Jacksonville.

PROSPECTIVE JUROR FOLSOM:  My name is Joshua Folsom, from Talladega.  I'm an appliance repair technician.  So the name of the company is His Way Appliance Service.  High school diploma.  Went to Virginia College in Alabaster before it closed down.  My wife, she teaches fourth grade at Lincoln Elementary School.  I don't -- no lawsuits.  Did serve on a jury in Talladega for -- it was a rape case.  And I've got three kids, so I don't really have any hobbies but that.

THE COURT:  I understand, sir.

PROSPECTIVE JUROR FOSHEE:  My name is Tamara Foshee. I live in Lincoln, Talladega County.  I work for FedEx.  I'm a package handler.  High school education, diploma.  I'm single. No law -- no experience with lawsuits or wasn't a witness or anything.  Juror, they call me all the time to be a juror, but I've never served.  And my hobbies are I like to clean.

THE COURT:  I'm sorry?

PROSPECTIVE JUROR FOSHEE:  I like to clean.

THE COURT:  There you go.  Good hobby.

All right, Mr. Barrentine.

PROSPECTIVE JUROR BARRENTINE:  My name is Kenny

Barrentine. I live in Henagar, DeKalb County. I work for Tennessee Valley Authority for the last 23 years, worked on substations and stuff outside. Got a associate's degree at Gadsden State. My wife's an accountant. I don't have no experience in a lawsuit or witness or no experience as a juror. My hobbies are I like to hunt and chase my kids.

THE COURT: And am I remembering correctly, you've got a property line -- interesting county line?

PROSPECTIVE JUROR BARRENTINE: Yeah. I think the counties swap out is what they do. It kind of depends right up the line, this, that, and the other, so --

THE COURT: Tell the lawyers, because they weren't downstairs. They didn't hear what you told me.

PROSPECTIVE JUROR BARRENTINE: I've always been associated with Jackson County. So I moved in DeKalb and the property -- and the county line goes right across my yard. So I've always been associated with Jackson, and so I've got a DeKalb address. So I'm here.

THE COURT: So basically, he watches TV in Jackson County but sleeps in DeKalb County. And I'm glad he doesn't get property taxes from both sides. Each month anyway.

Thank you, Mr. Barrentine.

PROSPECTIVE JUROR MYERS: Hi. My name's Kathy Myers. I live in Gadsden in Etowah County. I am a retired registered nurse. I do part-time sit with an elderly gentleman for his

family.  I have an associate's degree in nursing from Indiana Vocational Technical College.  I'm a transplant from Indiana. My husband is a retired mechanic and welder.  I've not been a party in a lawsuit.  I have served on a grand jury in Etowah County, like, within the last couple of years.  And my hobbies are many.  I like to camp, fish, read, crochet, paint, acrylic paints, and I'm learning to play the piano.

THE COURT:  Great.

All right.  I think we're going to pick up in the first row in the back with Mr. Patterson.

PROSPECTIVE JUROR PATTERSON:  My name's Dennis Patterson.  Ballplay, Etowah County.  Work for Laserfab.  I'm a high school grad.  My wife's a price coordinator.  No experience in law -- party in a lawsuit, witness in a lawsuit, or a juror.  And I work on cars.

THE COURT:  I'm sorry.  Last part?

PROSPECTIVE JUROR PATTERSON:  I work on cars.

THE COURT:  Work on cars.  Do you have your own business or do you do it on the side?

PROSPECTIVE JUROR PATTERSON:  I have my own business at home and I also work at Laserfab.

THE COURT:  Thank you.

PROSPECTIVE JUROR YITRAM:  My name is Tammy Yitram.  I live in Trussville, in St. Clair County.  I'm a call service representative at Edgar's Bakery for over two years.  I went

to Jeff State but I didn't finish.  My husband is a registered nurse.  I've never been part of a lawsuit or been a juror.  My hobbies would be -- like that guy said, I've got three kids and I'm a wife, so that's all.

THE COURT:  Thank you.

PROSPECTIVE JUROR BROYLES:  My name's Tom Broyles.  I live in Rainsville in DeKalb County.  My employer is the DeKalb County Commission.  I am the road department superintendent.  I've been employed there for over 36 years. I have a high school diploma.  My spouse is retired.  I have no experience as a party in a lawsuit, no experience as a witness in a lawsuit, no experience as a juror.  And my hobbies are fishing and hunting.

THE COURT:  Thank you.

PROSPECTIVE JUROR DAVIS:  My name's Brianna Davis.  I live in Ashland, in St. Clair County.  I am a supervisor at Rapha Ministries Thrift Store, been there for almost three years.  My husband is -- he's been in maintenance for Pell City jail.  They just opened.  I went to Jackson State, didn't finish.  I don't have any experience in -- as a party in a lawsuit or as a witness.  Never been a juror.  And the only hobbies I have time for is just hanging out with family.

THE COURT:  Thank you.

PROSPECTIVE JUROR METTS:  My name is Susan Metts.  It has Mary on the paperwork, but I go by Susan.  I'm from St. --

Springville, in St. Clair County. I was retired. I came out of retirement. I was a retired educator, came out of retirement, and I work for MDM Corporation. And my job is in Gadsden. I have been there since 2022. I am a technology specialist. I have a degree from University of Montevallo and a master's from UAB. My husband is retired from Alabama Power. And I have not experienced -- have experience as a party in a lawsuit. I have been a juror on a capital murder case. I've also been a court advocate. And my hobbies are gardening, sewing, and painting.

THE COURT: Thank you.

Pick up with Mr. Peoples.

PROSPECTIVE JUROR PEOPLES: Yes. My name is Zachary Peoples. I just recently bought a house in Springville, in St. Clair County. Before that, I lived in Jefferson County. That was about a month ago. I'm still in the process of moving everything over. Let's see. I'm a diesel mechanic for P & S Transportation. I graduated UAB with a civil engineering degree. Recently engaged. I've never had any lawsuits or been a juror. I enjoy hunting, fishing, target practice, anything outside, really.

THE COURT: Did you have a sigh of relief when I told Mr. Woods I was just kidding about describing your fiancee on the record?

PROSPECTIVE JUROR PEOPLES: Yes, I did.

THE COURT:  All right.

PROSPECTIVE JUROR VINCENT:  All right.  Hi.  My name is --

THE COURT:  I'm so sorry, Miss Vincent.  Let me just mention one thing to the lawyers, though, about Mr. Peoples.  So he's lived in the district for a year but he's only lived in the Eastern jury area for the last month or so when he purchased a house.  My assessment, along with the jury assembly folks, was he's therefore eligible since he's been in the district for the last continuous year.  But just bringing it to your attention in case you have any thoughts on that at some point.

Mr. Peoples, I think I told you I was going to bring that to the lawyers' attention, so thank you.

And, Miss Vincent, thank you for letting me interrupt you.

PROSPECTIVE JUROR VINCENT:  All good.  I live in Sylacauga, in Talladega County.  I am a high school teacher at Sylacauga City Schools.  I've been there -- this is my fourth year.  I'm a business teacher and I'm also a business owner.  I have a dance studio as well.  This is my third year with my dance studio.  I have Bachelor of Arts in dance from the University of Alabama, a Bachelor of Science in marketing from the University of Alabama, and a minor in computing technology.  My husband is a law clerk for my father-in-law's

law firm.  I have experience as a plaintiff in a lawsuit on behalf of my dance studio.  I do not have experience as a witness.  I do not have experience as a juror.  And my hobbies are dance, anything children, and my two kitties, so --

THE COURT:  Two follow-up questions.  First, who's your father-in-law and his law practice?

PROSPECTIVE JUROR VINCENT:  In California, so not even in the state.

THE COURT:  Okay.  All right.  And how about the lawsuit?  Just generally, what does it involve?

PROSPECTIVE JUROR VINCENT:  Not paying.

THE COURT:  Okay.  So you're the plaintiff.  It's a creditor's suit?

PROSPECTIVE JUROR VINCENT:  Yes.

THE COURT:  Thank you.  That's all I needed to know.

PROSPECTIVE JUROR SIMMONS:  Andrew Simmons.  I live in Munford, Alabama, in Talladega County.  I work for Euler Hermes.  It's based in Baltimore.  I have a four-year business major.  My spouse has an on-line business.  I do have experience in a lawsuit.  I have no experience as a witness. I was on a jury in Atlanta, Georgia, for a criminal case. Hobbies are riding four-wheelers and watching Auburn football.

THE COURT:  Do you generally remember what the criminal case involved over in Georgia?

PROSPECTIVE JUROR SIMMONS:  It was three to four folks

stole a couple of cars and armed robbery.

THE COURT:  Okay.  And then you said you're a business major.  Where did you get your degree?

PROSPECTIVE JUROR SIMMONS:  Lee University.

THE COURT:  Lee University.  I know that well.  Thank you.

PROSPECTIVE JUROR BRAND:  My name is Mason Brand.  I live in Ashland, St. Clair County.  I am an electrician with Southland Electric.  I've been working here for about five years.  I don't have a spouse.  I'm single.  I don't have any experience as a party in a lawsuit, I don't have any experience as a witness in a lawsuit, and I don't have any experience as a juror.  And for hobbies, I just like hunting and fishing.

THE COURT:  All right.  And tell us a little bit about your education while you're at it.

PROSPECTIVE JUROR BRAND:  I just have a high school diploma.

THE COURT:  High school degree.  Thank you.

Okay.  I think we're at Ms. Harper.

PROSPECTIVE JUROR HARPER:  Let's see.  I live in St. Clair County.  I've been there 25 years.  We moved from Jefferson.  Within the last five years -- I've been retired for the last eight years.  Before that, I worked with Baptist Medical Centers for 19 years and with Firstsource MedAssist

for 14 years and with Kmart for ten years when I was right out of high school.

THE COURT:  Just generally, what were those positions you held at those companies?

PROSPECTIVE JUROR HARPER:  Well, in Kmart, you know, you start out as a cashier and you go up your department heads and things like that.  Baptist Medical Center, I started out with them training when I went to school with Jeff State, UAB, and then went on with them as a job opportunity first with clinical technician and setting up offices for their satellite clinics.

THE COURT:  Right.  Okay.  Thank you.

PROSPECTIVE JUROR HARPER:  So I'm retired now, and I'm glad after 40-something years.  My spouse, currently he is in North Dakota, I think, today, maybe Minnesota.  He delivers Altech company trucks, those big -- it could be a small truck, big truck, but company trucks all over the country.  So he does that.  I've never been in a lawsuit or a party of one or a witness.  I was called for jury duty years ago.  I can't remember what it was for, but they declined to take me because, technically, I read the newspaper so -- when they had newspapers.  Did I get all of that?  And then hobbies and interests, I like to read and work in the yard and do different things with my grandkids.  I've got seven grandkids and three sons -- well, I have two sons and one nephew that I

raised, so I claim him as a son.

THE COURT:  Thank you.  Pass that back to Mr. Gallman, I think.

PROSPECTIVE JUROR GALLMAN:  I'm Chris Gallman.  I'm from Albertville, Alabama, Marshall County.  I work for the Boaz Postal Service.  High school degree.  Divorced.  No experience in any lawsuits.  Never been a juror.  And I like to have fun with my kids.

THE COURT:  Thank you.

PROSPECTIVE JUROR POTERACKI:  Okay.  My name is Brian Poteracki.  I'm from Pell City, Alabama.  Right now I'm kind of partially retired.  I build fences, wooden fences.  I had a motel for 39 years and I was the manager.  I dealt with all kinds of crazy people and stuff, and I'm glad to get out of it.  Had a guy buy the motel back in December.  High school education.  My wife was a pharmacy tech, and she did it -- our accounting at the motel as well.  Experience, party in a lawsuit, we had a convenience store and somebody was -- sandwich man was stealing from us, so it went to -- I think he plea-bargained and paid -- you know, paid us back what he owed us and other convenience stores in the Pell City area.  I was picked as a juror one time.  The guy had two life sentences and he was -- he plea-bargained and -- because they were bringing drugs or something into the prison.  And before we could even go out there, they dismissed the case.  He got

another year -- I mean another life term in prison.

THE COURT:  So the jury didn't reach a verdict?  You terminated the trial before you had a chance to deliberate?

PROSPECTIVE JUROR POTERACKI:  Yes, exactly.

Hobbies, I watch a lot of TV, too much TV, Fox News, Newsmax, too much, but that's about it.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR POTERACKI:  Uh-huh.

PROSPECTIVE JUROR CARROLL:  Georgia Carroll.  I live in Springville, in St. Clair County.  I work at Regions Bank. I am a quantitative risks analytics analyst and -- ten years there.  I have a bachelor's in information systems.  My wife is a data engineer.  Negative on the three experience things, and I am interested in bushcraft and aquascaping.

THE COURT:  Thank you.

PROSPECTIVE JUROR MCDANIEL:  My name is Charles McDaniel.  I live in Rainbow City, Etowah County.  I am disabled the last 13 years, formerly a toolmaker machinist and a firefighter.  I have a high school diploma and some college education.  I am widowed of six years but recently entered into a relationship in the past two months with an exciting new lady.

THE COURT:  You're going to break the rule and tell us all about it.

PROSPECTIVE JUROR MCDANIEL:  Not entirely.  No

experience in a lawsuit, witness or juror.  As far as my family, I have 20 children.  I have one biological son, six that I've adopted, and the others are all stepchildren or fostered.  And hobbies include hunting and fishing.

THE COURT:  And you did say 20?

PROSPECTIVE JUROR MCDANIEL:  20, yes.

THE COURT:  Thank you.

PROSPECTIVE JUROR CRAFT:  My name is William Craft.  I'm from Munford, in Talladega County.  I work at FabArc Steel.  I'm a maintenance technician.  I worked there about six and a half years.  I've got an associate's degree in electronics engineering.  I'm not married.  I was the defendant in a lawsuit over a auto accident about nine years ago.  And I've never been on a jury before.  And I like to play video games and listen to music.

THE COURT:  Where did you get your AA, your associate's degree?

PROSPECTIVE JUROR CRAFT:  Oh, Gadsden State.

THE COURT:  Gadsden State.  Thank you.  And then did the case go to trial that you were a defendant in?

PROSPECTIVE JUROR CRAFT:  Yeah, we sat through the jury selection and went through all that.  And I got on the stand and he got on the stand, so yeah.

THE COURT:  And did the jury reach a verdict or did the case settle?

PROSPECTIVE JUROR CRAFT:  I think it settled after --

THE COURT:  Thank you.  Probably based on your spectacular testimony.

PROSPECTIVE JUROR BRYANT:  My name is Rita Bryant.  I live in Alexandria, Alabama.  That's near Anniston.  I'm retired from AT&T.  I worked with them for 35 years.  I have some college, and I don't have a spouse.  Oh, I was in one lawsuit.  Our neighborhood brought a lawsuit against a processing plant that was working there near us, and we settled.  So I guess I was a witness in that also.  As a juror -- I've never been a juror.  My hobbies right now, since I'm retired, I make a lot of crafts and I sell them.  I teach a lot of crafts, especially basket weaving.  And I ride my Harley in my spare time.

THE COURT:  Your Harley.

PROSPECTIVE JUROR BRYANT:  Yes.

THE COURT:  I like that.  Where did you go to college?

PROSPECTIVE JUROR BRYANT:  Well, our -- AT&T educated us in classes, so it wasn't at an actual college.  But the courses were considered --

THE COURT:  College-level courses through AT&T?

PROSPECTIVE JUROR BRYANT:  Yes.

THE COURT:  Okay.  Thank you for answering that. Okay.  If you'd pass that along back to Mr. Moore.

PROSPECTIVE JUROR MR. MOORE:  My name is Michael Blake

Moore. I live in Attalla, in Etowah County. I work for Advance Auto Parts. I'm over the commercial program. High school diploma. My wife works for Northeast Orthopedics. No experience in a lawsuit. No experience as a juror. When I'm not working, I'm hanging out with my kids and watching football.

THE COURT: Great. Thank you. And what does your wife do at Northeast Orthopedics?

PROSPECTIVE JUROR MR. MOORE: Schedule surgeries.

PROSPECTIVE JUROR MOSES: My name is Maxine Moses. I live in Moody, Alabama. Obviously, it's in St. Clair County. I'm retired. Five years prior to retirement -- I'm an attorney. I handled social security disability cases for the most part. My education is Fyffe High School. Go Red Devils. And I went to Samford as well as Birmingham School of Law while I was working at Harbert Construction Company. My experience in lawsuits: Most of the experience I've gained was as a paralegal for Bibb Allen, also having picked jurors before, or assisted. Hobbies: I like to deer hunt; I like to fish; I like to travel; I like to knit; and I like to cook.

THE COURT: Have you ever served on a jury?

PROSPECTIVE JUROR MOSES: I have not.

THE COURT: But you've seen Bibb Allen try a jury case, I bet.

PROSPECTIVE JUROR MOSES: Absolutely.

THE COURT:  I'm going to make you stay late and hear Bibb Allen stories.  Bibb Allen was, folks, one of the best trial lawyers the state of Alabama has ever seen, and what a treat that would have been to get a chance to work with him.

PROSPECTIVE JUROR MOSES:  It was.

PROSPECTIVE JUROR MARTIN:  My name is Virginia -- I go by Ginny -- Martin.  I'm from Guntersville, Alabama.  I was a licensed physical therapist for 40 years.  I went to UAB.  My last employer was Rehab Select for seven years, and then I was at the Marshall Medical Centers for 30 -- whatever.  My spouse works at Mitchell Grocery in Albertville, Alabama.  I've never been in a lawsuit, never been a witness, never been a juror. I ride horses, I fly-fish, I sew, and I read and run after grandkids, too.

THE COURT:  Great.  Thank you.

PROSPECTIVE JUROR WHITE:  My name is Robert White and I'm from Jacksonville, in Calhoun County.  I work for First Baptist Church.  I've been there for about ten years.  I do music and administration for the church.  My education, I have a bachelor's degree from Northern Illinois University and a master's degree from Southwestern Seminary.  My spouse, she currently works at JSU as an administrative assistant in the business department but she's a teacher of the hearing-impaired.  I do not have any experience in lawsuits. I have not been a party nor a witness.  I have served on a

jury in Arkansas -- I think it was about '92 or '93 -- and it was a case involving a traffic accident where a fatality was involved.

THE COURT:  Was that a civil case where someone was suing for money damages?

PROSPECTIVE JUROR WHITE:  No.  The gentleman who killed the individual was drunk at the time.

THE COURT:  Okay.  So it was a criminal case on a DUI?

PROSPECTIVE JUROR WHITE:  Yes, yes.

THE COURT:  All right.  Thank you.

PROSPECTIVE JUROR WHITE:  Hobbies and interests, I enjoy hiking and biking.

THE COURT:  Thank you.

Ms. Moore.

PROSPECTIVE JUROR MS. MOORE:  Yes.  My name is Michaele Moore and I live in Rainbow City, Etowah County.  I have three businesses.  I do automotive returnable packaging, I'm a realtor, and I'm a homebuilder.  I -- my education --

THE COURT:  I feel lazy.

PROSPECTIVE JUROR MS. MOORE:  I'm sorry?

THE COURT:  I feel very lazy right now.

PROSPECTIVE JUROR MS. MOORE:  I still have a staging company but I'm not doing that as much anymore.  But my education is high school education.  My spouse is a senior estimator in construction.  I don't have any experience in a

lawsuit or as a witness in a lawsuit and I've never been on a jury. My hobbies, I like Auburn football and golfing, basically. That's about all I do.

THE COURT: Thank you.

PROSPECTIVE JUROR MS. MOORE: I have three grandchildren, so --

THE COURT: Yes. Productive.

PROSPECTIVE JUROR HUNTLEY: My name is Robbin Huntley. I live in Gadsden, Alabama, Etowah County. I have worked with Church of Christ for 16 years and I am now in the LEAP program. I have a two-year degree from Gadsden State. My spouse is a mechanic for the Gadsden city school system. I have no experience in a lawsuit or witness in a lawsuit or experience with a prior jury. My hobbies are I like spending time with the family.

THE COURT: Thank you so much.

PROSPECTIVE JUROR GONZALES: My name is Chris Gonzales. I live in Trussville. For the last five years I worked at TSA as a weld associate. Education, just a high school diploma. I'm currently single, have no experience in a lawsuit, and this is my first time on a jury. And my hobbies and interests are fitness, going to the movies, and walk and hike.

THE COURT: Thanks so much.

PROSPECTIVE JUROR JOHNSON: My name is Chris Johnson.

I'm from Albertville, Alabama, Marshall County.  I work for the City of Guntersville.  My wife currently does not work.  She stays at home.  And I got a diploma from Albertville High School.  No experience in lawsuits, witnesses, jurors.  My hobbies are traveling and hunting.

THE COURT:  What do you do for the City of Guntersville?

PROSPECTIVE JUROR JOHNSON:  I'm a street supervisor.

THE COURT:  Thank you.

PROSPECTIVE JUROR BUCKNER:  My name's James Buckner, from Moody, Alabama, St. Clair County.  I work at Brownlee-Morrow Enterprises, been there for 13 years.  Graduated from Moody High School.  My wife stays at home with the kids.  I've never been in a lawsuit, never been a juror.  And I hunt and fish and work on my own cars.

THE COURT:  What do you do for Brownlee-Morrow, just the job title?

PROSPECTIVE JUROR BUCKNER:  I'm a shop manager.

THE COURT:  Shop manager.  Thank you.

And last but not least, Ms. Stephens.

PROSPECTIVE JUROR STEPHENS:  Yes.  I'm Deddra Stephens.  I am from Gadsden, in Etowah County.  And my employer is BMSS, LLC.  We're advisors and CPA firm.  I'm the accounting manager there.  I work right hand to the CFO.  I've been there for 21 years.  Bachelor's from the University of

Alabama.  Spouse works for Averitt Express.  He's a driver.  No experience as a party in a lawsuit or witness, no experience as a juror.  And hobbies are mainly just working outside and camping.

THE COURT:  Thank you.

Appreciate that, folks.  You can see that that was a great way to get a lot of information about each one of you to the Court and the lawyers.  I've got some follow-up -- well, I've got some additional questions and some follow-up questions perhaps.

So first question is that -- does anyone here know someone else on the panel before you walked in the courtroom today?  Some of you-all are from the same communities, but I didn't know if you knew each other.

(No audible response.)

THE COURT:  Okay.  You've heard the lawyers and the parties introduced.  Anyone who knows or is related to any one of the lawyers or the parties in this case?  Got a couple hands up in the back, but let's start -- whenever I ask questions like that, we have an affirmative response, I kind of go row by row.  So anybody in the jury box?  First row in the back?  Second row in the back?  Third row in the back?  All right.  Two hands just went up.  So let's see.  I think Ms. Carroll?

PROSPECTIVE JUROR CARROLL:  Yes, sir.

THE COURT:  Who do you know?

PROSPECTIVE JUROR CARROLL:  Mr. Cross.  Mr. Cross, the attorney.

THE COURT:  You know Mr. Cross.  How do you know Mr. Cross?

PROSPECTIVE JUROR CARROLL:  Friends for a while.

THE COURT:  Okay.  Where did that friendship originate?

PROSPECTIVE JUROR CARROLL:  There is a park at the Episcopal church across from Regions, where I work.

THE COURT:  Right.

PROSPECTIVE JUROR CARROLL:  And I think I saw him there and we got to chatting and --

THE COURT:  Okay.  Anything about that that you couldn't put aside and hold him to the standard that -- as if you didn't know him?

PROSPECTIVE JUROR CARROLL:  No, Your Honor, not at all.

THE COURT:  That wouldn't affect your ability to sit as a juror in this case?

PROSPECTIVE JUROR CARROLL:  No, sir.

THE COURT:  All right.  I also saw another hand go up.

PROSPECTIVE JUROR CRAFT:  Yeah.  I'm pretty sure I went to high school with Mr. Wilson.

THE COURT:  With Mr. Wilson.

PROSPECTIVE JUROR CRAFT:  Yeah.

THE COURT:  How did he do in high school?

PROSPECTIVE JUROR CRAFT:  He's older than I am.

THE COURT:  Okay.  All right.  So you just knew him from high school.  Were you friends at all?

PROSPECTIVE JUROR CRAFT:  No.  We might have knew some of the same people.

THE COURT:  Yeah, so you would have obviously been in the same community.  But same questions I'm going to ask you there:  Anything about that that would keep you from being able to just hold him to the same standard you would any other lawyer in this case?

PROSPECTIVE JUROR CRAFT:  No.

THE COURT:  Okay.  And that wouldn't affect your ability to fairly try this case?

PROSPECTIVE JUROR CRAFT:  No.

THE COURT:  Thank you.

All right.  Anyone else who had a hand up?  All right. All the way in the back.  Is that Mr. Johnson?

PROSPECTIVE JUROR BUCKNER:  Mr. Buckner.

THE COURT:  Oh, Mr. Buckner.  I can't -- I didn't see where the arm was.

PROSPECTIVE JUROR BUCKNER:  I know Chip Arrington from football and school.

THE COURT:  From football, huh?

PROSPECTIVE JUROR BUCKNER:  Yes, sir.

THE COURT:  What position did you play?

PROSPECTIVE JUROR BUCKNER:  I was middle linebacker.

THE COURT:  What position did he play?

PROSPECTIVE JUROR BUCKNER:  DB.

THE COURT:  DB.  Tall DB.  So -- all right.  So did -- you-all were on the same team, though?

PROSPECTIVE JUROR BUCKNER:  No, sir.  He was actually my DB coach.

THE COURT:  He was your DB coach.  I'm just giving him -- I'm giving him a break on his age; okay?  All right. Anything about that that would affect your ability to sit as a juror in the case?

PROSPECTIVE JUROR BUCKNER:  No, sir.

THE COURT:  Okay.  You might hold him to a higher standard since he made you run wind sprints at some point; right?

PROSPECTIVE JUROR BUCKNER:  Yes, sir.

THE COURT:  All right.  Fair enough.  Was that -- what high school was that?

PROSPECTIVE JUROR BUCKNER:  That was Moody.

THE COURT:  At Moody.  Okay.  The -- let's see.  The Blue Devils?

PROSPECTIVE JUROR BUCKNER:  Yes, sir.

THE COURT:  So I had kids that went through the

Briarwood program and played Moody a lot.

PROSPECTIVE JUROR BUCKNER:  Briarwood, Irondale.

THE COURT:  Yeah, yeah.  Okay.  Great.

Anyone else?  All right.  Thank you-all.  And, look, that's exactly what we want you-all to do.  When there's a question that gets asked, raise your hand so we can follow up and just get some more information about that particular matter.

All right.  I gave a very brief introduction to this case.  You know, let me know if you need a broader, more specific introduction to the case, but the next question is this:  Does anyone think they know something about this case other than what they've heard in the courtroom today?

(No audible response.)

THE COURT:  So obviously, as we go through this process, more information about the case might come out.  What I'd ask you to do, if at any point you think you know something about this case from media or word of mouth or any other means, would you volunteer that, raise your hand, interrupt the proceedings, and say, "I think I know something about this case" so we can follow up with you about it?

All right.  So this may be a good time to have the Government qualify its witnesses, and that might have the folks kind of see if they know some of the witnesses in this case and might spark some recognition about the case.

So, Mr. Felton, you going to do that for us?

MR. FELTON:  Yes, Your Honor.

THE COURT:  Qualify -- now, this doesn't mean all these witnesses are going to be called, but he's going to qualify the witnesses that may be called.  And qualifying just means he's going to tell you who they are and we'll see if you know any of the witnesses in this case.

MR. FELTON:  All right.  Yes, Your Honor.  So potential witnesses that may be called are Trent Adams, from the Clay County Sheriff's Office; Chip Arrington has been introduced as a DB coach from one of the prospective jurors; Aaron Banach, from the Alabama Department of Forensic Sciences; Jarrod Camp, from the Clay County Sheriff's Office; Yasmine Hider; Samantha Higgins, from the Clay County Sheriff's Office; Shannon House, from the Ashland Police Department; Mark Osburn, from the Jacksonville State University Forensics Science department; Mikayla Paulus, one of the victims in the case; Chris Parker, from Cheaha State Park, was an employee there; Auguste Rebarchik; Edward Reedy, Department of Forensic Sciences; Dale Rush, the Clay County coroner; Abdul Simjee; Aaron Smith, from the Clay County Sheriff's Office; Brandie Smith, from the Alabama Department of Corrections; Emily Sustarich, from the Alabama Department of Forensic Sciences; Matthew Tapley, a paramedic from Clay County; and Garner Westbrook, from the United States

Department of the National Forest Service.

THE COURT:  All right.  Any of those names ring a bell with any of you?

(No audible response.)

THE COURT:  Okay.  Again, same thing.  I'll just give you the instruction as we go through the course of things:  If you do realize you have a connection to any of those names, just raise your hand and let us know that.  All right.  But just -- anyone here -- I just want to get an affirmative response to this:  Anyone who is related by blood or marriage to Ms. Pinkins, the defendant in the case?

(No audible response.)

THE COURT:  Anyone who knows Ms. Pinkins, the defendant in the case?

(No audible response.)

THE COURT:  All right.  And I -- Mr. Felton, you called Yasmine Hider's name; is that right?

MR. FELTON:  Yes, Your Honor.

THE COURT:  Okay.  I'm going to zero in on Yasmine Hider.  Anyone know or related to a Yasmine Hider?

(No audible response.)

THE COURT:  Okay.  Any -- let me ask you this:  Does anyone know somebody else in the courtroom, whether it's me or any of the court staff that you see in the courtroom?  Anyone know any of the --

(No audible response.)

MR. CROSS:  I think we had an answer.

THE COURT:  Oh, I'm sorry.  Where was it?

MR. CROSS:  Right over here.

PROSPECTIVE JUROR MULLINS:  I just know another juror.

THE COURT:  Oh, you know another juror.  All right. So it looks like you know -- and I'm sorry, you are Ms. Mullins and you know Ms. Troy [sic]?  Did I just turn to the wrong page?

PROSPECTIVE JUROR MULLINS:  Trey.

THE COURT:  Trey.  Sorry.

PROSPECTIVE JUROR TREY:  That's okay.

THE COURT:  I need to put my glasses on.  All right. So how do you-all know each other?

PROSPECTIVE JUROR TREY:  We were in band together.  We were in marching band in high school.

THE COURT:  Marching band together?

PROSPECTIVE JUROR TREY:  Yes, sir.

THE COURT:  Was it a good band?

PROSPECTIVE JUROR TREY:  Yes, it was.

THE COURT:  Good band.  Which city was that again?

PROSPECTIVE JUROR TREY:  Pell City High School.

THE COURT:  Pell City High School.  You-all have Coach Propst there now, don't you?

PROSPECTIVE JUROR TREY:  Yes, sir.

THE COURT:  He's a handful.  All right.  Okay.  Thank you for letting us know that.  Were you-all good friends or just knew each other in the band?

PROSPECTIVE JUROR MULLINS:  We say hi.

THE COURT:  You'd say hi to each other.  Have you-all been in touch with each other since high school?  Gotten together or anything like that?

PROSPECTIVE JUROR TREY:  No, sir.

THE COURT:  Okay.  So that kind of gives us an idea you-all were friends --

PROSPECTIVE JUROR TREY:  We were friends then but not much now.

THE COURT:  If you don't get a birthday card from each other, you're not really getting offended, it sounds like.  All right.  Thank you.

Other than what you just told us, folks -- and for example, we've had one of our panelists mention that -- and that was Ms. Moses, that she was a -- practiced law and was involved with a law firm before that, a really good lawyer before that.  Other than what you've already told us, does anybody have any legal training, formal or informal?

(No audible response.)

THE COURT:  Okay.  How about any law enforcement training, formal or informal?

(No audible response.)

THE COURT:  Okay.  And while I'm on that subject, obviously, when you're trying a criminal case in court, you're going to have law enforcement officials who testify during the trial.  What I'm going to tell you now is you hold those witnesses to the same standard you would any other witness.  You apply the same factors.  And I -- in my final instructions, if you end up on the jury, I'm going to give you some tips about how to evaluate each witness's testimony.  But whatever standard that the jury uses in evaluating the witness's testimony, I just want to make sure that everyone here can agree that they will not treat law enforcement any differently than any other witness.  They won't give them more credit because they're law enforcement; they won't give them less credit just simply because they're law enforcement.  You'll just evaluate their testimony as you would any other witnesses.  Anybody who would not be able to follow that instruction that I just gave you?

(No audible response.)

THE COURT:  Okay.  I don't see any hands.

Anyone here who's had just what you would describe as a bad experience with the criminal justice system, whether it's a judge, a jury, lawyers -- prosecutors or defense lawyers -- or any other aspect of the criminal justice system, it just wasn't -- you came away thinking that was not a good experience?  Okay.  I've got no hands in the jury box that I

saw; is that correct?  I do have two hands that went up, I think, in the first row in the back.  Let's start with Mr. Patterson.  Tell you what, we're going to do -- you answered yes to that question?  What I'm going to do is have you answer that question later when it's just us; okay?

Who else had the hand up?  All right.  So that would be Mr. Broyles.  Comfortable doing the same thing there?

PROSPECTIVE JUROR BROYLES:   (Nods head affirmatively.)

THE COURT:  Okay.  One second.  All right.  Anybody in the next row?

(No audible response.)

THE COURT:  All right.  Row after that?

(No audible response.)

THE COURT:  Row after that?

(No audible response.)

THE COURT:  So no one else.  Okay.

All right.  Anyone here who's -- and I'm going to put this in two categories; okay?  Anyone here who's been a victim of what I would call a property crime?  No one was ever put at risk or in danger but you're a victim of a crime?  All right.  So let's start -- is that Ms. Adams?

PROSPECTIVE JUROR ADAMS:  It is.

THE COURT:  What happened?

PROSPECTIVE JUROR ADAMS:  My house was broken into.

THE COURT:  How long ago was that?

PROSPECTIVE JUROR ADAMS:  Oh, goodness.  30-plus years.

THE COURT:  All right.  Anyone else in the jury box?  All right.  Anyone in the back?  So I see a couple of hands in the back.  Anybody in the first row?  All right.  Second row looks like Mr. Simmons.

PROSPECTIVE JUROR SIMMONS:  I had rental property in Montgomery, Alabama, and all the copper pipes and air-conditioning units were stolen.

THE COURT:  Okay.  Sorry about that.  And sorry about that for Ms. Adams as well.

Anyone else on that row?

(No audible response.)

THE COURT:  Okay.  Next row, it looks like -- is that Mr. Vincent?  No, I'm sorry.  Mr. Simmons.  Sorry.

PROSPECTIVE JUROR POTERACKI:  I'm Brian.

THE COURT:  Oh, Mr. Brian [sic].  Go ahead.

PROSPECTIVE JUROR POTERACKI:  We had a pontoon boat stolen out of our parking lot by somebody and I had camera surveillance from next door at the convenience store.  And they pinpointed the guy and everything.  They even found the boat in his neighborhood.  They just never did anything to the guy.  And I looked him up on Facebook, and he was arrested in Birmingham and then somehow with nothing to do with that they let him free.  And now I think he's living in Florida because

of that.  So he's hiding out, but they never --

THE COURT:  All right.  Just felt like there wasn't follow-up there that needed to occur?

PROSPECTIVE JUROR POTERACKI:  Yeah, yeah.

THE COURT:  Anyone else in that row?  Yes, sir.

PROSPECTIVE JUROR MCDANIEL:  House was broken into, had a trailer stolen out in my yard, and had a Cadillac Escalade from the shop that was stolen.

THE COURT:  How long ago did these three incidents occur, just generally?

PROSPECTIVE JUROR MCDANIEL:  Past five years.

THE COURT:  Past five years.  Okay.  Sorry about all that, too, on all four of these occasions.

All right.  Anyone else?  Okay.  Ms. Moses.

PROSPECTIVE JUROR MOSES:  We had an F-250 stolen from the Adamson Ford as it was being repaired.

THE COURT:  Oh.  That's -- was it recovered?

PROSPECTIVE JUROR MOSES:  Yes.

THE COURT:  Not in great shape, though?

PROSPECTIVE JUROR MOSES:  No.

THE COURT:  That's what I figured.  All right.  Thank you for letting us know that.

Anyone else?

(No audible response.)

THE COURT:  Okay.  Next -- told you there would be a

second category.  Anyone here who's been a victim of any violent crime on the panel?  And I'm going to -- Miss Foshee, I saw your hand.  Thank you.  Anyone else in the jury box? Anyone in the back?

(No audible response.)

THE COURT:  Miss Foshee, I'm going to have you hang around and tell us about that privately, if you don't mind.

Okay.  All right.  So, same question except a different group, and I want to make a -- give you a definition.  What I'm asking about are close friends and close family members.  Let me describe what I mean by that.  A close friend is someone not who you see down the street or walks their dog through your yard once in a while and you just know them.  These are people that -- in your life that they had an opinion about something that might change the way you view that subject.  In other words, it's somebody who you have that kind of relationship with; all right?  And close family member doesn't mean the third cousin that you see whenever there's a wedding, funeral, or family reunion but someone who's a close relative of yours.  Same kind of test there, if they had an opinion about something, you'd care about what their opinion is; all right?

So with those categories in mind, any of those folks who have -- you know anybody who's been a victim of any violent crime in those two categories?  Okay.  In the jury

box?  Okay.  First row?  Okay.  Thank you.  It's Mr. Broyles.  We're going to follow up on that later, if you don't mind, sir.

Next row?  All right.  Let's see.  That was -- is that Mr. Craft?

PROSPECTIVE JUROR CRAFT:  Yeah.

THE COURT:  Okay.  Same thing.  I'm going to follow up with you on that.

Anyone else in that row?  Yes, thank you.  That's Mr. McDaniel.

PROSPECTIVE JUROR McDANIEL:  Yes.

THE COURT:  Anyone else in that row?  All right.  Next row after that?  Okay.  And then next row after that?  All right.  I didn't see any other hands.

Counsel, your eyes -- your eyes are better than mine and you're closer.  Make sure you -- if I miss somebody's hand, you let me know.

All right.  Put your hand up if you, from time to time, watch crime shows or lawyer shows on TV.  All right.  That's what I suspected.  I'm going to tell you-all something that the television stations and producers don't want you to know.  Ready?  That is a bunch of rubbish.  That is not how cases get tried.  That's not how law gets practiced.  I always say -- so people ask me, since I'm a judge, "I watch 'LA Law' or I watch 'Boston Legal' or I watch 'CSI.'  Is that what it's

like?"  And I say, "Let me ask you something.  What do you do?"  "I'm a pipe fitter."  "What if they made a TV show about your job?  Do you think anybody would watch it if they didn't jazz it up and make it look different?"  That's the way every job in the country is, by the way, pretty much, maybe except for a handful.  But I want you to understand what's going to happen in the courtroom is real stuff.  That is fake stuff.  So I want you to put aside in your mind any expectation about how this trial might look compared to what you see on TV.  Fair?  Okay.

All right.  Here's one I like to ask.  Picture the front or the back of your car.  And we're going to go one by one through the audience.  Put your hand up in the jury box if you have anything on your car -- bumper sticker or vanity tag -- that says anything other than "Roll Tide," "War Eagle," "Go Blazers" -- and I guess there wouldn't be a lot of that since this isn't a Jefferson jury -- or anything other than those three.  Anything on your bumper sticker or vanity tag that sends a message about you that you want those in traffic around you to understand?

Okay.  And we're going to start with Ms. Mullins.

PROSPECTIVE JUROR MULLINS:  It's just -- do I stand up?

THE COURT:  Yeah.  That way we can hear you.

PROSPECTIVE JUROR MULLINS:  It's just the adoption

thing.

THE COURT:  Okay.  So you're a big fan of adoption, want -- think people ought to consider that as appropriate?

PROSPECTIVE JUROR MULLINS:  And a dog on a vinyl sticker.

THE COURT:  Anybody else on the first row?  Second row?

PROSPECTIVE JUROR TREY:  I have a -- on the back of my car I have a heart that has a cross in the middle of it.

THE COURT:  Okay.  Thank you.  I'm surprised you-all didn't have, like, more band paraphernalia on your -- okay.

Anybody else in the back row right there?

All right.  First row in the back?  Second row in the back?

MR. WILSON:  Your Honor, I think you might have had one in the front.

THE COURT:  Oh, yes.  Thank you.  Mr. Patterson?

MR. PATTERSON:  "If they come for your guns, give them your bullets first."  That's on the back of my car.

THE COURT:  That kind of goes with your T-shirt, doesn't it?

PROSPECTIVE JUROR PATTERSON:  Yes, sir, it does.

THE COURT:  All right.  The Second Amendment is well represented by Mr. Patterson.

All right.  Anybody else in that row?  Second row?

Third row?  Fourth row?  Oh.  There we go.  This is the First Amendment row.  Okay.  So let's see.  Ms. Moses?

PROSPECTIVE JUROR MOSES:  "Rooted in the Smokies." "Rooted in the Smokies."

THE COURT:  "Rooted in the Smokies."  Thank you.

All right.  Was that Ms. Martin who went up?

PROSPECTIVE JUROR MARTIN:  A Christian sticker:  "I Believe."

THE COURT:  All right.  Thank you.  Was there another hand on that row?  So is that Mr. White?

PROSPECTIVE JUROR WHITE:  Yes, sir.  I don't know if it's relevant.  I drive a Honda Accord, so it's kind of cheesy.  But it says "In One Accord" and then it has our church name.

THE COURT:  There you go.  That's not cheesy.  That's good.  That was the old joke about they had automobiles in the New Testament because the disciples were all in one accord. Okay.  They also had motorcycles in the Old Testament because David's triumph could be heard around the nation.

All right.  Anyone else in that row?  By the way, I'm very good at dad jokes.  That's what my kids tell me anyway. They're experts in knowing what my humor is like.

All right.  How about the last row?

(No audible response.)

THE COURT:  All right.  Thank you-all.

Well, so Mr. Patterson has brought about another question I probably need to ask you.  Mr. Patterson, you can sit this one out because you've already kind of answered it.  Anyone here who has strong opinions one way or the other about firearms?  Okay.  So this is helpful.  First row, let's start with Ms. Mullins.  What is your opinion about firearms?

PROSPECTIVE JUROR MULLINS:  I'm in full support of the Second Amendment.

THE COURT:  All right.  Thank you.  All right.  How about Ms. Adams?

PROSPECTIVE JUROR ADAMS:  Guns are the number-one killer of children in this country.  And it's the Second Amendment, not the First, for a reason.

THE COURT:  All right.  Okay.  Thank you.

All right.  Anyone else on the back row?  Okay.  Anybody besides Mr. Patterson on the next row?  All right.  Mr. Broyles?

PROSPECTIVE JUROR BROYLES:  I believe we have a right to bear firearms and I think we have the right to use them to defend ourselves and our families.

THE COURT:  All right.  Thank you.

All right.  Anyone else on that row?  I saw you nodding along, Ms. Davis.  Do you agree with that?

PROSPECTIVE JUROR DAVIS:  Yes, full support.

THE COURT:  And I just saw Mr. Peoples nodding.

Anyone else on that row besides Mr. Peoples?

Okay. How about next row, Mr. Gallman's row? Okay. Mr. Gallman?

PROSPECTIVE JUROR GALLMAN: I agree with exactly what they said.

THE COURT: All right. Anyone else in that row? Let's see. Mr. Poteracki, as well.

PROSPECTIVE JUROR POTERACKI: Yes.

THE COURT: Anyone else? Yes, sir, Mr. McDaniel.

PROSPECTIVE JUROR McDANIEL: Same.

THE COURT: Anyone else in that row? Mr. Craft?

PROSPECTIVE JUROR CRAFT: Yeah. Guns don't kill people; people kill people.

THE COURT: All right. Thank you. Yes, Ms. Bryant.

PROSPECTIVE JUROR BRYANT: Same as they first said. I believe they have a right to own guns for protection for yourself. I do believe it should be regulated.

THE COURT: You think there needs to be more regulation right now?

PROSPECTIVE JUROR BRYANT: I do.

THE COURT: Thank you for that. And let's see. Last row. Okay. No hands that I see. Thank you, folks. That was helpful.

Anyone here who is familiar with the area around Adams Gap in the Cheaha wilderness area in Cleburne -- Clay/Cleburne

County and the nearby area, Cheaha State Park and Talladega National Forest?  Anybody just very familiar with that area?

(No audible response.)

THE COURT:  All right.  So you can picture that area as we're sitting here.  All right.  I didn't see any hands.

PROSPECTIVE JUROR GRAY:  Well, I'm very familiar with Cheaha but I'm -- not that personal area.  So is that what you're asking?

THE COURT:  Yeah, just if you know that particular area I just referenced.

PROSPECTIVE JUROR GRAY:  Not on the Cleburne County side.

THE COURT:  But you know Cheaha generally?

PROSPECTIVE JUROR GRAY:  Yes, sir.

THE COURT:  Okay.  And I saw Mr. -- I'm sorry.  Is that Mr. Folsom?

PROSPECTIVE JUROR FOLSOM:  Yeah.  Pretty much grew up up there.

THE COURT:  You grew up up there?

PROSPECTIVE JUROR FOLSOM:  Me and my grandmother and grandfather lived at -- pretty much at the base of Cheaha.

THE COURT:  Okay.

PROSPECTIVE JUROR FOLSOM:  Run all over.

THE COURT:  Highest point in Alabama; right?

PROSPECTIVE JUROR FOLSOM:  Yeah.

THE COURT:  But are you familiar with Adams Gap?

PROSPECTIVE JUROR FOLSOM:  Is that on the Clay County side?

THE COURT:  You're asking me geography questions?

PROSPECTIVE JUROR FOLSOM:  I mean, all over it.

THE COURT:  Fair enough.  That's what we needed to know.  That's helpful.

Anybody else in the back?  All right.  Did I get everybody in the jury box?  All right.  Anybody else in the back?

(No audible response.)

THE COURT:  Thank you-all.

All right.  So, folks, here's an important question for everybody on the jury.  We all have different views about different things.  That just came across when I asked what's your view about guns; okay?  Now, everybody's entitled to their own opinions.  That's what makes America great.  But when it comes to applying the law, no one who ends up on this jury is entitled to their own view of the law.  You have to follow what I say about what the law is because -- and I'm going to tell you this -- when we pick a jury and I start instructing the jury, if you think about it, every trial has two judges.  Every jury trial has two judges.  You-all will form the trier -- you'll become the trier of the facts if you're on this jury.  It's for you to decide what the facts

were.  And I can promise you that I will not do anything to influence you about trying to determine what the facts are in this case.  When I try -- I used to try cases myself when I was a lawyer 20 years ago plus, and it used to really make me mad when the judge tried to influence the jury in fact-finding even when I thought the judge was doing it kind of in my client's favor.  I just -- I thought that was wrong.  That's not -- that's not the judge's job.  And I'm going to stay on my side of the line.  I'm going to stay in my lane.  But the same thing is true:  You have to stay in your lane on the law. You have to trust me on what the law is.  And you're not entitled to impose your view about the law regardless of what your view about the law is.  Otherwise, the system doesn't work; okay?

So I'm going to give you -- if you end up on the jury, I'm going to give you instructions about what a felony murder is, what the elements of that are, what a kidnapping is, what a robbery is and elements about that instruction.  We're going to talk about what's a legal versus an illegal possession of a weapon.  We might get into that.  What I want to hear from you right now, is there anyone here who just doesn't think, based upon how your life experience is, that you can set aside what you think the law should be, even what you think the law is, and follow what I tell you about the law in this case? Anybody who just thinks they couldn't do that?

(No audible response.)

THE COURT:  Okay.  I don't see any hands.

Now, one of the witnesses you're going to hear from in this trial, we think, is someone who was charged with crimes related to the same incident and will be appearing to testify in this case as part of a plea agreement.  Now, that's perfectly lawful under our laws, and this goes back to what I just said about you're going to have to follow my instructions.  What I'm going to tell you, if you end up on the jury, is you have to treat those witnesses with a special attention and care because, you know, they -- if they're testifying in return for something, you have to give that testimony special attention.  And I'll give you instructions about that.

But you're still going to have to follow those instructions in deciding how to evaluate that witness's testimony.  So you can't go in with a blanket view that -- you can't take the view that anyone who's cooperating and admitting they did something wrong necessarily has to be telling the truth; okay?  Nor can you approach that testimony saying, well, anyone who's testifying in return for something necessarily can't be telling the truth.  You're going to have to evaluate the testimony as it comes to you, and at this point you can't have any views about that because you haven't heard the testimony yet.

Anybody who just feels strongly about -- either way -- about a cooperating witness, that they wouldn't be able to follow my instruction to you about what a cooperating witness's testimony -- how it should be handled by a jury? Anybody just feel so strongly about that, you couldn't follow my instruction?

(No audible response.)

THE COURT: Okay. I don't see any hands.

Now, one of the other things I'm going to tell you is that Ms. Pinkins sits here before you -- and I'm going to tell you this in the introductory instructions I'm going to give you at the very beginning of the case once we've started the case, once we've selected the jury, 13 of you-all are sitting in that box right there, and that is in a criminal case you have to approach it this way: One, Ms. Pinkins is considered innocent until proven guilty; okay? Two, she has no obligation to testify in this case; okay? And you can't hold it against her if she doesn't testify, because the burden -- and this is number three -- the burden of proof is always on the Government, remains with the Government, never leaves the Government; okay? And that's one of those things that has been around since the 1700s, because that's not the way we used to do it in England -- the way they used to do it in England. So we built in constitutional protections for anyone who has been charged with a crime in a case.

Anyone here who thinks they couldn't follow those instructions and that approach in this case?

(No audible response.)

THE COURT:  Okay.  All right.  I've asked the questions that I think I need to ask for right now.  It's the lawyers' turn.  So who from the Government has voir dire questions they would like to pose to this panel?

MR. FELTON:  I will, Your Honor.

THE COURT:  Mr. Felton, you may proceed when you're ready.  Please give your attention to Mr. Felton.  And, Counsel, obviously you're going to have a chance to follow up with a handful of people we identified already.  We'll see if there's any others --

MR. FELTON:  Very well.

THE COURT:  -- we need to circle when we get finished with your questioning.

MR. FELTON:  Good afternoon.  I'm Brad Felton, again, with the United States Attorney's Office.  So I have a few follow-up questions, but the Court has already checked off a lot of the questions that I wanted to ask.  So I just wanted to follow up on some and give a few questions related to the case.

We talked a little bit about law enforcement officers and whether you -- having law experience or law enforcement experience.  But I don't remember how specifically we got

about do you have somebody very close to you, that is, brother, father, son, daughter, that is a law enforcement officer in the community. And when I -- I'll ask these questions. I'll go to the box first and then I'll come this side first -- second. So in the box, does anybody have very close family members that have -- that are law enforcement officers?

Yes, ma'am. Miss Mullins.

PROSPECTIVE JUROR MULLINS: Yes, sir. Do I to stand?

MR. FELTON: Yes.

PROSPECTIVE JUROR MULLINS: Sorry. My soon-to-be father-in-law, he's a detective for Pell City Police Department.

MR. FELTON: All right. And the follow-up question I'll give to everybody is, is there anything about that experience that would cause you to have any bias one way or the other in this case or would that impede you in any way listening to this case?

PROSPECTIVE JUROR MULLINS: No, sir.

THE COURT: All right. Anybody else in the box? In the audience? First row? Second row? Yes, ma'am.

PROSPECTIVE JUROR VINCENT: My dad is an ex-police officer and my brother-in-law is on the SWAT team in California.

MR. FELTON: Okay. In the -- so he's in the law firm

-- connected to the law firm there?  That part of the family?

PROSPECTIVE JUROR VINCENT:  Yeah.  Pretty large family.

MR. FELTON:  And then again, anything that would cause -- impede you in any way listening to this case because of that relationship?

PROSPECTIVE JUROR VINCENT:  No.

MR. FELTON:  All right.  In the third row?  The fourth row?  Yes, sir.

UNIDENTIFIED PROSPECTIVE JUROR:  My son was just sworn in as a police officer.

MR. FELTON:  Okay.  And where is that?

UNIDENTIFIED PROSPECTIVE JUROR:  In Memphis.

MR. FELTON:  In Memphis.

UNIDENTIFIED PROSPECTIVE JUROR:  It's actually in Bartlett.  He is in the Memphis Police Academy right now.

MR. FELTON:  All right.  And again, the follow-up question, anything about that experience or that connection that would cause you to have any issues in this case one way or the other?

UNIDENTIFIED PROSPECTIVE JUROR:  No, sir.

MR. FELTON:  All right.  Last row?

(No audible response.)

MR. FELTON:  All right.  I expect that this case will have some evidence about living off-grid.  Is everybody

familiar with that term, in the box, living off-grid?  Living outside of social norms and government and, you know, regulatory things?  Has anybody in the box had any experience with a close family member or themselves attempting to live off-grid?  Or do you have any questions what that means?  But living in a national park or in public land without any supervision or government supervision at all?  Anybody had experience with that?

In the audience?  Yes, yes.  You mentioned earlier that you know a little bit about bushcraft; is that right?

PROSPECTIVE JUROR CARROLL:  I don't know "a little," but I practice it as a hobby.

MR. FELTON:  You practice it as a hobby.  Okay.

PROSPECTIVE JUROR CARROLL:  Yeah.  So primitive survival skills.  I don't live off-grid but I do enjoy learning primitive skills.

MR. FELTON:  So fire starting, primitive shelters, and all those kinds of things?

PROSPECTIVE JUROR CARROLL:  Yes.

MR. FELTON:  All right.  Okay.  Anything about that experience, knowing that this case will involve that, that would cause you any issue listening to cases where either witnesses or the defendant lives off-grid?

PROSPECTIVE JUROR CARROLL:  (Shakes head negatively.)

THE COURT:  For the record, that was Ms. Carroll?

PROSPECTIVE JUROR CARROLL:  Yes, sir.

MR. FELTON:  Oh, I'm sorry.

THE COURT:  This helps my court reporter to get the name.

MR. FELTON:  And in relation to living off-grid, sometimes those that live off-grid practice different types of religion, including dark magic or black magic, types of magic, spells, and things like that.  Anybody have any experience with that?  Anybody in the audience?

(No audible response.)

PROSPECTIVE JUROR ADAMS:  I think I know what this case is.  I remember reading this case.

THE COURT:  Let me hold you right there and we'll talk to you individually about that.

PROSPECTIVE JUROR ADAMS:  Okay.  Yeah.  That just triggered some article or --

THE COURT:  That's fine.  We're going to follow up with you.  Thank you.

MR. FELTON:  Ultimately, ladies and gentlemen, this case will involve you having to pass judgment on another individual related to the facts of the case.  But you do not consider punishment.  That is for the Court solely to consider punishment.  Does anybody have any social or religious reasons that they feel like I just can't do that religiously or socially or morally, can't pass judgment on another individual

and be on a jury?  Anyone in the box?

(No audible response.)

MR. FELTON:  Anyone in the audience?

(No audible response.)

MR. FELTON:  Also in relation to this case, you will be listening to evidence related to aiding and abetting.  That is a concept of the law that relates to words, assistance, encouragement, support, and/or presence to another individual's crime.  So you have to listen to evidence related to aiding and abetting someone else involved in a crime.  Does everybody understand what that concept -- or have heard of that concept of law before in the box?  Okay.  Anybody in the audience have not heard of aiding and abetting before?

(No audible response.)

MR. FELTON:  Okay.  Does anybody believe they could not sit on the case and listen to the Court and ultimately -- all the law comes from the Court, and the Judge will tell you the law related to that.  But as I said, it involves words, assistance, encouragement, support, and/or presence in relation to the case to complete a criminal activity.  Does anybody in the box and in the audience feel as though if they were to listen to that evidence that they could not pass judgment on someone if they believed, in relation to the case, that the elements were met related to the idea and concept of law of aiding and abetting another?  Does that make sense?

Does everybody understand what I'm talking about, that you could listen to evidence and say I cannot be involved with aiding and abetting in relation to a case?  Anybody would have an issue with that concept of law?

(No audible response.)

MR. FELTON:  Anybody in the audience, if you heard evidence related to aiding and abetting, you could not sit in judgment of another person related to that concept of law?

(No audible response.)

MR. FELTON:  I will say that, as the Court has told you what some of the charges are, this case does involve the intentional murder of another individual, the death of another individual.  So you will hear evidence and see evidence of graphic pictures and/or audio evidence related to the death of another individual.  Does anybody have any issue or think that they could not sit where they have to listen to evidence that deals with graphic things in nature of the death of another individual?

(No audible response.)

MR. FELTON:  The Court gave some instruction and some questions about defending yourself related to a firearm.  And I'll ask, first in the box, has anyone had to personally defend themselves with a firearm before?  In the box?

(No audible response.)

MR. FELTON:  In the audience?  Yes, sir.  Oh, sorry.

Mr. Patterson.  Yes, sir.  Okay.  And we can bring that -- and I think we had some follow-up questions with you as well.

Anybody else?

(No audible response.)

MR. FELTON:  Can I follow up with Miss Vincent?  Miss Vincent, I was curious and wondering, what kind of law does your father practice in California?  It's your father; correct?

PROSPECTIVE JUROR VINCENT:  Father-in-law.  Personal injury.

MR. FELTON:  Personal injury.  Okay.  Not criminal law.

PROSPECTIVE JUROR VINCENT:  No.

MR. FELTON:  Spouse the same?

THE WITNESS:  Yes.

MR. FELTON:  I don't think I have any further questions, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Wilson, does that leave you any questions to ask?

MR. WILSON:  Yes, sir.

THE COURT:  You may proceed when you're ready.

MR. WILSON:  Can everybody hear me okay?  I've been told I'm hard to hear once in a while.  Can everybody in the back hear me?

All right.  Miss Adams, you expressed some strong

opinions on guns.  Just out of curiosity, do you think gun manufacturers should be held responsible for what happens with their products?

PROSPECTIVE JUROR ADAMS:  No.

MR. WILSON:  Okay.  Can you tell me why not?

PROSPECTIVE JUROR ADAMS:  Because at the end of the day, we're all still responsible for our own actions.

MR. WILSON:  Thank you.

How many gun owners do we have?  I know we've talked about opinions on guns.  Okay.  Nearly everybody.  Okay.  How many people have ever bought -- I'm sorry, not bought -- has ever sold or given someone else a gun?  Your name, sir.

PROSPECTIVE JUROR FOLSOM:  I'm Joshua Folsom.

MR. WILSON:  Mr. Folsom, you have given or sold a gun before?

PROSPECTIVE JUROR FOLSOM:  Oh, yeah.

MR. WILSON:  Sir?

PROSPECTIVE JUROR FOLSOM:  Oh, yeah.

MR. WILSON:  Multiple times?  Should you be held any kind of -- hold any kind of responsibility for what happens with a gun that you give to somebody else?

PROSPECTIVE JUROR FOLSOM:  I wouldn't think so, because you hold responsible the gun manufacturer?

MR. WILSON:  Sir?

PROSPECTIVE JUROR FOLSOM:  The gun dealer that sells?

MR. WILSON:  Just should you be personally responsible for anything that happens to a gun you gave somebody else?

PROSPECTIVE JUROR FOLSOM:  No.

MR. WILSON:  Right.  Can you tell me why?

PROSPECTIVE JUROR FOLSOM:  Because I'm not making their decision.

MR. WILSON:  Thank you.

We've asked some questions about law enforcement.  Has anybody here ever applied for a job as a law enforcement officer?

(No audible response.)

MR. WILSON:  Evan Craft, how you doing, man?

PROSPECTIVE JUROR CRAFT:  I'm good.  How you doing?

MR. WILSON:  What year did you graduate?

PROSPECTIVE JUROR CRAFT:  2011.

MR. WILSON:  Okay.  I was '09.  Your hair's gotten longer; mine's gotten shorter.

PROSPECTIVE JUROR CRAFT:  Yeah.

MR. WILSON:  We did hang around some of the same people, though.

PROSPECTIVE JUROR CRAFT:  Yeah.  It's been a while since --

MR. WILSON:  Okay.  And you can put that aside and not be Team Me just because we've met each other?

PROSPECTIVE JUROR CRAFT:  Oh, yeah.

MR. WILSON:  Miss Carroll, you said you knew Mr. Cross?

PROSPECTIVE JUROR CARROLL:  Yes, sir.

MR. WILSON:  Are you more likely to trust him over me or trust arguments he's making more than arguments you hear from me?

PROSPECTIVE JUROR CARROLL:  No, sir.

MR. WILSON:  Well, Judge, I think that's all of the questions I have.  Thank you.

THE COURT:  All right, folks.  Remember what I said downstairs to you-all about jurors in cases?  I said a lot downstairs.  But I'm about to give you the point I'm asking about.  I said that there are different jurors for different cases just like there are different lawyers for different cases.  Remember you heard me say you don't want me drafting your will?  Okay.  But 20-plus years ago, if you wanted to try a case in federal court, you might have called me and hired me to do that.  That's what I used to do.

Having said that, there are different jurors for different cases.  Anybody who's been sitting here listening to what this case generally involves who's thinking, you know, I'm just not sure this is the right case for me?  I ought to get selected on a different case than this one?  Anybody who has that view in the jury box?  In the back.  Okay.  Thank you, Mr. -- yes, we're going to follow up with you anyway,

Mr. Patterson.  Thank you.

Anyone else besides Mr. Patterson in the back?  Okay.

We're going to -- we think this case will try in three or four days, so be finished this week, we think.  Of course, my mentor, who raised me in the law, used to tell me it always takes longer than you think.  But we're pretty confident we'll have the case tried this week.  Anything going on with anybody this week that's going to be a distraction to you and cause you not to be able to focus on this case?  Because both sides deserve your attention during the course of the trial.

Okay.  All right.  Last -- yes, sir.  Let's see.  I saw a hand go up in the back, and that is Mr. McDaniel?

PROSPECTIVE JUROR McDANIEL:  Yes, sir.  I've got vacation time scheduled Thursday through part of next week.

THE COURT:  All right.  So you're -- when are you leaving Thursday?

PROSPECTIVE JUROR MCDANIEL:  Yes, sir.

THE COURT:  I mean what time are you leaving Thursday?

PROSPECTIVE JUROR MCDANIEL:  Probably Thursday morning.

THE COURT:  Thursday morning.  Okay.  We'll take that into account.

All right.  Yes.  Let's see.  Ms. Vincent?

PROSPECTIVE JUROR VINCENT:  My dance studio is set to perform Friday through Sunday.

THE COURT: Friday through Sunday?

PROSPECTIVE JUROR VINCENT: Yeah.

THE COURT: Okay. What time do you-all usually perform?

PROSPECTIVE JUROR VINCENT: Yeah. We won't -- it'll be, like, 4:00 Friday.

THE COURT: Again, I think we're going to take three or four days to try this case. Now, the jury is going to get the case and have to decide the case after that. All right. Thank you for letting us know that, too.

Okay. So last question: You might be sitting there going, this judge isn't very good because he has not asked me about "that" yet and it seems like somebody ought to ask me about "that" before they put me on this jury. Anybody have a "that" in your mind that you've been waiting to get questioned about? This is my Catch 22 question to capture what we should have asked. Anybody in the jury box?

(No audible response.)

THE COURT: Anybody in the back?

(No audible response.)

THE COURT: Okay. So here's what we're going to do. Everybody but the following persons can head downstairs. As I said, lunch on me. Ms. Adams, stay where you are, and Ms. Foshee stay where you are. Mr. Patterson, Mr. Broyles, Mr. McDaniel, and Mr. Craft.

Anyone else, Counsel, besides those six?

MR. WILSON:  Not from the defense, Your Honor.

THE COURT:  All right.  Thank you, Mr. Wilson.

Mr. Felton, anyone else?

MR. FELTON:  Just a second -- just a second, Your Honor.

THE COURT:  Take a moment.

MR. FELTON:  I think that's all, Your Honor.

THE COURT:  All right.  So if I just called your name, those six, stay where you are.  Everybody else can head back downstairs.  Karen will let you out of the courtroom.  And we'll go from there.

(Prospective jurors exited the courtroom.)

THE COURT:  All right.  If your name was called and your name is not Ms. Adams, come stand up by this door to my right, not the one that says "Exit" over it but the one with the red light button facing you.  Karen's going to let you all in -- that's the jury room.  She'll let you in the jury room and we'll call you out one at a time.  And as soon as we get done questioning each of you, we'll send you down for lunch. How does that sound?  Ms. Adams has figured out we're going to start with her.

Okay.  Counsel ready to start with individual questioning?

MR. WILSON:  Yes, Your Honor.

MR. CROSS:  Yes, Your Honor.

THE COURT:  All right.  Ms. Adams, you had an epiphany.

PROSPECTIVE JUROR ADAMS:  I did.

THE COURT:  You know something about this case.

PROSPECTIVE JUROR ADAMS:  I don't know that -- I don't -- it sounds real familiar to stuff I've been reading over the last couple of months.

THE COURT:  Okay.  It did -- this case has received some media attention, to be sure.

PROSPECTIVE JUROR ADAMS:  And, yeah, as soon as you start about off the grid and the general geographic area, I'm fairly certain I've read several articles.

THE COURT:  All right.  So pro tip, kind of like what I told you about the television shows on the media --

PROSPECTIVE JUROR ADAMS:  It's not real life.

THE COURT:  -- the media doesn't always get it right, and what the media says has nothing to do with this case because, look, they've got sources, so that's not evidence.  Any problem putting aside what you've heard about this case or might have seen about this case in the media and saying, I'm going to just try this case based upon the facts presented to me at trial?

PROSPECTIVE JUROR ADAMS:  I don't have any problem with it because I'm not sure what I remember.  I just wanted

to be honest.

THE COURT:  Well, then, that's fine.  I appreciate that.  You did exactly what I asked you to do and that is to follow up if anything sparks a recollection.  But you're confident you can set aside any of that, not even try to remember it, just base your verdict on the evidence in this case?

PROSPECTIVE JUROR ADAMS:  Yes, sir.

THE COURT:  Okay.  Any follow-up to that, Counsel?

MR. WILSON:  No, Your Honor.

MR. CROSS:  No, Your Honor.

THE COURT:  Thanks again in following through on what I asked you to do.

(Prospective Juror Adams exited the courtroom.)

All right.  And then bring out Ms. Foshee, Karen.

All right, Ms. Foshee.  Just for the benefit of you and everyone else so they didn't hear anything related to you personally, I just wanted to give you a chance to talk to us individually.  I think you mentioned that someone within your close circle of friends and/or family member have been a victim of violent crime.

PROSPECTIVE JUROR FOSHEE:  Yeah, and I was, too.

THE COURT:  You were, too.  Okay.  Thank you.  So tell us what we need to know about that.

PROSPECTIVE JUROR FOSHEE:  Well, I was a victim of

domestic violence, and my daughter's father -- I'm from Boston.  My daughter's father was kidnapped and killed in '03.

THE COURT:  Okay.  I'm sorry to hear that.  What part of Boston are you from?

PROSPECTIVE JUROR FOSHEE:  Massachusetts.

THE COURT:  I know.  But, I mean, is there a --

PROSPECTIVE JUROR FOSHEE:  Roxbury.

THE COURT:  Yeah, sure.  My -- I've got family --

PROSPECTIVE JUROR FOSHEE:  Right near Fenway Park.

THE COURT:  Yeah.  I've got a son who is a pastor up in Foxborough --

PROSPECTIVE JUROR FOSHEE:  Okay.

THE COURT:  -- right on the Patriots' doorstep. Obviously, those are tragic situations in both situations. Would you be able to set aside what happened in those cases, unrelated to this case, and try this case fairly based upon the evidence and the instructions I give you?

PROSPECTIVE JUROR FOSHEE:  Yeah.

THE COURT:  Okay.  Any follow-up to that, Counsel?

MR. FELTON:  Not from the Government, Your Honor.

MR. WILSON:  Not from the defense, Your Honor.

THE COURT:  All right.  I'm going to let you go get some lunch.

(Prospective Juror Foshee exited the courtroom.)

THE COURT:  Folks, is there a motion to strike

Mr. Patterson for cause before we even hear anything further?

MR. WILSON: I liked him.

THE COURT: You liked him? Then you're not making the motion. Okay. We'll bring him out if there's not a motion to strike him for cause. He said that he didn't think he could try this case, so I don't know what we need to hear.

MR. CROSS: Do you want to make a motion or hear what he has to say?

MR. FELTON: Can we just hear what he --

THE COURT: Let's hear what he has to say. I'm trying to save you five minutes, but that's okay. You don't need those five minutes. All you're doing is trying a case this week.

Mr. Patterson, when did you buy your T-shirt?

PROSPECTIVE JUROR PATTERSON: Huh?

THE COURT: When did you get that T-shirt?

PROSPECTIVE JUROR PATTERSON: I got it about two weeks ago, Pigeon Forge.

THE COURT: Is this its maiden voyage out in the public?

PROSPECTIVE JUROR PATTERSON: Yes, sir, sure is.

THE COURT: All right. So you just picked the -- showing up for jury -- to decide I'm going to put that T-shirt on?

PROSPECTIVE JUROR PATTERSON: Well, you probably

wouldn't want me to wear my Trump T-shirts.

THE COURT:  Well, there you go.  You got that for you. All right.  I think these lawyers have some questions for you based on what you told us during the general voir dire session.

Anything from the Government?

MR. FELTON:  Mr. Patterson, you said that you didn't feel like you could sit on this case.  Can you tell us why you feel that way?

PROSPECTIVE JUROR PATTERSON:  What, that I couldn't sit on this case?

MR. FELTON:  Yes.

PROSPECTIVE JUROR PATTERSON:  Yeah, I have a problem with the Government politics and I just -- I don't want to be a part of this.

MR. FELTON:  All right.  Thank you for your honesty. I appreciate that.

THE COURT:  Mr. Wilson?

MR. WILSON:  Mr. Patterson, I'm not sure what you mean by the Government and politics.  But if you were selected for the jury and the Judge instructed you on what the law was and what decision you have to make, would you be able to follow his instructions and make a decision?

PROSPECTIVE JUROR PATTERSON:  You don't understand what -- politics is crooked; okay?

MR. WILSON: The basis of this trial is not political. So what I'm asking you is, if you're selected to be on the jury and the Judge asks you to listen to the evidence impartially, without any bias, would you be able to do that?

PROSPECTIVE JUROR PATTERSON: No.

MR. WILSON: I have a motion to strike for cause.

THE COURT: All right. You can go get some lunch. Thank you, sir. We'll let you go out that door right there.

(Prospective Juror Patterson exited the courtroom.)

THE COURT: I take it there's no objection to the defense motion?

MR. FELTON: No objection. But I thought it was worth hearing, though.

THE COURT: You know, I am much better off than I was five minutes ago. All right. Mr. Wilson's motion is granted. Mr. Patterson is excused for cause. Okay.

MR. CROSS: Anybody surprised he's had to defend himself?

THE COURT: No comment.

All right. Bring in Mr. Broyles, who I think had a bad experience and also had something connected with violent crime.

All right, Mr. Broyles. Thank you for hanging around. I think you answered two -- you gave us two responses that we wanted to follow up on. One, I think you had indicated that

some -- either you or someone close to you had had a bad experience with law enforcement, and also, I think you answered a question about violent crime that we wanted to follow up on.  So why don't you just tell us what we need to know about those two subject areas.

PROSPECTIVE JUROR BROYLES:  Well, which -- first thing was about the judicial system maybe but I may have misunderstood your question.  But --

THE COURT:  Yeah, just a bad experience with the judicial system, yes, sir.

PROSPECTIVE JUROR BROYLES:  When I was a young boy, ten years old, my grandmother's neighbor walked across the road, knocked on her door.  When she came to the door, he shot her seven times through the screen door with a .22 rifle and killed her.  He was finally charged with second-degree murder, sentenced to 20 years, which -- and he only served 14 of those 20.  I don't believe -- I believe it was a miscarriage of justice.  I think he deserved to be killed and I think he got off.  He come by our house and waved as he came by just flaunting the fact that he killed her and almost got away with it.  He spent 14 years in prison for it.

THE COURT:  Yes, sir.  I understand.  That's tragic.

PROSPECTIVE JUROR BROYLES:  And I've had no confidence in the judicial system since then.

THE COURT:  And that's also the experience you've had

with violent crime as well?

PROSPECTIVE JUROR BROYLES:  Well, I've had two more. I had a brother-in-law that was killed in 1976.  A man walked to his door.  He answered the door and he shot him twice with a .22 rifle and killed him.  He also was charged with second-degree murder.  This happened in Texas.  And then I have a cousin that -- she was shot by her cousin's husband supposedly in -- again, with a .22 rifle, and killed.  He turned the gun on hisself, supposedly, and killed hisself. But I've dealt with violent crime some, but the first one, my grandmother, impacted me considerably.

THE COURT:  Pretty substantially.  Well, that's my next question is, would you be able to set aside those experiences and be a fair juror in this case?

PROSPECTIVE JUROR BROYLES:  It would be hard to do, you know.  That's -- when he killed my grandmother, he destroyed my family, basically.  He could have just killed every member of that family because that basically destroyed the family when he did that.

THE COURT:  Right.

PROSPECTIVE JUROR BROYLES:  I feel like my family deserved justice and they didn't get it.

THE COURT:  Yes, sir.  Understand.

PROSPECTIVE JUROR BROYLES:  Whether or not it would temper my ability, I couldn't say.

THE COURT:  All right.  Any follow-up from the Government to that line of questioning?

MR. FELTON:  No, Your Honor.

THE COURT:  Mr. Wilson?

MR. WILSON:  No, Your Honor.

THE COURT:  All right.  Thank you, sir.  We'll let you know where things stand.  But you can head down and get some lunch on me, though.

PROSPECTIVE JUROR BROYLES:  All right.  Thank you.

THE COURT:  Thank you, sir.  She's going to let you out that door right behind you where it says "Exit."

(Prospective Juror Broyles exited the courtroom.)

THE COURT:  All right.  Hold on, Karen.

Is there a motion?

MR. WILSON:  Yes, sir, motion to strike for cause.

MR. FELTON:  No objection.

THE COURT:  No opposition.  It's granted.  All right.  So you have Mr. Patterson and Mr. Broyles have been excused for cause, and now we are dealing with Mr. McDaniel, who has, I remind you, a Thursday morning vacation and also has experience with violent crime.  I mean, there's a good chance he's going to miss his vacation if we keep him around, and he's already said he has a bad experience.  Any reason I shouldn't just excuse him with everybody's good graces?

MR. FELTON:  We have no opposition.

MR. WILSON:  No opposition.

THE COURT:  We'll just excuse him.  Our jury -- by the way, you all figured out, our jury assembly folks sent up 38, which gave us more room in the joints to play with respect to things like this.  I thought we might need that in this case for various reasons.  So we're fine with the numbers.

THE COURTROOM DEPUTY:  Just let him out?

THE COURT:  You can tell him he can head on down, and we're ready to talk to Mr. Craft.

THE COURTROOM DEPUTY:  Okay.

THE COURT:  And that'll be it; right?

MR. CROSS:  I think so.

THE COURT:  By the way, I'm giving Mr. McDaniel a lot of credit because he did not ask for an excuse based upon the vacation.  He just came up and let the lawyers know about that.  So I told him -- I told the panel I wasn't very interested in excuses today, so he did -- I thought he did things the right way.

All right.  So, Mr. Craft, you were two years behind Mr. Wilson --

PROSPECTIVE JUROR CRAFT:  Yes, sir.

THE COURT:  -- in high school?  I'm not going to use this time for you to catalog all of the things you observed during those two years you interacted with him, but what I will do is say that you indicated that you had an experience

involving violent crime, and I wanted you to just tell us about that.

PROSPECTIVE JUROR CRAFT:  Yeah.  My aunt was murdered.  I was really young.  I was, like, two.

THE COURT:  Right.

PROSPECTIVE JUROR CRAFT:  But yeah, it took them a while.  They caught the guy finally and somehow he only ended up doing three years in prison.  He's out now.

THE COURT:  Yeah, right.  What -- so is this on your dad's side or mom's side --

PROSPECTIVE JUROR CRAFT:  Mom's side.

THE COURT:  Your mom's sister?

PROSPECTIVE JUROR CRAFT:  Yes, sir.

THE COURT:  So obviously, that's tragic.  I know you're young, but still, you probably heard family stories about it since then.

PROSPECTIVE JUROR CRAFT:  Yeah.  I have a cousin that grew up without a mom, so --

THE COURT:  Right, right.  Would you be able to set aside that experience unrelated to this case and be a fair and impartial juror in this case?

PROSPECTIVE JUROR CRAFT:  Yeah.

THE COURT:  Okay.  Any follow-up with the Government to that?

MR. FELTON:  No, Your Honor.

THE COURT:  Mr. Wilson?

MR. WILSON:  Mr. Craft, you said he only served three years in prison.  That sounds like a plea deal.  Is that what happened?

PROSPECTIVE JUROR CRAFT:  I think.  They kind of kept us -- my family kind of kept us in the dark.

MR. WILSON:  Do you remember if it went to trial or not?

PROSPECTIVE JUROR CRAFT:  I don't know.  I think I was 15, because he got out right before -- right when I turned 18.

MR. WILSON:  If evidence in this case included another person who took a plea deal in exchange for a lighter sentence and testimony, would that affect your ability to be unbiased?

PROSPECTIVE JUROR CRAFT:  No.

MR. WILSON:  It would not?

PROSPECTIVE JUROR CRAFT:  No.

MR. WILSON:  Okay.  Thank you.

THE COURT:  Okay.  Anything further from either side?

MR. FELTON:  No, Your Honor.

THE COURT:  All right.  Yes, Mr. Craft?

PROSPECTIVE JUROR CRAFT:  Listening to him talk, I know exactly what this case is now.

THE COURT:  Okay.  So you --

PROSPECTIVE JUROR CRAFT:  I live right at the bottom of the mountain.  I don't know the mountain, but --

THE COURT:  So when you say you know, that means you've heard about it or read about it.

PROSPECTIVE JUROR CRAFT:  I read about it.

THE COURT:  Okay.  So news flash.  The media and word of mouth --

PROSPECTIVE JUROR CRAFT:  Oh, yeah.

THE COURT:  -- doesn't always get it right.  Would you be able to set aside anything you've heard about this case and base your verdict solely on the evidence in the case?

PROSPECTIVE JUROR CRAFT:  Yeah.

THE COURT:  Okay.  Because I assure you that we can't try the case.  The newspaper -- look, journalists have to write a compelling story that gets everybody reading.  They cut out a lot of the details.  They might not get some of their details right.  Just put aside that.  Can we have that agreement?

PROSPECTIVE JUROR CRAFT:  Yes, sir.

THE COURT:  Any follow-up to that, Counsel?

MR. FELTON:  No, Your Honor.

MR. WILSON:  Mr. Craft, do you remember the articles you've read or facts from the articles you've read?

PROSPECTIVE JUROR CRAFT:  A little bit.

MR. WILSON:  Okay.  Would you not share those with the jury if you're selected?  Or would you tell them what you've read?

PROSPECTIVE JUROR CRAFT:  I mean, it depends.

THE COURT:  What if I told you don't?

PROSPECTIVE JUROR CRAFT:  If you told me no, then I won't.

THE COURT:  Again, just -- because if you're telling other jurors that, it makes a difference in your deliberations.  So that's the point is all the deliberations, all the thinking about this case, should be based solely on the evidence presented in the four corners of this courtroom and the law that I give you as part of the legal instructions in the case; okay?

PROSPECTIVE JUROR CRAFT:  All right.

THE COURT:  All right.  Thank you.  And Karen's going to let you out.  You can go get some lunch.

MR. WILSON:  Judge, I did have a follow-up.

THE COURT:  Oh, I'm sorry.  Go ahead, Mr. Wilson.

MR. WILSON:  Now, you said you wouldn't say anything about what you've read to the rest of the jurors.  But having read it, would it affect your decision-making process in the deliberation, your personal decision-making process?  If you heard something or read something in the news that you didn't hear or see in this courtroom, would that play a part in what you're thinking about as far as guilty or not guilty?

PROSPECTIVE JUROR CRAFT:  No.

THE COURT:  All right.  Thank you.

(Prospective Juror Craft exited the courtroom.)

THE COURT:  Okay.  Everybody have what you need to have in order to make decisions about our jury?

MR. FELTON:  Yes, Your Honor.

MR. CROSS:  Yes, sir.

THE COURT:  So we are now dealing with -- just to make sure everybody's on the same page, we're now dealing with 32 jurors eligible -- potentially eligible for sitting as the jury and the last three are up for alternate.  Obviously, if we're taking 12 plus a total of 16 strikes, six for the Government, ten for the defendant, that gets us to 28.  So I always tell folks, when it comes to math, I was a Carson-Newman linebacker and my math core was statistics for football players.  So don't count on me but let's double-check this together.

Looks to me like the following folks are not in play to be on this jury:  32, 33, 34, and 35.  Is that what you-all are coming up with?  If we had no excusals for cause, we would cut off after Juror 28, but since we had three strikes for cause, I think we cut off after Juror 31.  Sound right?

MR. WILSON:  Yes, Your Honor.

MR. FELTON:  32, 33, 34, 35 are --

THE COURT:  Yeah, 32 through 35, you don't need to waste any strikes on them, by my math anyway.  You go do your own math to double-check things; okay?

MR. CROSS:  Not to confuse everyone, but that's what is remaining?

THE COURT:  Correct.

MR. CROSS:  Okay.

THE COURT:  When you say "what is remaining," you mean --

MR. CROSS:  So actually, we're talking about Juror 36, Juror 37, Juror 38?

THE COURT:  No, because they're your potential alternate.

MR. CROSS:  Okay.

THE COURT:  So 36, 37, 38, we're going to -- the first one of those not struck -- that's a separate category, if you think about it.  The first one of those not struck will be your alternate; okay?

MR. CROSS:  Very good.

THE COURT:  So if you -- for example, if you were happy with either Mr. Johnson or Mr. Buckner, then don't strike anybody of those last three.  But if you have a preference between those two, you'd strike the one you don't have a preference about.  In other words, if you didn't want one of those to be the alternate.

Okay.  So let's talk about timing.  I'm thinking that -- let's get your strikes back to Karen by -- five till 2:00 work?  Give you about a little over an hour?

MR. CROSS:  Yes, sir.

THE COURT:  And that way it'll give her a little bit of time to make sure there's no -- get the information to me, no legal issues.  We'll dismiss the jurors shortly after that and bring the ones that are on -- among the 13 up.  And at some point after 2 o'clock we'll get started with my opening instruction, your opening statements, and we'll probably get some testimony on before we get out of here.

Now, one of the things I'm going to talk to the jury about in terms of opening instructions is, since they're driving over from various places, I suspect they're going to want to start at 9:00, not 8:30.  And I suspect they may want to knock off at 4:30, not 5:00.  I don't suspect that's going to make a difference in this case from what you-all told me about the length of trial, but why don't you-all be thinking about that over lunch, too, and give me what your thoughts are on hours of operation before we -- I make a call on that, if you want to.

MR. FELTON:  Yes, Your Honor.

THE COURT:  Okay.  What else do we need to take up for right now?

MR. FELTON:  Nothing from the Government.

MR. WILSON:  Do we have the demographic population statistics for the division that we're in?  The reason --

THE COURT:  I don't, but I'm sure they're available on

the Internet.

MR. WILSON:  The reason I'm concerned is we have, I think, three African-Americans in the entire pool and one of them is for sure not going to be on the jury, which leaves us two.  I don't want to try a case in front of an all-white jury.

THE COURT:  Yeah.  You'll just have to evaluate that, I guess, over the lunch period.

MR. WILSON:  Okay.

THE COURT:  Okay.  What else do we need to take up?

MR. FELTON:  Nothing I can think of.

THE COURT:  All right.  Thank you-all.

(Recess taken at 12:54 p.m. to 2:26 p.m.)

THE COURT:  I understand we do have legal issues to address with respect to the jury selection process; is that right?

MR. WILSON:  Yes, Your Honor.

THE COURT:  All right.  What are the issues we need to address?

MR. WILSON:  Your Honor, the defense has a Batson challenge as to the State's -- or the Government's preemptory strike of Tamara Foshee.  We have reason to believe it's based on race and gender.  She was the only black female that was even possible to make the jury and she was struck.  We would ask for the Government to provide a neutral reason for

striking her.

THE COURT:  All right.  What's the Government's position on this?

MR. CROSS:  Judge, for the record, I'm not so sure a prima facie case --

THE COURT:  Well, that's why I was asking what your position was, not anything else.

MR. CROSS:  I don't believe that a prima facie case has been made at this point.

THE COURT:  And for the record, so we can have a discussion about that with Mr. Wilson, what's your understanding of the prima facie case elements with respect to a Batson challenge?

MR. CROSS:  They would have to establish that based on the jury venire and then the race breakdown of then our strikes that it corresponds or is so disproportionate that it creates a situation where we are obligated to justify our strikes.

THE COURT:  Okay.  Why wouldn't the Government -- and so there's no dispute, you struck Ms. Foshee?

MR. CROSS:  That's correct.

THE COURT:  Right.  And why wouldn't striking the only black female on the panel not at least raise an inference of discrimination?  That would have to be disbursed with an articulated reason.

MR. CROSS:  Correct.

THE COURT:  Okay.  Why wouldn't that be the case?

MR. CROSS:  Your Honor, I don't think it's going to be a hard prima facie case to make, but for the record, I think it needs to be made.

THE COURT:  All right.  Well, but I've just asked you -- I think he said I've made a prima facie case because they struck the only black female on the panel.  Why isn't that sufficient?

MR. CROSS:  Your Honor, we'll accept that and --

THE COURT:  All right.  So let's go ahead and give me your reason for striking Ms. Foshee that's race-neutral.

MR. CROSS:  Your Honor, in this case, number one, there will be testimony involving the defendant and prior to -- prior to August there was a campsite in Cheaha National Forest and there were two black males involved, a Chief and a Sawhoo.  This was somewhat of a dysfunctional situation. There were allegations of physical violence going on.  But in addition to that -- and she was romantically involved with both gentlemen.

In addition to that, the defendant has a five-year-old child and there was a custody dispute over the child after this took place.  We're aware of evidence where the father of that child, there has been allegations of abuse made as to him and involving the defendant.  And we were afraid of this juror

relating or sympathizing with the defendant in that situation.

THE COURT:  Because of the domestic relations incident she had reported to the Court?

MR. CROSS:  Correct.

THE COURT:  All right.  I think that's a race-neutral reason.  Do you agree with that, Mr. Wilson?

M. WILSON:  Your Honor, the Government --

THE COURT:  First question is, do you agree that's a race-neutral reason?

M. WILSON:  Yes, Your Honor.

THE COURT:  All right.  So I think that the burden falls back on you, then, to explain why that's a pretext for discrimination again this juror -- this potential juror.

M. WILSON:  Yes, Your Honor.  The Government started their -- or responded to the Court, when asked to provide a race-neutral reason, that there were these two black guys, Chief and Sawhoo.  I don't know why their race is relevant. Furthermore, he's talking about custody issues and he's stricken her because of custody issues, and not another juror in the entire panel was asked about custody issues or issues relating to custody whatsoever.

THE COURT:  Well, this Ms. Foshee volunteered to the Court that she was in a -- experienced that based upon a general question posed by the Court; right?

MR. WILSON:  Yes, Your Honor.

THE COURT:  All right.  So I'm not sure I make much of the second point.

But, Mr. Cross, why did we start off with race of the two individuals who were --

MR. CROSS:  Quite frankly, I wasn't even aware I brought up their race.  Probably was providing it to the Court just for description so that we know who we're speaking of, because these two individuals -- several individuals have provided statements involving Chief and Sawhoo.  I certainly didn't mean anything racial by identifying the race to the Court.

THE COURT:  All right. Mr. Wilson?  Now, with that explanation, keep going.

MR. WILSON:  Nothing to add, Your Honor.

THE COURT:  All right.  I'm going to overrule the objection.  I find that the reason Ms. Foshee was struck by the Government was because she privately reported to the Court and counsel and court staff, in response to a question about whether anyone had been affected by violent crime, the fact that she had been the victim of domestic violence; also reported a separate matter involving violent crime, but she did focus in on -- her first incident she reported to the Court was domestic violence.  I think that certainly would be a concern of the prosecution's that someone in that circumstance would certainly be concerned about the defendant

being a victim of some kind of domestic relations violence, too. That doesn't disqualify her in any way, shape, or form from being a juror, but if I'm the Government and I'm exercising preemptory strikes, that would be something I would consider, and the Government considered that. So I'm going to overrule the Batson challenge.

Any other challenges that we need to take up?

MR. WILSON: Not at this time, Your Honor.

THE COURT: All right. You had raised earlier -- and let's just put the cards on the table. You had raised earlier a concern about the venire. I've got a report -- I told you I think that was available on the Internet, but I should have also said, you know, you're welcome to go down and check with our jury assembly folks. I guess I assumed you might do that. But I do have a couple reports that I'd be glad to give you so you can review them with your client just to satisfy yourself.

MR. WILSON: Sure, Your Honor.

THE COURT: One report has to do with what our jury assembly folks are required to provide in terms of report on the operation of the jury selection plan. But for context here, I think you're aware of the fact we have four separate jury areas.

MR. WILSON: Yes, Your Honor.

THE COURT: I was fairly new on the Court when our -- I call him my chief because he was the chief when I -- my

first chief I had when I came to the court was Judge Clemon -- led the Court through a review of our district-wide selection process, and he thought it would be more equitable to have juries selected in four separate jury areas.  Those four separate jury areas have been, since the Court approved that, the way we've drawn our juries.

So this is a report for the Eastern divisional area, which makes up our divisions Eastern in Gadsden.  And I think this report is dated -- well, I don't see a -- I'm sure the date's on here but I -- oh, here it is -- June 7, 2021.  That's the last report we have on file.

The second is -- the second is -- well, there's three reports.  The second is a report dated February 12, 2021, when the wheel that we use was created.  And the third report is the source list race-gender report for the entire pool, and the fourth is for this panel only.

So I'm going to give you those four things, give you a few moments to review those with your client and your counsel who's assisting you.

Government want to see these, too?

MR. CROSS:  Sure, Your Honor.

THE COURT:  All right.  So I'm going to ask you to share those with the Government.  If we need to make copies, I can get Karen to do that.  I think what you're going to find is there's three elements that you'd have to show in order to

challenge the venire. I think the first you can easily show, and that is that the group that you allege was excluded as a distinctive group in the community, I think that's clearly the case. I think the second and third elements are where you're going to have difficulty with any challenge that you were contemplating. I think you'd have to show that the representation of the group in the venires from the juries -- which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and third, that the underrepresentation is due to systematic exclusion of the group in the jury selection process. So I think those are the three elements you'd have to show for a successful challenge to the venire. Make sense?

MR. WILSON: Yes, Your Honor. In light of --

THE COURT: Do you need a few minutes to visit with your client about it?

MR. WILSON: I don't think we're going to raise that objection, Your Honor.

THE COURT: All right. I still -- I wouldn't mind you just making sure -- look, your client's got an important stake in this case. So, Ms. Pinkins -- why don't you just walk through with her maybe in nonlegalese what I just explained to you.

MR. WILSON: Yes, Your Honor.

THE COURT: And we'll take a short break to do that.

Other than that, we have a jury; right?

MR. WILSON:  Yes, Your Honor.

THE COURT:  So I'll just wait to hear from you just after you've talked to Ms. Pinkins to make sure that we're all squared away on where we stand; okay?

MR. WILSON:  Yes, Your Honor.

THE COURT:  And we'll be in a short recess until then.

(Recess taken at 2:37 p.m. to 2:41 p.m.)

THE COURT:  All right.  Just to be on the safe side, Counsel, I think I'm going to ask Karen to make these four reports I've shared with counsel court exhibits to the voir dire process, not to the trial itself but to the voir dire and jury selection process.  Any objection to that?

MR. CROSS:  No objection from the United States.

MR. WILSON:  No objection from the defense.

THE COURT:  I just wonder if anybody ever comes back and looks at what we did, I'd want them to know what information counsel and the Court had in assessing that particular issue; okay?

So, Karen, if there -- let me give you these four reports, and would you just make those a court exhibit to the jury selection portion of the trial?

All right.  Are we ready to bring up our jurors? Let's just make sure we have -- Karen, do you have the list there?

THE COURTROOM DEPUTY:  Yes, sir.

THE COURT:  Can I have it?

THE COURTROOM DEPUTY:  Yes, sir.

THE COURT:  Thank you.

All right, folks.  Let's just walk through and make sure that we are all on the same page about who our jurors are.  We have Ms. Clark, Juror 1; Mr. Woods, Juror 3; Mr. Hill, Juror 5; it was Ms. Tray, Juror 7, is that -- Tray?

THE COURTROOM DEPUTY:  Yes, Tray, T-R-A-Y.

THE COURT:  Yeah.  Ms. Harmon, Juror 8; Mr. Barrentine, 5 -- we call him Two County; Ms. Myers, 12; Ms. Yitram, or Yitram, 14; Peoples, 18; Brand, 21; Harper, 22; Gallman, 23.  Those are our 12 jurors, and our alternate is Mr. Johnson.  Is that right?  Everybody got that?

MR. FELTON:  Yes, Your Honor.

MR. WILSON:  Yes, Your Honor.

THE COURT:  Okay.  That's our jury.  We'll bring them up.  I'm going to ask Karen to hold onto her selection sheet.  All right.  We'll be in recess for a few moments until we bring the jury up.

(Jury entered the courtroom.)

THE COURT:  Pick your seat wisely.  You're never able to change.  Just kidding.

All right.  Have a seat, folks.  Thank you.  All right.  Ladies and gentlemen, I want to congratulate you on

being chosen as the most fair, impartial group to try this case.  What I'm going to do is ask Ms. Humphrey to call your names out.  Just indicate you're here so we can have a record of exactly who's seated as jurors, and then we're going to -- as I told you, we like to have you stand up and take oaths.  We're going to have you take one more oath.  That will control your conduct as jurors during the course of this trial; okay?

So, Karen, if you wouldn't mind.

THE COURTROOM DEPUTY:  Miss Clark.

JUROR CLARK:  Here.

THE COURTROOM DEPUTY:  Mr. Woods.

JUROR WOODS:  Here.

THE COURTROOM DEPUTY:  Mr. Hill.

JUROR HILL:  Here.

THE COURTROOM DEPUTY:  Miss Tray.

JUROR TRAY:  Here.

THE COURTROOM DEPUTY:  Miss Harmon.

JUROR HARMON:  Here.

THE COURTROOM DEPUTY:  Mr. Barrentine.

JUROR BARRENTINE:  Here.

THE COURTROOM DEPUTY:  Miss Myers.

JUROR MYERS:  Here.

THE COURTROOM DEPUTY:  Miss Yitram.

JUROR YITRAM:  Here.

THE COURTROOM DEPUTY:  Mr. Peoples.

JUROR PEOPLES:  Here.

THE COURTROOM DEPUTY:  Mr. Brand.

JUROR BRAND:  Here.

THE COURTROOM DEPUTY:  Miss Harper.

JUROR HARPER:  Here.

THE COURTROOM DEPUTY:  Mr. Gallman.

JUROR GALLMAN:  Here.

THE COURTROOM DEPUTY:  And Mr. Johnson.

JUROR JOHNSON:  Here.

THE COURT:  All right.  Everybody's name was called; correct?  And no one's sitting there whose name wasn't called?

(No audible response.)

THE COURT:  All right.  Please stand, raise your right hand, and let Ms. Humphrey administer this oath to you one more time.

(Jury was sworn.)

THE COURTROOM DEPUTY:  Be seated.

THE COURT:  And what was your case number you had on that?

THE COURTROOM DEPUTY:  22-cr-417.

THE COURT:  22-cr-417.  Good.  Thank you.

All right, folks.  Are we ready to proceed with opening instructions -- initial instructions and opening statements?  Government ready?

MR. FELTON:  Yes, Your Honor.

THE COURT:  Defense ready?

MR. WILSON:  Yes, Your Honor.

THE COURT:  All right, folks.  I'm going to give you some instructions, preliminary instructions.  Sometimes, when I would try cases back when I was a lawyer, we just selected the jury, we -- the lawyers would get up and make their opening remarks, we'd call the witness stand [sic], and I felt like the jury was over on the side of the courtroom looking at each other like, What are we supposed to do?  Nobody's really told us what's going on here.  And so we've started, the plane's taken off, and we haven't gotten instructions about anything.  So I've always made it a practice to walk through not a lot of information but some information just so you'll have some context about what we're doing and what your role is.

So, one of the things I'm going to ask you to do on our midafternoon break is to talk with each other and then discuss with Karen what would be best for you as far as the schedule of starting and finishing each day.  And I'm going to -- I don't usually do that with juries.  I usually decide when we're going to start and finish, but I am sympathetic to the fact that each of you are driving a pretty good little distance to be here with us, so I want to just defer to you about that.

Generally, we start about 8:30.  I can certainly

understand if you would say we would prefer 9:00 as far as a time to start with our commute that we have to make. Generally, go to 5:00 or 5:30. I could certainly see you saying we need to -- we would appreciate if we'd knock off about 4:30. Now, these times are approximate in terms of the ending time because if I've got a witness on the stand and we can wrap that witness up and get them going and not have to have them come back the next day, we might go a little longer. But I really would like for you-all to give me some feedback about what you're thinking about scheduling; okay? So that's the first thing.

We'll take a lunch break every day like we did today. We'll take a midmorning and a midafternoon break as well just to make sure everybody's fresh and has the opportunity to use the rest room as necessary. And again, those times may depend upon the flow of the evidence; okay?

I told you in voir dire essentially every trial has two judges. Every jury trial has two judges. I judge the law; you judge the facts. Again, I'm going to instruct you, you have to follow the law as I explain it to you. You can't follow your own notion of what the law is or ought to be. You have to apply the law as I instruct. At the end of the trial, I will give you my final instructions.

I'll give each of you a written copy of those so you'll be able to go back to the jury room and have your own

copy of the legal instructions and you won't have to remember what I said or -- you'll have that and it's going to be -- I think that makes your job a lot easier in following the instructions.

But what I want you to know for now is that your duty is to find the facts. And I'm not going to do anything in this trial that telegraphs to you in any way what I think the facts are in this case, what I think your verdict should be in this case. I really respect each of you being here today, and I'm going to give you the full lane to decide those things.

But what I am going to tell you is you have to find the facts from the evidence and nothing else. You have to go solely on the evidence. And so you're understanding that you're going to have to base your verdict on the evidence, but nothing I'm going to do during the course of this trial is going to give you any signal about what I think the evidence is or what I think the facts are or what I think your findings should be.

If you want to take notes during the trial, we're going to give you some writing pads and writing instruments to do that. You're not required to take notes. You may choose to take notes. What I would warn you about, though, is if you do end up taking notes, don't become so involved in your note-taking that you're distracted from the ongoing testimony in the case; okay? And remember that your notes are an aid to

your memory.  I'll give you more instructions about this in the final instructions, but they're to help you remember things, they're not to substitute for your memory of things; okay?

All right.  And what we'll do with the notebooks is have you leave them in your chair each time you leave the courtroom, and there will be a reason I'll explain in a minute why we do that.

So I said you have to find the facts from the evidence.  Let's talk about what evidence is and what evidence -- and what is not evidence; okay?  Here is what is evidence: testimony you're going to hear during the trial; documents that I'm going to allow in during the course of the trial; and you also have to pay attention to any stipulations the parties reach.  Now, in a criminal case you have to verify the stipulation.  You just have to make sure that the stipulation accords with what you understand.  But there's some -- there's at least one area where the parties don't disagree about where this occurred, where the incident occurred.  They very much disagree about whether the defendant's responsible for the incident but they don't disagree about where it occurred.

Let me tell you what's not evidence:  statements by the lawyers, arguments by the lawyers, even questions by the lawyers.  Now, you have to pay attention to the question to understand the answer because the answer a witness gives is

evidence.  But, for example, statements made by lawyers, those -- that is not evidence.

On objections -- let me give you a quick explanation about objections.  We operate in an adversarial system in our American judicial system.  When I say "adversarial," I mean we have two sides.  And they don't agree on some aspects of the case, and I expect that during the course of the case they may not agree on what's admissible evidence.  That's where I get called in to -- that's my job is to determine what is admissible evidence and what is not; okay?

So if you hear an objection, I wouldn't put a lot of attention in the objection.  If I sustain the objection, simply ignore the question.  If I overrule the objection, just give the answer that follows that question the weight you would have given it if no objection had been made to the question.  In other words, don't give any special attention to an answer just because the question was objected to.  And if I sustain the objection in part and allow something in for a limited purpose, I'll tell you the limited purpose it's coming in for and I'll explain to you the only thing you can consider that evidence for, and you have to follow my instruction about that.  That could very well occur during the course of this trial.  We'll see how things move along.  But I'll be very clear with you, when the time comes, that if I'm letting something in for a limited purpose that you can only consider

it for that purpose; okay?

The other thing is anything you hear outside the courtroom, including any media attention, is not evidence. And what I would ask you to do on that is just avoid seeing any media attention in this case. The media has an important job. They -- you know, they try to do that job well, but they're not jurors. They may not sit on the entire case like you are. They may not be following the evidence the same way you are because you're invested to try to make findings of fact. So a lot of times media accounts do not reflect what I would expect the judgment of jurors to be in marshaling through the evidence and finding the facts. So if there's any media attention in this case, just ignore it. Understand that you're in a much better position than the media to understand the facts, and you don't want that to influence the way you think; okay?

While I'm on that subject, I'm going to tell you a little bit about assessing the evidence and what you shouldn't do. I don't want you -- so let me -- before I give you instruction, I'm going to give you an analogy. When I was younger, I had -- I have three children. They were younger. Two of -- the two oldest were boys. Now, you may be totally shocked to hear this, but from time to time they may get into a dispute when they were younger. So -- and I might be in a different part of the house when the dispute occurred, and

then I might have to go to their -- where they were and they're in a full-blown disagreement.  Sometimes it went beyond words, and I would have to referee what happened and what was going to happen because of that.

Let me ask you this:  What would have happened if I would have pulled the oldest out and said "What happened?" and let him tell his side of the story and then took my action based upon what I heard from him without hearing from the younger one?  I probably wouldn't have got it right most of the time; right?

Well, that's the same thing with a trial.  You can't start reaching decisions or judgments about the facts of the case until you've heard all the evidence; all right?  So for that reason, we're going to ask you, one, hold off on any judgment about the facts until you've heard everything; and second, don't deliberate about the case until the very end of the case.  And what that means is don't walk into the jury room and start saying, "Well, what did you-all think of that evidence?"  You're going to have full opportunity to do that at the end of the case.

Also, that means don't go to lunch in twos or threes and talk about the evidence, because first, the other jurors aren't going to have the benefit of hearing what you make of that evidence.  They will at the end of the case when all of you-all are in the jury room evaluating it, discussing it, and

deliberating about it, but they're not going to have the benefit of hearing what you think because they're not party to that conversation.  Second, you're not going to get the benefit of hearing what they think.  And third, we know that what happens when we start making early discussions about a case like that, you may start putting down anchors about what you think of certain facts before you've heard everything and heard from all the other jurors about their assessment of that evidence.  So just hold off on doing any deliberating until the very end of the case, when you've heard everything, I've given you the green light to begin your deliberations, and you're doing it with the entire group.

I told you earlier during voir dire this is a criminal case.  I gave you the three rules for a criminal case.  I'm going to remind you what those were:  first, the defendant, Ms. Pinkins, is presumed innocent until proven guilty.  The indictment against her is an allegation, an accusation, nothing more.  It's not proof of guilt or anything else; therefore, she starts out before all of us, including you, with a clean slate; okay?

Second, the burden of proof is on the Government all the way to the end of the case.  So because Ms. Pinkins carries no burden in this case, she's not required to present evidence or even to testify.  And if she doesn't do those things, you can't hold that against her in any way in your

deliberations.  Your question at the end of the day is going to be, Did the Government carry its burden of proof; okay?

And the third rule is about the Government's burden of proof.  Its burden is to prove facts in this case necessary to secure a conviction beyond a reasonable doubt.  Now, I'll give you more instructions about that later in my final instructions in writing, but for now I want you to know that that is the heaviest burden that we have from the federal court system.  It's more -- it's a greater burden than we have in the civil cases where it's -- you're having to prove something more likely than not is true.  Here they're having to prove -- they're having to remove any reasonable doubt you might have about the defendant's guilt; okay?  Again, more about that later, but I just want to make sure you understood those three rules.

Now, I told you you're going to hear about four different charges involved in this case.  Count 1 -- and generally, you might hear the Court or the parties talk about counts.  So each charge is contained in a separate count, Count 1, Count 2, Count 3, and Count 4.  Count 1 alleges that the defendant either was involved in or aided and abetted in a felony murder.  I'll give you more instructions about that.  So this is not meant to be a precise instruction of law to you, but that's generally when a murder occurs during the commission of a felony; okay?  Separate felony; okay?

Second, the allegation is that the defendant was involved in kidnapping; third, that the defendant was involved in a robbery; and fourth, that the defendant used a firearm in furtherance of a crime of violence.  Again, more instructions about that at the end of the day, but I'm just giving you these -- this very quick helicopter ride over the various four charges in this case so you'll understand and be able to keep track of facts as they relate to these four separate charges; okay?

And I'll also give you instructions at the end of the case about what it means to aid and abet another -- that's abet, A-B-E-T -- aid and abet another in the commission of crimes.

As you heard earlier, I'll give you some instructions in the case about cooperating witnesses, somebody who's testifying under a plea deal.  We expect that to happen in this case.

All right.  So let me walk you through the outline of the trial now, I mean, what are the -- so right now I'm giving you preliminary instructions.  When we finish that, the lawyers will have a chance to make opening statements to you. That's their opportunity to stand before you and kind of give a road map of what they expect the evidence in this case to be.  Remember, what they say isn't evidence.  I invite you to test what they say about opening statements against what the

actual evidence is.  But that's their opportunity not to come and argue their case to you but just to kind of give you an opening statement that kind of introduces you to the case and what they expect you might hear during the course of the trial and the evidence.

Once opening statements are made, then we'll have the evidence in the case.  The Government will present its case in chief and we'll hear witnesses called to the stand.  They'll be examined.  Documents will be admitted into evidence.  Other tangible evidence may be admitted into evidence.  So anything I admit will be available to you in the jury room when you begin your deliberations.

Once the Government rests, the defendant has the option of putting on a case in chief; isn't required to, but if the defendant does put on a case in chief, then the Government would have the opportunity after that defense case in chief to present a rebuttal case.  The reason the Government gets to rebut the defendant's case in chief is it carries the burden of proof all through the case, so it has a chance to rebut what the defendant said if the defendant puts on a case; okay?

After that's finished, we'll have closing arguments and my final instructions to you.  Again, you'll get those in writing.  Then you'll be free to go into the jury room and begin your deliberations about the case.

Now, a few things about the course of the trial: one, you have to decide this based on the evidence. That means sympathy or prejudice for or against the Government or sympathy or prejudice for or against the defendant can't enter your mind in any way. You have to base your evidence -- your verdict solely on the evidence; okay?

The second thing I would tell you is don't do any independent research or investigation into this case; okay? Don't go on the Internet or go to the scene of any of the incidents in this case you're going to hear about. Everything you need to have to decide this case will be presented to you by way of evidence, and it would be inappropriate for you to base your verdict on anything other than the evidence; okay? What you see on the Internet or what research you do may not be correct. But we're going to be very confident that when we finish this evidentiary portion of the trial, you're going to have everything you need to go decide this case. So that means you can't use any media devices or any social platforms of the Internet to do any type of research or investigation in the case.

The parties and the witnesses and the lawyers know they can't have any communication with you during the course of this case. If you see them downstairs or in the hallway along the way here, they're not being rude when they're ignoring you. It's just that if there's a communication

between a juror and someone else involved in the case, then I might have to stop the trial and do an investigation into what that was even if it was something innocent.  So they know not to even greet you; okay?  No communication whatsoever.

You have taken an oath now to base your jury verdict on the evidence and my instructions, and again, the parties have the right to count on you to do that.  They expect nothing less than that; okay?  When you get home this evening, you might have someone ask you, "You ended up on a jury; tell me about it."  Don't talk to them about the case.  Just tell them you're on a jury.  Tell them you can't talk about the case until the end of the trial.  Then you can talk to anybody as much or as little as you want when we're all finished up.  But if you talk to someone about the case, they might say something to you that may get you off on the wrong track thinking about the evidence in this case and my instructions; okay?

Karen's going to give you some information about how to communicate with her.  If you're running late or if you have a problem, let her know.  Again, we're going to ask you to be here on time every day, but we understand sometimes you're providentially hindered.  So if you're running late, please let us know so we can use that time wisely.  Karen's quite good at her job.  She and I have been working together for 20 years now, even though she looks a lot younger than me.

So, you know, she'll do a great job taking care of you-all.  I promise, your best friend after this trial is all said and done will be Karen, who's taking great care of you.

I also like to brag on other parts of my staff.  My court reporter here, Pam, is awesome at her job.  She does great work, too.  One of the reasons she does very well is she double- and triple-checks everything as far as a transcript goes.  I have no idea how she writes down everything that takes place in a trial, but she does.  Why am I telling you this?  Again, I like to brag on my staff, but also because she double- and triple-checks everything, we're not going to be able to give you a transcript about anything that occurred.  You see that on TV from time to time.  And at certain trials -- not this one -- that may be a possibility, but this is not a case where you're going to get the transcript.  So that means you're going to have to pay careful attention to what the witnesses say and remember that collectively when you get back in the courtroom.  Again, you can use your notes to help with that.

All right.  If, at any point, you're having trouble hearing or seeing something or you just have to take a break, let us know; okay?  We want to really equip you to do your job well.  And I hope you will appreciate your service.  We certainly appreciate your service to us.  At the end of this, regardless of how this case comes out, I hope you'll all feel

even better about our justice system and how it operates. Your service is so important to us and so appreciated by us. You have our great thanks for it.

Are we ready to proceed with opening statements?

MR. CROSS:  Yes, Your Honor, we are.

MR. WILSON:  Yes, Your Honor.

THE COURT:  All right.  So how much time does each side want for opening statements?  I probably should have asked that before the jury walked in.

MR. CROSS:  Right around 15 minutes.

THE COURT:  Is that enough for you, Mr. Wilson?

MR. WILSON:  That's sufficient.

THE COURT:  Why don't we say 20, because I always -- again, I appreciate it takes longer than you think.  Do you want a two-minute warning?

MR. CROSS:  Please.

MR. WILSON:  Sure, Your Honor.

THE COURT:  Karen will give you a two-minute warning; okay?  So each side will be allotted 20 minutes for opening statements.

And, Mr. Cross, you may proceed when you're ready.

MR. CROSS:  May it please the Court, members of the jury.

It was just over a year ago, just over a year ago, on a sunny summer August day when Mikayla and Adam, a young

couple, college students from Florida, were going hiking to see the waterfalls of Cheaha State Park, but they never made it.  Instead, they were flagged down by a woman who appeared in distress.  They made the mistake of helping.  Within minutes, they were kidnapped, robbed, and Adam was gunned down as he tried to defend himself and Mikayla.

Lurking in the words nearby was the defendant, the shooter's friend and partner.  She watched as their plan to carjack Adam and Mikayla went horribly wrong.  It's hard -- it's really hard -- to wash your hands of his blood when your gun killed.

Again, I'm Jonathan Cross.  Along with Brad Felton, we are privileged to represent the United States in presenting this case with you.  Sitting at the table with us is FBI Special Agent Chip Arrington.  He was the chief investigator of the federal case.  Also sitting with us is Kim Murphy, our paralegal.  Without her, we couldn't put this case on.  You're going to hear a lot of audiotapes, you're going to see a lot of videotapes, you're going to see a lot of pictures, and Kim is invaluable in presenting this case.

This is a case -- a case of taking advantage of innocence and cunningness of youth.  And I want to tell you a little more about that.  Adam Simjee and Mikayla Paulus, both young 20-somethings, were students in Florida very near Orlando.  Adam had hoped to become a financial portfolio

manager.  Mikayla was in graduate school -- still is in graduate school -- becoming a social worker.  She's also a substitute teacher.

So just over a year ago, fall was approaching and they were getting ready to go back to school.  And they wanted to take a trip because Adam had just bought a new van, an Uplander.  So, like young people, they loaded up in the van on August the 13th in Florida and headed to Alabama.  They were going to go to Alabama, then Tennessee, then Arkansas, take some hikes.  And their first sight to see was Cheaha State Park.

That night, the night of the 13th, they stopped at the Alabama Welcome Center just west of the Alabama-Georgia state line very near Cheaha State Park.  They slept there and woke up the next morning.  Mikayla was driving.  They went to the Cheaha Mountain store, got some gas, bought a admission ticket to the park.  They were debating on whether or not to go see the lake or the waterfalls.  They decided on the waterfalls.

They're traveling to the waterfalls on a road you're going to hear a lot about, Forest Service Road 600-3, when a young woman who appeared in distress flagged them down.  That woman, her name is Yasmine Hider.  When Mikayla stopped, she said, "My car is broken down just down this pathway.  Can you help me?  I need a jump.  I need a jump."

Mikayla initially said, "We don't have any jumper

cables," but then Adam -- Adam says, "I have jumper cables. Let's help."  So they followed her down this road off of 600-3 about 100 yards into the woods where they found a blue Cube Scion, and the hood of the Scion was up.  You know, they dared to care.  They dared to be kind.  They were in the prime of their life just helping out.

So as soon as they got down there by the Scion, Mikayla called her father for advice on how to fix the Scion, called her father for advice.  That is a call we fathers love to receive most of the time.  He gave them some advice on what to do to get the car started.  The steering wheel was also not working, and Hider just watched as they tried to fix the car. Her father sent her a YouTube video on how perhaps to get the steering wheel to move.  That didn't work.  The jumper cables didn't work.  Nothing worked because that Scion was inoperable.  It would not crank, and that is a fact that Hider knew; that is a fact that the defendant knew.

They were about to give up when Hider pulled out the gun, the gun that the defendant had given her two days earlier, told them to put their hands up and empty their pockets.  Mikayla had her cell phone and keys to the Uplander. She threw them on the ground.  Hider grabbed them both and then told them to walk deeper into the woods another 30 yards to a log, a pine tree that had fallen.  And once they got out to that pine tree, they were standing beside the log.  She

started recording herself so that she would remember later information concerning their banking and credit cards and passwords and account numbers.  You'll hear those recordings.  She walked them out further into the woods because that's where the defendant was located.

At some point Hider looked down.  What I didn't tell you is that before Adam got out of his van, he had a pistol himself and he took his pistol and he stuck it in his waistband where you couldn't see it.  So once they're out there at that log and Hider finally drops her guard for just a moment, Adam pulled his gun and told her to throw her gun down and to get down on the ground.  Hider asked, "Are you serious?"  And then Hider tried to cock the gun and operate the slide and began firing.  And Adam began firing and several shots were fired.  And when the shots had stopped, Adam had been hit once right in his lower abdomen on the right side, Hider had been hit four times, but Adam would die.  Hider did not.

Meanwhile, Hider fell to the ground.  One of the bullets went through her leg, shattered her femur.  She was laying on the ground.  Mikayla's phone is laying there as well along with the defendant's gun.  Mikayla grabbed her phone and called 911 immediately.  You might be surprised she was able to get 911 in the middle of the forest.  You're going to hear that terrible call.  You're going to hear Adam take his last

breaths of life, and you're going to hear the defendant come out of the woods when Hider starts calling for her. She came out of the woods to tend to her friend and her partner.

Hider would be airlifted. Later, at the hospital, Hider would tell investigators that they were hungry, they were starving, they needed food, they needed a vehicle, and that's why they were carjacking someone.

The charges, charges that we have filed against this defendant, is aiding and abetting murder, felony murder; aiding and abetting kidnapping; aiding and abetting robbery; and aiding and abetting using a firearm in the commission of a violent act, kidnapping and robbery.

Now, I want to tell you what this case is not about and what we're not going to make this case about. This is not an intentional premeditated murder. It's felony murder. It's when you're committing a felony, kidnapping and robbery, and a death results. It does not require an attempt to kill, and that is what is important about that charge.

The other thing we're not going to prove is that this defendant shot the gun. That's not what we're here to prove. We're here to prove that she aided and abetted. The Judge will tell you, as he already has, at the end of the trial aiding and abetting is when you're held responsible for the acts of another if you aid and abet in their criminal activity, if you assist.

So I ask you, as you hear the evidence that will be put on, the evidence that will come from this witness stand, that you look -- that you look for evidence of assistance, of encouragement, of support, of presence in order to commit a crime.

Now, let me talk to you about the defendant and Hider as you look to that evidence.  Hider is 21 -- 20 years old. She was 20 years old at the time, young, not even old enough to drink legally.  She was homeless in Atlanta when she fell in with the defendant, who was 35 years old, wiser and more experienced.  And the defendant told Hider that she had a campsite over in Talladega National Forest very near Cheaha State Park.  She asked her to join her at that campsite.  The defendant admitted to living at that campsite with some other individuals.  This was a group of people that believed in living off the grid and off the land.  So she had already set up camp with these other individuals.  By the time Hider joined her, those other individuals weren't there.  For some reason, they had left.  Hider will tell you that it was based on some sketchy stuff.

Another thing about Hider is that she was drawing food stamps.  And that's really important.  She would get her food stamps and put them on her ED- -- EBT card, her EBT card.  So in order to use those funds -- in order for the defendant to be able to use those funds, they would have to take the

defendant's car, the Scion, and drive into town or drive to a store in order to get food and supplies.

About a month before the killing, that Scion was vandalized and rendered inoperable. The defendant's car was rendered inoperable, so they had no way to get food. They had no way to get supplies. It was Hider, the defendant, and the defendant's son, who was five years old, living out at this campsite, which was about a half-mile away from where Adam would get killed.

No longer able to drive the Scion into town to get food and supplies, they became more and more desperate. And about two days before the killing of Adam, they started talking about they were going to have to get a vehicle, they were going to have to take someone's car, and they talked about carjacking and doing what they had to do. And it was two days before Adam was killed that the defendant gave Hider the defendant's pistol.

Hider will testify pursuant to a plea agreement. You're not going to like Hider, but I ask you to listen to what she says. It's very important, because she will tell you that the plan that day was to carjack someone to take their car to get food and supplies because they were hungry. But you're not just going to hear from Hider. You're going to hear from the defendant.

From the day that Adam was killed, the defendant gave

a statement to law enforcement about what took place that day. You're going to hear that statement, and in that statement the defendant admitted they were hungry, broke, and desperate. The defendant admitted to inviting the younger, more impressionable Hider to join her at her off-the-grid campsite where the defendant had been living with others.  The defendant admitted that the Scion was totaled and inoperable. Defendant admitted that the pistol that Hider used was the defendant's pistol and she gave it to Hider two to three days before the killing.  And at the time that the defendant gave Hider the gun, the two were discussing using that 9-millimeter pistol to carjack someone to get the food.

But that's not all.  That's not all you're going to hear.  Actions speak louder than words.  Let's go back to the killing.  After Adam had been shot and was dying, after the defendant's friend had been shot and was laying there and Hider was calling out to the defendant, "What happened?" the defendant came out and her response to her friend was, "What do you want me to do?"  And then she fled.  And then she fled and went to that campsite which was hid away in the middle of the woods where her son was.

I should point out that she had left her five-year-old son back at that campsite alone in the middle of the woods for several hours while she and Hider went to carjack somebody. But don't worry, the son wasn't alone.  She left him with a

loaded shotgun.  She fled back to the campsite.  Law enforcement wasn't able to locate her for six hours, and it took a tracking dog in order to find her.  And as the team were approaching the camp, guess who walked out holding that loaded shotgun.  Her five-year-old son.

That's an overview of the evidence that you're going to hear.  There's going to be testimony.  There's going to be video statements.  You're going to hear the 911 call.  You're going to see pictures.  A lot of it's not very pleasant, but it's the truth of what happened.

And then after listening to that evidence, then it will be time for you to do your job, as the Judge mentioned to you.  You will get this case.  And it's what makes the system work and so great.  Prosecutors don't make the decision.  The Judge doesn't make the decision of guilty.  You make that decision.  And we're confident that when you go back into that jury room and you talk about the evidence that you'll come back into this courtroom and render a verdict of guilty as to all charges, not because I asked you to, which I will, not because Mr. Felton will ask you for a guilty verdict, although he will, not because you may feel anger toward the defendant or toward Hider, not because you may feel sympathetic --

THE COURTROOM DEPUTY:  Two minutes.

MR. CROSS:  -- toward Mikayla and Adam and Adam's family.  Do not base your verdict on any emotion.  Base your

verdict on the evidence.  And we're confident your verdict will be guilty as to all charges because the overwhelming amount of evidence will demand it.

Thank you.

THE COURT:  All right.  Mr. Wilson, care to make an opening statement?

MR. WILSON:  Yes, Your Honor.  If it pleases the Court.

THE COURT:  You may.  I'm sorry?

MR. WILSON:  If it pleases the Court --

THE COURT:  You may proceed when you're ready.

MR. WILSON:  -- and present counsel.

My name is Justin Wilson and I represent Krystal Pinkins.  I'd like to thank all of you for being here this week, for serving your civic duty being on a jury.

Before we get into my opening statement, I'd like to kind of tell you how important it is what you're doing and why we have jury trials.  I like to start that way.  I'll mention it again in my close, but I'll give a brief overview of it.

The reason we're here today is because our Sixth Amendment gives every defendant in a criminal trial the right to a fair trial by an impartial jury.  You're going to be that jury this week.  The Sixth Amendment is part of our Bill of Rights, which is part of our Constitution.  Both of those documents exist to protect us from a powerful government.  The

United States is one of the most powerful governments in the whole world, and they brought charges against Krystal Pinkins. You're here today to hold the Government accountable, hold them to their burden, challenge the evidence, and ultimately protect the rights of everyone involved.

Now, one of the rights that Miss Pinkins has, the Judge has already told you, is the presumption of innocence. And he's already talked to you about standard of proof and all of that, and you'll get more instructions on what beyond a reasonable doubt is.

Now, Mr. Cross gave an opening statement.  He talked a lot about Yasmine Hider.  Yasmine Hider is not on trial today. Krystal Pinkins is on trial.  Krystal Pinkins is charged with aiding and abetting all of the charges that he mentioned. Part of the Government's attempt to prove that she aided and abetted all of those charges is proving that those charges happened.  So the majority of the overwhelming amount of evidence that you're going to hear is that a murder happened, that a kidnapping happened, that a robbery happened, and that a gun was used in a violent felony.  My statement's going to be considerably shorter than his because I agree with him on a lot of the facts.  All of those things happened.  What we have a disagreement about is whether or not Krystal Pinkins aided and abetted.  The key issue is going to be whether she was a willing participant or whether she was a spectator.  I expect

the evidence to show that she was a spectator.

Again, you're going to hear overwhelming evidence of a murder, kidnapping, robbery, and the use of a gun in a violent felony. You're going to hear, really, two key pieces of evidence as far as aiding and abetting. You're going to hear a statement that was given by Krystal Pinkins and you're going to hear the testimony of Yasmine Hider. At the end of this trial, you're going to have to choose who to believe. You can't believe both of them, because their statements are going to contradict each other. If you believe neither of them and you don't know who to believe, you have to find Ms. Pinkins not guilty because we really don't know what happened. You only have those two people's statements about aiding and abetting.

But here's some reasons I think you should believe Krystal Pinkins over Yasmine Hider and that's what is bringing about these statements. Krystal Pinkins gave a statement the day of the incident. She gave it willingly. She didn't ask for representation, she didn't ask what was going to happen to her, and she answered every question until they ran out of questions to ask her.

It is true she did go back to camp, but that was to be with her kid. She is not on trial for being a bad mother. She is not on trial for living off the grid or any form of trespassing. You have to only consider the charges that she's

charged with and whether she's guilty of those.

Now, let's get to Yasmine Hider's testimony and what she's going to tell you about aiding and abetting. She's going to say, I think, that Krystal Pinkins gave her the gun and they planned this together. But the only thing that they have to prove that is Yasmine Hider's statement. And here's some things about how her statement came about. Right after she murdered Mikayla Paulus's fiance in front of her, she asked Mikayla to lie to the police so she wouldn't get in trouble. When the police found Yasmine Hider, she immediately asked them not "Is he going to be okay?" but "How much time am I going to get for this?"

She got airlifted to a hospital, where agents or law enforcement met with her to try to get a statement. She talked to them for just a few minutes before she shut it down and said, "I will not talk to you any longer without an attorney." Way later, her attorney worked out a deal between her and the Government where she's going to get way less than she probably would pursuant to a plea agreement they've already mentioned.

Miss Hider has been interested in how she can protect herself the entire time, not truth or justice or anything like that. So, I expect the evidence to show that they're basing their whole case of aiding and abetting on the statement of Yasmine Hider. I expect the evidence to show she can't be

trusted.

I started this statement by telling you we're here to hold the Government to the highest standard and the highest burden of proof in our legal system, and I expect the evidence to show that the Government made a deal with the killer and that they want you to trust the words of a murderer and that they negotiated this with a monster who destroys people's lives. I expect the evidence to show you can't trust her because she's willing to lie to get a lesser sentence and to get a good plea deal and she would do that because she would kill somebody over a car and a bag of groceries.

Thank you.

THE COURT: All right, folks. You've heard the lawyers present their opening statements. I'll remind you what the lawyers say is not evidence. But we're about to begin the process of you receiving the evidence.

So with that said, is the Government ready to call its first witness?

MR. FELTON: Yes, Your Honor.

THE COURT: All right. Call your first witness.

MR. FELTON: Your Honor, the Government calls Samantha Higgins to the stand.

(SAMANTHA HIGGINS, being first duly sworn, was examined and testified as follows:)

THE COURTROOM DEPUTY: Thank you. Be seated, please.

Please state and spell your first and last name for the record.

THE WITNESS:  Samantha Higgins.

THE COURTROOM DEPUTY:  Would you spell it for me?

THE WITNESS:  S-A-M-A-N-T-H-A.  Do I need to restart?

THE COURTROOM DEPUTY:  Ma'am?

THE WITNESS:  Do I need to restart spelling my name?

THE COURTROOM DEPUTY:  Yes.

THE WITNESS:  S-A-M-A-N-T-H-A, Higgins, H-I-G-G-I-N-S.

THE COURTROOM DEPUTY:  What city and state do you reside in, please?

THE WITNESS:  Clay County, Alabama.

MR. FELTON:  May I proceed, Your Honor?

THE COURT:  You may.

                    DIRECT EXAMINATION
BY MR. FELTON:

   Q.  Miss Higgins, are you a little nervous?

   A.  Very.

   Q.  Have you ever testified before?

   A.  I have not.

   Q.  Okay.  You know why we're here, in relation to this murder in this case?

   A.  Yes, sir.

   Q.  And your involvement, where do you work, Miss Higgins?

   A.  I work for Clay County E911.

Q.    How long have you been working there?

A.    Nine years.

Q.    And what does the E911 do?

A.    We answer 911 calls and we dispatch out the ambulance and fire department.  And if it's police-related, we transfer to the police departments.

Q.    And you say you've been doing that for about nine years?

A.    Yes, sir.

Q.    Do you receive calls from the public as well as the police?

A.    Yes, sir.

Q.    And do you have certain training to help you understand how to respond to traumatic situations either dealing with the police or civilians that are dealing with traumatic events?

A.    Yes, sir.

Q.    What kind of training do you go through?

A.    We have telecommunicator and we also have EMD training that provides us information and protocol that we follow when we have an emergency situation.

Q.    All right.  And does your jurisdiction of E911 involve the entire county of Clay County, Alabama?

A.    Yes, sir.

Q.    Okay.  And Clay County is, of course, in Alabama in

the Northern District; correct?

A.   Yes, sir.

Q.   All right.  Were you working on August the 14th, 2022?

A.   Yes, sir.

Q.   And what shift were you working, if you remember?

A.   I was working first shift, 7A to 7P.

Q.   Okay.  Was there anybody else in the dispatch room with you?

A.   No, sir.

Q.   You were all by yourself?

A.   Yes, sir.

Q.   Was it a bad day that day?

A.   Very.

Q.   Did you receive a call from a civilian in relation to this case?

A.   Yes, sir.

Q.   Do you remember approximately or precisely the time that you received that call?

A.   I received that call at 11:24 a.m.

Q.   You remember to the minute?

A.   Yes.

Q.   Okay.  Did they identify themselves?

A.   They did.

Q.   And who was it?

A.   Mikayla Paulus.

Q.   Okay.   And what were you trying to do when you received this call?   What was the situation that you -- as you understood it?

A.   That her boyfriend had been shot in the back and they were trying to control the bleeding.   And I was trying to get emergency help dispatched out to them.

Q.   All right.   And so what was your primary focus with Mikayla once you understood the situation that she was in?

A.   Can you repeat the question?

Q.   What was your focus?   When you're talking to Mikayla about the situation you've described, that he was shot in the back, what was your primary focus to do once you understood what was going on?

A.   Providing medical care, controlling the bleeding, and told her to let me know at any time if he stopped breathing so we could start CPR.

Q.   Okay.   Did you understand that he was bleeding?

A.   Yes.

Q.   Did he stop breathing?

A.   He did.

Q.   Okay.   And what did you do to help her when he stopped breathing?

A.   We started CPR.   I walked her through CPR.

Q.   Do you know CPR?

A.   I do.

Q.   And you have training for that as well?

A.   I do.  I recert every two years.

Q.   And during the call, were you able to help her through CPR and what it entailed?

A.   Yes, sir.

Q.   In addition to that, were you -- was one of your responsibilities to get assistance for Mikayla?

A.   Yes, sir, it was.

Q.   And so how did you do that?

A.   So when the call come in, Mikayla did not know where she was at besides she was on a dirt road on Cheaha.  And -- I'm sorry.

Q.   Okay.  Take your time.  And there's tissue right there if you need it.

A.   She didn't know where she was at, and we, with our CAD training and our map and database, were able to get a lat and longitude off of a cell phone.

Q.   Lat and longitude -- I didn't mean to interrupt.  Lat and longitude, what does that mean?

A.   It is location.  I don't know the acronym right off this minute.  I'm sorry.

Q.   Are you familiar with GPS?

A.   Yes.

Q.   Okay.  And what is that?

A.   Whenever you say GPS, like, my GPS in turn is -- I put

it in GPS and it takes me to it.  That's not how we do it in our case.

Q.  Okay.  How do you do it in your case?

A.  It comes in with a lat and longitude, and we hit a phase two button and it maps to -- it pings to the location.

Q.  Did you do that in this case?

A.  I did.

Q.  And is that a really precise location or is it more like a bubble?

A.  It's pretty precise.  You're within, I'd say, at least 200 yards whenever a caller comes in.  I was able to ask her if she passed a bridge, if she was near a bridge, because there was a bridge close by, and she told me that she came over that bridge.

Q.  Are you familiar generally with the area below Cheaha?

A.  Not very.

Q.  Do you know where the store is on top of the mountain?

A.  I do.

Q.  Okay.  And did you send help to that particular area near that bridge?

A.  I was able to locate because our bridges in our county do have an address.  So I was able to pull that address in our database from U.S. Forestry Service, Road 600-3, and send our ambulance there.

Q.  Okay.  Now, were there any obstacles for your response

team, be it ambulance and law enforcement, to get to that location?

A.   It's the very -- it's in the very north end of our county, so you're looking at least 30 minutes before anybody's going to arrive.

Q.   And, in fact, were there certain discrepancies between you and Cleburne County on the call as to who to take the call?

A.   Once I -- once she transferred it to me, I knew it was going to be ours, once I mapped it.

Q.   Okay.  And ultimately, did you help some people to respond and get to the location?

A.   Yes, sir, I did.

Q.   Do you know approximately what time that they arrived at the scene?

A.   They arrived at the scene at 11:57, 30 minutes --

Q.   Okay.  And you remember that?

A.   Yes, sir, 30 minutes after dispatch time.

Q.   All right.  So it took a good amount of time to get to the location?

A.   Yes, sir.

Q.   Was this in a remote part of the woods in the wilderness there?

A.   It was in a not-well-known area at all.  It was just in the middle of nowhere.

Q.   Okay.   Was there a recording of the conversation that you had with Mikayla and the events that took place during your conversation with Mikayla on that particular occasion at around 11:24 until people arrived?

A.   Yes.

Q.   Have you listened to that recording?

A.   Yes, sir.

Q.   Does it truly and accurately depict what you remember, the conversation you had with Mikayla and the events that occurred in the audio transaction?

A.   Yes, sir, it does.

Q.   Was there also a transcript that was embedded onto that recording to show and hear precisely what was said during the recording?

A.   Yes, sir.

Q.   And you've listened to those with the transcript?

A.   Yes, sir.

Q.   And does it truly and accurately depict as you remember the occasion?

A.   Yes, sir.

MR. FELTON:  Your Honor, we would offer Government's Exhibit 1 and 2, which is the recording and transcript of the 911 call.

THE COURT:  Any objection?

MR. WILSON:  No objection, Your Honor.

THE COURT:  Without objection, Government's Exhibits 1 and 2, which are the recording and the transcript respectively, Mr. Felton --

MR. FELTON:  Yes, Your Honor.

THE COURT:  -- are admitted.

MR. FELTON:  Your Honor, may we publish them at this time?

THE COURT:  You may.

Folks, when we ask to publish something, that means we're going to display or play it for you, depending upon what type of exhibit it is.

MR. FELTON:  And is it on those screens as well?

THE COURTROOM DEPUTY:  It should be.  Do you-all see it on your screen?  Thank you.

(Audio was played.)

Q.  (By Mr. Felton)  Miss Higgins, subsequent to that call, did you then have to call in the coroner?

A.  I did.

Q.  Okay.  And was he pronounced dead at the scene?

A.  He was.

MR. FELTON:  That's all I have at this time, Your Honor.

THE COURT:  All right.  Cross-examination?

CROSS-EXAMINATION

BY MR. WILSON:

Q.   Are you okay, Miss Higgins?

A.   How are you?

Q.   What?

A.   I thought you asked me how I was.  I'm sorry.

Q.   I said, Are you doing okay?

A.   I'll be fine.

Q.   I've been better, too.

MR. WILSON:  Miss Murphy, can you back the exhibit up to about the two-minute mark.

(Audio was played.)

MR. WILSON:  Thank you, Miss Murphy.

Q.   (By Mr. Wilson)  Miss Higgins, did you hear a second voice saying, "Help, they're going to kill me"?

A.   I did.

Q.   Okay.  Were you able to tell on the other line who was screaming that?

A.   I cannot recall.

Q.   Okay.  At any point during that recording or that you can remember just hearing through the phone, do you remember hearing a third female voice?

A.   No.

Q.   Miss Paulus describes the shooter in the recording; correct?

A.   She does not.

Q.   Or says that there is a female shooter?

A.   There is a female shooter.

Q.   Does she ever mention another female helping that woman in any way?

A.   I do not recall.

MR. WILSON:  Thank you.  No further questions.

THE COURT:  Any follow-up to that?

MR. FELTON:  Your Honor, we did offer 1 and 2, right, the transcript --

THE COURT:  You did.  And those were admitted and received and that's why we played them.

MR. FELTON:  Thank you, Your Honor.

THE COURT:  All right.

MR. FELTON:  That's all.

THE COURT:  Very well.  She may step down.  Is she excused?

MR. FELTON:  Yes, Your Honor.

THE COURT:  All right, folks.  We're at 4:18.  Do you want to start another witness or do you want -- it's been a long day for you-all.  Do you want to head out?  I don't usually run a democracy but I'll make an exception here.

How long is your next witness, Mr. Felton?

MR. FELTON:  Not too long.  Twenty minutes.

THE COURT:  Let's call your next witness.  And you-all

are free to give me a signal if someone needs a rest room or anything like that; okay?

MR. FELTON:  Your Honor, we call Aaron Smith.

(INVESTIGATOR AARON SMITH, being first duly sworn, was examined and testified as follows:)

THE COURTROOM DEPUTY:  Be seated, please.  Please state and spell your first and last name for the record.

THE WITNESS:  Aaron Smith, A-A-R-O-N S-M-I-T-H.

THE COURTROOM DEPUTY:  What city and state do you reside in, Mr. Smith?

THE WITNESS:  Talladega, Alabama.

MR. FELTON:  May I proceed, Your Honor?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. FELTON:

Q.  Mr. Smith, where are you employed?

A.  The Clay County Sheriff's Office.

Q.  How long have you been there?

A.  Around three and a half years now.

Q.  And what's your duties with them?

A.  Criminal investigation.

Q.  Okay.  Have you always been a criminal investigator?

A.  No, sir.

Q.  What were you before that?

A.  Patrol deputy.

Q.  How long have you been an investigator?

A.  Approximately six months.

Q.  And what were your duties when you were on patrol?

A.  Enforcing state and local laws in the entirety of the county.

Q.  So you could get a call in any part of Clay County and respond to another police officer or a civilian?

A.  Yes, sir.

Q.  Were you working on August 14th, 2022?

A.  Yes, sir.

Q.  What shift were you working, if you remember?

A.  6:00 a.m. to 6:00 p.m.

Q.  Did you get a call related to this case?

A.  Yes, sir.

Q.  And what were you called to do?

A.  I was called to a 22-year-old male who had been shot in the back two times in the Cheaha area.

Q.  Did you later determine that to just be one time?

A.  Yes, sir.

Q.  Okay.  And the bullet had gone through from the front to the back?

A.  I'm unsure of that.

Q.  All right.  And so where did -- precisely did you go?

A.  There's a dirt road across from the Turnipseed Campground parking lot.  It was a short distance down that

dirt road.  I'm unsure of the name of the road.  It was on that dirt road.

Q.  And do you remember where you were when you got the call?  Did you have to travel a long ways?

A.  I remember where I was.

Q.  Where were you?

A.  In Barfield, Alabama.

Q.  And so about how long did it take you to get to this location?

A.  Approximately 30 minutes, maybe a couple minutes more.

Q.  Down the dirt road, did you have to make another turn to another dirt road or trail?

A.  It was a trail, not a public road, as far as I know. It was -- it had two tracks in the pathway from where it looked like maybe some ATVs or off-road vehicles had driven and made a path.  That was the location that I went to.

Q.  Do you know approximately how far it was off the 600-3 dirt road down to the location where you had to travel?

A.  It was approximately 100 yards or so.

Q.  And again, do you know how far down the -- if you know, down the 600-3 road off of 281 that you had to travel?

A.  I don't know the exact distance on that.

Q.  And 281, is that the road that goes to Cheaha State Park on top of the mountain?

A.  Yes, sir.

Q.   All right.

MR. FELTON:   Can I -- Karen, can I show him -- just show him Exhibit 5?

Your Honor, while she's trying to find it, can I approach the witness with the physical exhibit?

THE COURT:   You may.

Q.   (By Mr. Felton)   Let me show you what's been identified as Government's Exhibit 5.   Do you recognize that particular exhibit?

A.   Yes, sir.

Q.   And how do you recognize it?

A.   I've seen it before.

Q.   Okay.   And on that particular exhibit, does it show the location of the roads that you've been discussing, the crime scene, the campsite scene that's been described on the particular map?

A.   Yes, sir.

Q.   Okay.   And does it accurately depict the information that you remember in relation to going to the scene and the other scene, the campsite?

A.   Yes, sir.

MR. FELTON:   Your Honor, we would offer Government's Exhibit 5.

THE COURT:   Any objection?

MR. WILSON:   No objection, Your Honor.

THE COURT:  Without objection, it's received.

MR. FELTON:  Can we publish it?

THE COURT:  You may.

MR. FELTON:  And I believe he has access to draw, Karen, on -- what does he do to draw on the map?

THE COURTROOM DEPUTY:  He has.  Just circle with --

Q.  (By Mr. Felton)  So you'll be able to put your finger on the map and show -- I'd like to point out some locations. Can you show us the Turnipseed Campground where you turned off of Highway 281 to travel down the dirt road?

A.  It wasn't the actual campground.  It was the parking lot.

Q.  Parking lot?

A.  Yes, sir.

Q.  And --

A.  That was right in here (indicating).

Q.  And that campground is back up in the woods; is that correct?

A.  Yes, sir.

Q.  But that has nothing to do with this particular scene. That's just where you turned; right?

A.  That's correct.

Q.  All right.  Now, show us the direction you traveled down the dirt road.

A.  Starting from here, it was in this direction

(indicating).

Q.   Okay.  And where did you go to turn to the ATV road or two-lane trail down to the crime scene?

A.   It would have been down this way (indicating) and then that trail was in that area, approximately right in there.

Q.   All right.  And the "Parked Vehicle Location," what vehicle was that?

A.   It was a -- which vehicle?

Q.   Yes.

A.   There were two vehicles.

Q.   Okay.  And what two vehicles were there?

A.   There was a passenger van and a -- like, a disabled Scion vehicle.

Q.   Okay.  Did you determine that the disabled Scion vehicle was the defendant's vehicle, Ms. Pinkins' vehicle?

A.   Yes, sir.

Q.   Did you determine that the white -- or the other van was the victim's vehicle?

A.   Yes, sir.

Q.   Okay.  When you initially got to the scene, where was the white van, or the victim's vehicle, the van?

A.   It was approximately 40 yards or so from the entrance of that trail off the dirt road.

Q.   So the van was off the dirt road closer to where the crime scene was?

A.   Can you repeat that?

Q.   The white van, was it closer to the crime scene or was it closer to 600-3, the main road that you came off of?

A.   I'm unsure exactly the --

Q.   Where did you initially see the van, the victim's van?

A.   Oh, okay.  It was closer to 600-3 initially.

Q.   Okay.  And so where did you go once you got to the scene?

A.   I went past -- you want me to draw on here?

Q.   Yeah, if you can.  Just show us --

A.   I went past that van, and it was at that "Parked Vehicle Location" (indicating).  And then I went past there to that second location there.

Q.   Okay.  Another location on this map says "Main Campsite."  Do you see that location?

A.   Yes, sir.

Q.   Did you go to that location as well?

A.   I did.

Q.   And was that the main campsite where Ms. Pinkins and Ms. Hider stayed with Ms. Pinkins' son, Lucas?

A.   Yes, sir.

Q.   Approximately, if you could tell us, how far from the main campsite location is it to the location of the deceased, where Adam eventually met his demise?

A.   It was approximately half a mile to three quarters of

a mile.

Q.  So if I understand you right, the location of the deceased, where it says "Location of Deceased," not as the crow flies but as trails go and through the woods, you have to travel somewhere between a half-mile and three quarters of a mile back to the main campsite; is that correct?

A.  Yes, sir.  Yes, sir.

Q.  That main campsite, is it on any road or is it in any parking lot that you can get to by vehicle?

A.  No, sir.

Q.  Is it tucked away in a little bowl area?

A.  That's right.

Q.  Can you see it from any road?

A.  No, sir.

Q.  Would you describe it -- would it be kind of a stealth campsite?

A.  Yes, sir.

Q.  Is this an area where you paid to camp or anything?

A.  No, sir.

Q.  Investigator -- Investigator Smith, when you were at this crime scene, were you wearing a bodycam?

A.  Yes, sir.

Q.  And did you record your movement as you arrived at the scene and then getting to the location where Ms. Hider was, Mikayla Paulus was, and the victim, Adam Simjee?

A.   Yes, sir.

Q.   Have you viewed that bodycam?

A.   Yes, sir.

Q.   Okay.  And you've done that before coming here today?

A.   I have.

Q.   Does it truly and accurately depict the events that took place for the first ten minutes or so, at least we'll show, that occurred as you approached the scene and your interactions with the defendant, Miss Hider, the victim, Miss Paulus, and the victim, Adam Simjee?

A.   It does.

Q.   Were there also other people there?

A.   There were.

Q.   Who -- if you could tell the jury kind of who those people were when you arrived.

A.   There were multiple personnel with the volunteer fire department that was nearby and the rescue squad for Clay County as well as an investigator with Lineville Police Department.

Q.   Do you know approximately what time you arrived?

A.   It was approximately 11:57 a.m.

Q.   So were you one of the first to get there?

A.   Yes, sir.

Q.   Okay.  Directly ahead of you, were some of the ambulance people and paramedics there?

A.  Yes, sir.

Q.  All right.

MR. FELTON:  Your Honor, we would offer Government's Exhibit 4, which is the bodycam of Aaron Smith.

THE COURT:  Any objection?

MR. WILSON:  No objection, Your Honor.

THE COURT:  Without objection, Exhibit 4 is received, Government's Exhibit 4.

MR. FELTON:  Your Honor, can we publish it at this time?  I expect to play the first ten minutes or so.

THE COURT:  Yes, you may.

MR. FELTON:  We need to erase that, if we can.

THE COURTROOM DEPUTY:  In the bottom right-hand corner you'll see clear somewhere.  There you go.

MR. FELTON:  I did it.  I did it.  Okay.  All right. I'm not very tech savvy, but okay.

Q.  (By Mr. Felton)  All right.  Is this your bodycam?

A.  Yes, sir.

Q.  And when this bodycam starts, is the volume or audio immediately activated?

A.  Not immediately.

Q.  How long does it take before the audio comes on?

A.  Thirty seconds.

Q.  And is this precisely when you arrive at the dirt track?

A.  Yes, sir.

Q.  Okay.

MR. FELTON:  All right.  If you can play it now.

(Video was viewed.)

Q.  (By Mr. Felton)  Investigator Smith, was that the encounter that you had at the location of Mr. Simjee's passing?

A.  Yes, sir.

Q.  I'd like to go back to a couple spots.

MR. FELTON:  If you can go to 37 seconds.

(Video was viewed.)

MR. FELTON:  Stop it right there.

Q.  (By Mr. Felton)  All right.  Initially we see the white van there not close to the crime scene.

A.  Yes, sir.

Q.  Was this van moved by ambulance and/or paramedics to get it out of the way?

A.  I'm unsure who moved it.

Q.  Okay.  You don't know who moved it but it was moved?

A.  Yes, sir.

Q.  Okay.  But this is how you saw it when you first arrived?

A.  Yes, sir.

Q.  All right.

MR. FELTON:  If you can go to 48 seconds.

(Video was viewed.)

MR. FELTON:  Okay.  Stop.  Stop there.

Q.  (By Mr. Felton)  Now, this vehicle, what is this vehicle?

A.  That's the disabled Scion vehicle that we determined to be Miss Pinkins'.

Q.  Okay.  And was this where it was located when you got to the scene?

A.  Yes, sir.

MR. FELTON:  Okay.  Let's go to one minute.  Stop there.

(Video was viewed.)

Q.  (By Mr. Felton)  Back to where there was some debris, were you able to determine if there were people camping there?

A.  Not to my knowledge.

Q.  Okay.  But there was remnants of a campsite there?

A.  Yes, sir.

Q.  But is that the main campsite where Pinkins and Hider were staying?

A.  No, sir.

Q.  Okay.  You don't know where this stuff came from that was close to the vehicles?

A.  No, sir.

Q.  And as you described, the campsite, the main campsite, for Ms. Pinkins and Ms. Hider was approximately how far from

this location that we're looking at now?

A.    Approximately half a mile to three quarters of a mile.

MR. FELTON:  All right.  Let's go to 4:25.  May have to go back just a few seconds:  4:20 or a little before that.  Just play it from there.  Okay.  Stop there.  Stop.

(Video was viewed.)

Q.    (By Mr. Felton)  All right.  What are we looking at there?

A.    A firearm.

Q.    Okay.  Was this determined to be Ms. Pinkins' firearm?

A.    Yes, sir.

Q.    And where was this in relation to Ms. Hider?

A.    Just a few feet away from her where she was sitting down.

MR. FELTON:  Let's go to 8:34.  Right there.  If you could stop there.

(Video was viewed.)

Q.    (By Mr. Felton)  And we see a vehicle moving.  Was that the victim's vehicle?

A.    Yes, sir.

Q.    And do you know why it was moved?

A.    I believe it was to allow the ambulance easier access down closer to where we were.

Q.    But initially, where was that white van when you arrived?

A.   It was just in front of the ambulance, where the ambulance is parked now.

MR. FELTON:   I believe that's all I have at this time, Your Honor.

THE COURT:   All right.   Cross-examination?

MR. WILSON:   Ms. Murphy, can you back the video back up to three minutes and 42 seconds, please?   You don't have to be spot on, just a little bit.

(Video was viewed.)

MR. WILSON:   Can you pause.

CROSS-EXAMINATION

BY MR. WILSON:

Q.   Investigator Smith, that's you speaking on the body camera; right?

A.   Yes, sir.

Q.   And that's you speaking directly to Miss Hider?

A.   Yes, sir.

Q.   And what was that she asked you that you told her you wasn't the person to answer that?

A.   She asked me -- she said, "I'm going to do time; right?"   And then she said, "I just wanted to know how much time."

Q.   Okay.   I was trying to find it around the three-and-a-half-minute mark.   You also asked her was anyone else involved in the shooting; correct?

A.    Yes, sir.

Q.    Did she say anyone else was involved?

A.    She said nobody else was.

Q.    Okay.  She said her family lives in the woods; correct?

A.    Yes, sir.

Q.    Did she say any of them were nearby?

A.    Not to me.

Q.    Did she say any of them helped her at that time?

A.    Not to me.

Q.    And her first priority was figuring out how much time she was going to do; correct?

A.    Correct.

MR. WILSON:  Thank you.  No further questions.

THE COURT:  All right.  Any follow-up to that?

MR. FELTON:  No, Your Honor.

THE COURT:  All right.  Folks, I'm going to call it a day now.  I don't think we need to put another witness on today.  Do you-all want to go back to the jury room and talk?  I didn't give you a midafternoon break because we started about two something.  Talk about report time, tell Karen that, and she'll report it back to me.  How's that sound?  Okay?

So I'm going to give you a continuing instruction whenever we take a break.  Whenever we take a break, I'm going to remind you not to investigate the case or research the

case.  Don't talk about the case.  In fact, over the evening break, what I would want you-all to do is just go home and don't think about this case and just come back to us at the time you and Karen discuss tomorrow and be ready to go.  We'll put in a full day tomorrow of hearing more evidence.

And I wish you safe travel to and from.  We'll see you back tomorrow morning; okay?  But don't everybody leave until Karen walks in there and you all give her the 9 o'clock or some other time as far as a report time; okay?  All right.  You-all can go back to the jury room.  Just leave all your notepads there overnight.  Nobody's going to disturb those.

THE COURTROOM DEPUTY:  Can I tell them to put a number on their jury notebook?  Because I didn't do that.

THE COURT:  Okay.  That's fine.  Put your name on one.

(Jury exited the courtroom.)

THE COURT:  All right.  Anything we need to take up before we break for the evening, Counsel?

MR. WILSON:  Nothing from the defense, Your Honor.

THE COURT:  Hang around and find out our start time tomorrow.  I hope you don't mind I let the jury decide that just a little bit because they have this commute.

MR. CROSS:  Me and Mr. Wilson talked, briefly, Your Honor.  I think we may reach Miss Hider tomorrow, and he had made mention of offering the actual plea agreement into evidence.  And the United States will be objecting to the

actual agreement.  We certainly think it's fair game to talk about the agreement and her understanding of the agreement, but I didn't know if we wanted to highlight that for the Court.

THE COURT:  All right.  Why do we need the entire -- the entire plea agreement into evidence as opposed to just the evidence about the cooperation provisions in the plea agreement?

MR. WILSON:  It lists the entirety of the agreement, what she is specifically agreeing to testify to and what her maximum sentence is and what she's getting instead of the maximum sentence.

THE COURT:  That's -- those are all things I said about sentencing.  What about the balance of the plea agreement that doesn't deal with cooperation or sentencing?

MR. WILSON:  That part's not relevant, but I wouldn't want to sever the exhibit.

THE COURT:  Well, I think we can tell the jury they're giving -- that we're giving them the relevant portions of the plea agreement; right?

MR. WILSON:  Right.

THE COURT:  Okay.  So why don't you-all work overnight to see if you can come up with a redacted portion of the plea agreement that everyone's happy with and, if not, I'll just make a decision tomorrow about what is actually going to go

into evidence.  And you can re-present your arguments at that point if you need to.  All right.  Read everybody happy with that approach for now anyway?

MR. CROSS:  Yes, Your Honor.

THE COURT:  Okay.  What else?

MR. CROSS:  I think that's it.

THE COURT:  Okay.  Well, we'll hear -- we'll see everybody back in the morning.  We're about to find out when in just a moment here.  Let's give that a minute.

(Discussion off the record.)

THE COURT:  Did you hear that, folks?  Nine o'clock. So that means be here at 8:45 in case we need to take something else up.

(Adjourned accordingly at 5:02 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated:  February 24, 2024

*Pamela G. Weyant*
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter