FILED
158
2024 Feb-26 AM 08:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

UNITED STATES OF AMERICA,     |     CASE NO. 1:22-cr-417-RDP
                              |
              Plaintiff,      |
                              |
v.                            |
                              |
KRYSTAL DIANE PINKINS,        |
                              |
              Defendant.      |

*  *  *  *  *  *  *  *  *

**TRANSCRIPT OF TRIAL - VOL. II**

*  *  *  *  *  *  *  *  *

FOR THE PLAINTIFF:     Jonathan S. Cross
                       John B. Felton
                       UNITED STATES ATTORNEY'S OFFICE
                       1801 Fourth Avenue North
                       Birmingham, Alabama 35203


FOR THE DEFENDANT:     Justin C. Wilson
                       LAPLANTE, MERRITT, FAULKNER & CLAY, LLC
                       1207 Noble Street
                       Anniston, Alabama 36201


     BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES

DISTRICT JUDGE, at Birmingham, Alabama, on Tuesday, September

26, 2023, commencing at 9:11 a.m.


The proceedings were reported by a stenographic court reporter.

The transcript was produced using computer-aided transcription.

**Transcript prepared by:**
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter

I N D E X

WITNESS TESTIMONY                                    PAGE

FOR THE PLAINTIFF:

MIKAYLA PAULUS
      Direct Examination by Mr. Cross              169
      Cross-Examination by Mr. Wilson             197

INVESTIGATOR MARK OSBURN
      Direct Examination by Mr. Cross              218
      Cross-Examination by Mr. Wilson             243
      Redirect Examination by Mr. Cross           246
      Recross-Examination by Mr. Wilson           246

CHRISTOPHER PARKER
      Direct Examination by Mr. Cross              248
      Cross-Examination by Mr. Wilson             266

AUGUSTE REBARCHIK
      Direct Examination by Mr. Cross          272,355
      Cross-Examination by Mr. Wilson          290,360

YASMINE HIDER
      Direct Examination by Mr. Cross              294
      Cross-Examination by Mr. Wilson             340

SERGEANT BRANDIE SMITH
      Direct Examination by Mr. Cross              362
      Cross-Examination by Mr. Wilson             367

(Proceedings commenced at 9:11 a.m. in open court.)

THE COURT:  All right.  So my understanding is we have something to take up before we bring the jury in; is that right?

MR. CROSS:  Yes.  I was just going to address the admission of exhibits, trying to expedite examination.

THE COURT:  All right.  What do you have?

MR. CROSS:  The United States next expects to call -- or will call -- Mikayla Paulus, and we will be offering Government's Exhibits 12 --

THE COURT:  One second.  Let me keep up with you here.

MR. CROSS:  Sure.

THE COURT:  Okay.  12.

MR. CROSS:  134 through 138.

THE COURT:  One second.

MR. CROSS:  And I'd be glad to describe it, if that might help as well.

THE COURT:  Okay.  So 12 is a title to the victim's vehicle?

MR. CROSS:  Correct.

THE COURT:  Okay.  And then 134 through 138 are scene photos involving the Scion vehicle?

MR. CROSS:  Pictures of the Scion.

THE COURT:  Okay.

MR. CROSS:  The Government's Exhibit 16 is a picture

of the Scion and the Uplander at the scene.  Government Exhibits 121 and 122 --

THE COURT:  Okay.

MR. CROSS:  -- pictures of the steering column of the Scion.

THE COURT:  Okay.

MR. CROSS:  Government's Exhibit 9 are screenshots and texts with the victim's father.

THE COURT:  One second.  9 and 10?

MR. CROSS:  Just 9.

THE COURT:  Just 9.  I'm sorry.  Okay.

MR. CROSS:  14 is already in, I believe.

THE COURT:  No.

MR. CROSS:  Oh, it's not.

THE COURT:  Karen, do you have 14 in?

THE COURTROOM DEPUTY:  No.

MR. CROSS:  It's not?

THE COURTROOM DEPUTY:  No.

THE COURT:  I've got a demonstrative aid, so I didn't know if that was going to be in at all.

MR. CROSS:  Correct.  We will offer that.  No objection?  It's the map, the National Forest Service map.

MR. WILSON:  We will have no problem with that.

THE COURT:  Okay.

MR. CROSS:  Government's Exhibit 20.

THE COURT:  A scene photo?

MR. CROSS:  Scene photo.  And the importance of it will be it will show the log that we've seen in the videos already.  And then Government's Exhibits 6, 7, and 8 are Hider's voice messages that were left on Mikayla's phone.

THE COURT:  Okay.

MR. CROSS:  Government's Exhibit 92, picture of Miss Pinkins and her son.

THE COURT:  Okay.

MR. CROSS:  And that's it.

THE COURT:  All right.  Any objection to any of those?

MR. WILSON:  The one with Pinkins and son I don't know if Miss Paulus saw because I don't know how --

MR. CROSS:  You are correct.  I was using it for her to identify Miss Pinkins that day.

MR. WILSON:  Okay.

MR. CROSS:  We can admit it through another witness if you would like.

MR. WILSON:  I think it will eventually come in anyway, so no objection.

MR. CROSS:  Very good.

THE COURT:  So without objection -- let me just -- I'm going to go in order, not chronological but the order you gave me, just to make sure I got these right.  Government's Exhibit 6, 7, 8, 9 are admitted.  Government's Exhibit 12, 14, 16, and

20 are admitted.  Government's Exhibit 92 is admitted.  Government's Exhibit 121 and 122 are admitted.  And finally, Government's Exhibits 134, 135, 137, and 138 are admitted.  Did I get them all?

MR. CROSS:  That's correct.

THE COURT:  All right.  If that's the case, Mr. Wilson?

MR. WILSON:  Yes, Your Honor.

THE COURT:  All right.  Very well.

MR. WILSON:  Your Honor, I anticipate the Government will call Yasmine Hider as a witness today.

THE COURT:  Yes.

MR. WILSON:  As has been stated several times, she is testifying pursuant to a plea deal.  I may try to move that her plea deal be admitted as an exhibit.  I think the Government had an objection to it.

THE COURT:  And I thought this was what you all had worked out at the beginning of the morning.

MR. WILSON:  Well, we're going back and forth.  Mr. Cross --

THE COURT:  I heard "deal," but tell me what's going on.

MR. WILSON:  We may can get around it by just marking it as a defendant's exhibit and then showing it to her to refresh her memory if she says anything contrary to it but not

admitting it as an actual exhibit.

MR. CROSS:  And I'm good with that.

THE COURT:  Okay.  So give me that one more time.

MR. WILSON:  Mark it as Defendant's Exhibit 1.

THE COURT:  Okay.

MR. WILSON:  Ask Miss Hider questions about it:  Does it say this?  Did you agree to this?  If she says anything contrary to it, just so I can reference what I'm showing her on the record, show it as Defendant's Exhibit 1 but not admit it as an actual piece of evidence to submit to the jury.

THE COURT:  Okay.  If that's what you-all worked out, I'm fine with that.

MR. CROSS:  And since we're talking about just in case this comes up, Mr. Wilson has been very professional in this. The United States' concern is that it is stated somewhere on the record or in the jury's presence the range of punishment that the defendant is facing, especially since she is charged with the same thing Miss Hider is charged.  And certainly it's permissible for him to talk about what Miss Hider is facing, but I would like to caution and I would now move in limine that there would be no testimony or comments as to the range of punishment that Miss Pinkins is facing.

THE COURT:  Mr. Wilson?

MR. WILSON:  In response to that, the jury are not legal experts.  They know that Miss Hider is charged with

committing murder and robbery and kidnapping and all of these things and that Miss Pinkins is charged with aiding and abetting these things. For all they know, that could carry a completely different sentence range. As far as why I want to ask Miss Hider about it, showing that she could go to prison until the day she dies and this deal gets her out of that is relevant to why she --

THE COURT: Sure. But the point is, I think, the motion in limine -- I think the Government, Mr. Cross, is pretty clear that he has no objection to you doing that; he thinks you're entitled to do that with Hider. What you can't do and what the witness can't do, though, is describe or state what range of punishment your client is looking at if convicted in this case.

MR. WILSON: I have no intention of trying to admit that.

THE COURT: I take it, then, should we -- should I admonish Ms. Hider, when she's called, of that ruling so she understands, too, not to make reference to that?

MR. WILSON: I don't know why Miss Hider would know what Miss Pinkins' sentence may be.

THE COURT: I don't know either, but you know what? All sorts of things happen in trials and I don't know why they happen. It's an in limine ruling that governs the Courts, the proceedings for all parties and proceedings. Why not inform

her of the in limine ruling?

MR. WILSON:  I have no issue with that.

MR. CROSS:  Thank you.

THE COURT:  I'm like Wilford Brimley in "The Firm":  I get paid for worrying about things when there's nothing to worry about.

Okay.  What else?

MR. CROSS:  Nothing from the United States at this time.  Nothing further from the United States.

MR. WILSON:  Nothing further from the defense.

THE COURT:  Okay.  Are we ready to bring the jury in?

MR. CROSS:  You want to bring the witness in or wait until the jury is in?

THE COURT:  You can wait until they're seated and call your witness.

(Jury entered the courtroom.)

THE COURT:  All right, folks.  Welcome back.  Have a seat, everyone.  Okay.  So yesterday we had a good day as far as progress.

THE COURTROOM DEPUTY:  Judge, hold on a second.  Hold on a second.

THE COURT:  Folks, I'm going to ask you to go back to the jury room so we can take up one matter with the lawyers. I'm sorry.  Karen just told me something I need to discuss with the lawyers, so why don't you-all head back in and --

(Jury exited the courtroom.)

THE COURT:  Okay, folks.  The juror seated in the front row far right that just whispered to Karen is nauseated and doesn't know what's going on but feels sick.  So this is your opportunity to have input about how we handle it.

MR. CROSS:  Just speaking out loud, I hate to lose someone this early, but especially if she's nauseated, I mean, is there a chance she has COVID?  I would hate for something to spread to the other jurors.

THE COURT:  Okay.  Mr. Wilson?

MR. WILSON:  I have no objection to letting her go and using the alternate.

THE COURT:  Why don't we do this.  Why don't we tell her that if she doesn't feel like she can continue, she's excused, but if she feels like she can, we'll accommodate her to the extent we can and just see how it plays out.

MR. CROSS:  Very good.

THE COURT:  I agree with you.  But something tells me if she's got something contagious, she was with the jurors all day yesterday, so --

MR. CROSS:  That's true.

THE COURT:  -- I think that ship might have sailed; okay?  I'll wait for Karen to come back out and we'll see how that goes.

MR. CROSS:  Yeah.  I wonder --

THE COURTROOM DEPUTY:  The juror says she's sick and she has nausea and she's been dealing with, I guess, this virus that's going around, throwing up and going to the rest room.  She don't think she can sit through it.  Judge, that's what she confirmed to me.

THE COURT:  Okay.  So you think we should excuse her?

MR. CROSS:  No objection from the United States.

MR. WILSON:  No objection.

THE COURT:  We are now on the highwire with no safety net.  Okay.  Let's excuse her without objection from the parties.  Tell her we're sorry but she's free to go.

(Jury entered the courtroom.)

THE COURT:  All right, folks.  Welcome back again.  So as you probably figured out, we've excused a juror who's not feeling well.  If any of you-all start not feeling well, let Karen know; okay?  We know in this day and time we have to be particularly vigilant about just monitoring things like that.  So anyway, have a seat.

I was saying, before that came up, that we had a really good day yesterday, got through all the legal stuff at the beginning, started our trial, called two witnesses.  And I think the Government's ready to call its third witness, and it may do so now.

MR. CROSS:  Thank you, Your Honor.

The United States calls Mikayla Paulus.

(MIKAYLA PAULUS, being first duly sworn, was examined and testified as follows:)

THE COURTROOM DEPUTY:  Be seated, please.  Please state and spell your first and last name for the record.

THE WITNESS:  Mikayla Paulus, M-I-K-A-Y-L-A P-A-U-L-U-S.

THE COURTROOM DEPUTY:  Give me just a moment to adjust the mic.  What city and state do you reside in?

THE WITNESS:  Apopka, Florida.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  Miss Paulus, if you wouldn't mind, just speak directly into the mic when you're answering questions. Appreciate that.

All right.  You may proceed when you're ready, Mr. Cross.

DIRECT EXAMINATION

BY MR. CROSS:

Q.  Mikayla, if you will, please introduce yourself to the jury again with your full name.

A.  Mikayla Paulus.

Q.  I'm going to stand back here so that when you talk, you'll talk to me so that they will hear you.  And just speak into the mic as the judge instructed you.

Where are you from?

A.  Orlando, Florida.

Q.   And what do you do in Orlando, Florida?

A.   I am in grad school to be a mental health counselor and I'm a substitute teacher.

Q.   And how old are you?

A.   I'm 21.

Q.   Last year, August 14, 2022, how old were you?

A.   20.

Q.   And do you know Adam Simjee?

A.   Yes.

Q.   How do you know Adam?

A.   He was my boyfriend.

Q.   When did you-all meet?

A.   I met him on his 18th birthday.  Our best friends were dating, so they hooked us up and we started dating May 11th, 2018.

Q.   And how did you-all first correspond with each other?

A.   On Snapchat.

Q.   It's a new day.

A.   (Nods head affirmatively.)

Q.   Tell us about the progression of your relationship.

A.   We both started college at the same time even though I was younger.  So we got all of our time together, only having school twice a week.  So we would go on adventures all the time, road-tripping, hiking, adopting cats.

Q.   Do you still have some cats?

A.   Yeah.

Q.   How many cats do you have?

A.   I have three.  We had three cats together.

Q.   What's their names?

A.   Olive, Mico, and Lugo.  And they're in a band called Mico and the Freakos.

Q.   Say that once again.

A.   They're in a band called Mico and the Freakos, which I got that tattoo for him.

Q.   Did you get to know Adam's parents?

A.   Yes.

Q.   And do you know their names?

A.   Abdul and Nafisa (phonetic).

Q.   And are you aware of why they're not here?

A.   They have COVID.

Q.   Mr. Simjee?

A.   Yes.

Q.   And is Mr. Simjee his biological father?

A.   Yes.

Q.   And his mother, is that his -- actually his stepmother?

A.   Nafisa raised him but not his biological mother.

Q.   How long had it been since -- how long has it been since he ever saw his mother?

A.   He was about two the last time.

Q.  I think you said y'all enjoyed traveling, hiking?

A.  Yes.

Q.  In August of 2022, where did Adam live?

A.  Apopka, Florida, with me.

Q.  And what was he doing at that time?

A.  He wasn't working but he was a full-time student at UCF.  He got accepted to the finance program just a week after he died.

Q.  Were you attending UCF last year?

A.  I was supposed to start the week after he passed, but we never actually went to school together.

Q.  Are you enrolled in UCF now?

A.  Yes.

Q.  That's University of Central Florida?

A.  Yes.

Q.  And what was his aspirations and hopes?

A.  He wanted to, first and foremost, live in a nice house in the middle of nowhere on a big piece of land and then be a portfolio manager.

Q.  Financial portfolio manager?

A.  Yes.

Q.  I want to go back about a year ago, August 14th, 2022. Do you remember that day?

A.  Yes.

Q.  What day of the week was August 14th, 2022?

A.   It was a Sunday.

Q.   Were y'all in Alabama at that time?

A.   Yes.

Q.   Tell us what brought y'all to Alabama.

A.   Adam had just got this van.  And we wanted to live a nomadic lifestyle eventually, just going state park to state park, so we were setting up the van, trying it out, and we were going to go to Arkansas.

Q.   When did y'all leave Florida?

A.   Saturday --

Q.   I'm sorry.  Before August 14th.

A.   Saturday, the 13th.

Q.   And where did you go from Florida?

A.   We went up to Atlanta and then over to stay the night at the Alabama Welcome Center.

Q.   Is that just west of the Alabama-Georgia state line?

A.   Yes.

MR. CROSS:  If we could look at Government's Exhibit 12, please.

Q.   (By Mr. Cross)  Do you recognize Government's Exhibit 12?

A.   Yes.

Q.   And what is it?

A.   It's the title of the van that we were driving.

Q.   Is that his new van --

A.   Yes.

Q.   -- y'all were trying out?

A.   Yes.

Q.   And who is it actually titled to?

A.   Abdul Simjee, his dad.

Q.   All right.  About what time did y'all wake up on August 14th?

A.   About 7:00 a.m.

Q.   And what did you do?

A.   He was still half asleep, so I started driving the car -- the van.  We drove towards -- Cheaha State Park was the first place that we were going to go on our trip.  Got breakfast.

Q.   Had y'all mapped that out previously?

A.   Yes.  It was on a list of places to go.

Q.   Did you go to the state park?

A.   We did.

Q.   Where did you go first as you went into the park?

A.   The store to buy tickets to get into the state park.

Q.   And did you have any specific destination that morning?

A.   We wanted to make it to Tennessee, but the morning was just to make sure we got, like, the most out of seeing the state park.  It was, like, the one place in Alabama that we were going to spend time.

Q.   And what sites in the park did you hope to see?

A.   We went to Bald Rock, the outlook, and took some pictures there, and then went to a lake and then mapped it to some waterfalls.

Q.   So you made it to Bald Rock?

A.   (Nods head affirmatively.)

Q.   You went to the lake?

A.   (Nods head affirmatively.)

Q.   And then from the lake y'all were going to the falls?

A.   Yes.

Q.   Did you make it to the falls?

A.   No.

Q.   Tell us what happened.

A.   We got to the lake and the gauge on the gas tank went down and said that it was empty.  So I asked if we should go get gas up by the store or if we should go find the waterfall. We turned around to pull out and then the gas gauge went back up, so then we mapped it to a waterfall.  We were driving down a dirt road and there was a woman who had her arms up.  And Adam told me to stop for her, and she said that she needed a jump.

Q.   She needed a what?

A.   A jump.

MR. CROSS:  If we could look at Government's Exhibit 5, please.

Q.   (By Mr. Cross)   We're looking at Government's Exhibit 5.   Do you recognize Government's Exhibit 5?

A.   Yes.

Q.   Drawing your attention to 600-3, is that the dirt road you were traveling on?

A.   Yes.

Q.   And which way were you traveling on 600-3?   Can you use your finger and draw where that is?

A.   We went this way (indicating).

Q.   And if you will, draw on to where you saw the woman that flagged you down.

A.   Like, here (indicating).

Q.   And she said she needed a jump?

A.   Yes.

Q.   Did she ask you for a ride to the store?

A.   No.

Q.   Ask you to give her a lift anywhere else?

A.   No.

Q.   She just said she needed a jump?

A.   That her car wasn't running, yes.

Q.   Did y'all try to help her out?

A.   Yes.   I -- she asked if we had jumper cables and I said no.   And Adam said, "Yes, we do, right here."   So then he -- she started walking down the dirt road and he told me to follow her.

Q. Okay. You're still driving at this time?

A. Yes.

Q. Adam was in the passenger seat?

A. Yes.

Q. You didn't think you had jumper cables?

A. (No audible response.)

Q. Adam volunteered to help?

A. Yes.

Q. Did you disagree with him?

A. Yes. I didn't feel like a good idea [sic], but he wanted to help.

Q. So did y'all try to help?

A. (Nods head affirmatively.)

Q. Okay. You were telling us from 600-3 y'all went down another dirt road?

A. Yes.

Q. To the left or to the right of 600-3?

A. To the left.

Q. And was she in the vehicle with you?

A. No. She was walking in front.

Q. And how far into the woods did you follow her, if you know?

A. I don't know.

Q. Deeper into the woods?

A. Right, yes.

Q.   And did you see anything once y'all got deeper into the woods?

A.   A purple Scion.

Q.   And was anything -- do you remember anything remarkable about the Scion at that point?

A.   No.

Q.   Did y'all have to pop the hood in order to jump her off?

A.   No.  The hood was already up when we got there.

Q.   As y'all arrived, the hood is up?

A.   Right.

Q.   Mikayla, I'd like to show you Government's Exhibit 4. We'll play just a little bit of it.  And so that we know, there's a lot of things you don't want to hear or see today; is that true?

A.   Yes.

Q.   Are you nervous?

A.   Yes.

Q.   A little emotional?

A.   Yes.

Q.   We're just going to play just a little bit at the very beginning of Government's Exhibit 4, if you don't mind.

(Video was viewed.)

MR. CROSS:  Stop it.

And how do I clear the screen, Karen?  I apologize.

THE COURTROOM DEPUTY:  Should be your left hand, your left-hand corner.  Do you see a clear?  Just click on here.

Q.   (By Mr. Cross)  Mikayla, you see that vehicle?

A.   Yes.

Q.   Is that Adam's Uplander?

A.   Yes.

Q.   Is that where y'all parked that day?

A.   Yes.

Q.   And then you got out of the Uplander?

A.   Yes.

Q.   Before y'all got out of the white Uplander, what, if anything, did y'all get to carry with you?

A.   While we were driving behind her, Adam jumped into the back and grabbed his gun and put it in his waistband.

Q.   Do you know what kind of gun he had?

A.   A 9- -- a black 9-millimeter.

Q.   And do you know why he grabbed his gun?

A.   He said, "This is how people get robbed."

Q.   But y'all still helped?

A.   Yes.

Q.   Did he grab his jumper cables?

A.   Yes.

Q.   Anything else?

A.   No.

MR. CROSS:  I'd like to play it till we get to the

site.

(Video was viewed.)

Q. (By Mr. Cross)  Do you recognize the vehicle y'all worked on there?

A. Yes.

Q. If you will, just describe it for us.

A. It's purple and the door's open and the back window looks like it's gone.

Q. And when y'all arrived, the hood was up?

A. Yes.

Q. While I'm thinking about it, was the van ever moved that day?

A. Yes.

Q. How do you know the van was moved?

A. I drove it because I needed to get the paramedics closer.

Q. So you actually drove the van?

A. (Nods head affirmatively.)

Q. And did you move it beside the Scion?

A. Yes.  I moved it behind it.

MR. CROSS:  You can take that down.  I'd like to look at Government's Exhibits 134 and 135.

THE WITNESS:  Can I get some water, please?

MR. CROSS:  May I approach the witness?

THE COURT:  You may.

THE WITNESS:  Thank you.

Q.  (By Mr. Cross)  Are you ready?

A.  Yes.

Q.  Okay.  We're going to look at Government's Exhibits 134 through 138 and just scroll through them briefly.

MR. CROSS:  If we could go back one.

Q.  (By Mr. Cross)  Is that the Scion y'all tried to fix that day?

A.  Yes.  Yes.

Q.  And we are looking at Government's Exhibit 137.  We see a white vehicle there to the left of the Scion.

A.  Yes.

Q.  Is that y'all's vehicle?

A.  Yes.

Q.  After you moved it?

A.  Yes.

Q.  Later that day?

A.  Yes.

MR. CROSS:  Okay.  Take that down.

Q.  (By Mr. Cross)  What did y'all do to try to get the Scion to work that day?

A.  Adam tried to jump it for probably about five minutes or so and then --

Q.  Did it ever turn over?

A.  No.

Q.   Ever sound like it was going to crank?

A.   No.

Q.   Okay.

A.   So then we put the key in the ignition.  And it was locked, so we were, like, shaking the steering wheel.  And then I called my dad.

Q.   And what did you say to your dad?

A.   That we were working on a car, that the steering wheel was locked and the key wouldn't turn forward.

MR. CROSS:  If we could look at Government's Exhibits 121 through 122.

Q.   (By Mr. Cross)  We're looking at Government's Exhibit 121.  Do you recognize that?

A.   Yes.

Q.   Did you ever get in the driver's seat that day?

A.   I did not.

Q.   Did Adam?

A.   Yes.

MR. CROSS:  Government's Exhibit 122.

Q.   (By Mr. Cross)  Did you ever look into the door that day?

A.   Yes.

Q.   Is that the way the Scion appeared?

A.   I think Adam took the bottom panel off.

Q.   Why did he take the bottom panel off?

A.    To try and reach some of the wires behind to see if we could bypass the security system that was keeping the ignition locked.

Q.    Did y'all ever get the steering wheel to turn?

A.    No.

Q.    What advice did your dad give you?

A.    He sent me some YouTube videos, and we watched -- I watched those to see what could be done to get the steering wheel to move.  And then he told me that if we've tried for as long as we were, then there's probably another key or something and it's not going to work.

MR. CROSS:  If we could look at Government's Exhibit 9.

Q.    (By Mr. Cross)  Do you recognize Government's Exhibit 9?

A.    Yes.

Q.    What is that?

A.    It's a screenshot of August 14th, 2022, when I called my dad.

MR. CROSS:  You can go to the next page of Government's Exhibit 9.  Can't read it.

Q.    (By Mr. Cross)  Is that a phone history?

A.    Yes.

Q.    Did you talk to your dad a couple of times?

A.    Yes, earlier that morning, because of the gas gauge.

Q.   Okay.  So you only made one call to him about the Scion?

A.   Yes.

MR. CROSS:  Next page.

Q.   (By Mr. Cross)  Is this the text with your dad?

A.   Yes.

Q.   And what's at the bottom of this page of Government's Exhibit 9?

A.   The YouTube video.

Q.   That he sent you?

A.   Yes.

MR. CROSS:  Next page.

Q.   (By Mr. Cross)  More texting about the vehicle?

A.   Yes.

MR. CROSS:  Next page.  All right.  Thank you.

Q.   (By Mr. Cross)  Did y'all -- what did you do next?

A.   Adam got out of the driver's seat and we stood back with our backs towards the van, facing her, and she was sitting in the driver's seat.  And I asked her if she needed anything else, if we could, like, tell a ranger that she needed help or if there was anything we could do for her.  And she said, "Yeah, you can do something for me" and then grabbed her gun, pointed it at us, and told us to put our hands up.

Q.   Where did she find her gun?

A.   I believe it was, like, in the back seat of the car.

Q.   Did y'all comply?

A.   Yes.

Q.   Did she tell you anything else?

A.   She told us to turn around and walk with our hands up and then take the stuff out of our pockets and put it on the ground.

Q.   Did you have anything in your pockets?

A.   My phone, the keys to the van, yeah.

Q.   Did Adam have anything in his pockets?

A.   He didn't have anything in his pockets.  He just had the jumper cables in his hand.

Q.   Did he reply to her in any way?

A.   He said that everything was in the van, she could just take it.

Q.   Okay.  Did she then just take your van and leave?

A.   She did not.

Q.   Tell us what happened next.

A.   She told us to keep walking with our hands up.

Q.   And where did you walk?

A.   We ended up around, like, a log that was, like, blocking the path that we were taking, so we turned around there.  And she started asking us for banking passwords after she picked my phone up.

Q.   She picked your phone up?

A.   Yes.

Q.   Y'all walked back to this log?

A.   Yes.

MR. CROSS:  If we could look at Government's Exhibit 14, please.

Q.   (By Mr. Cross)  Have you ever seen this before?

A.   Yes.

Q.   What does this appear to be to you?

A.   A diagram of where we were that day, the campsite.

Q.   While not to scale, does it fairly represent where the Scion was located, the van?  I'll ask you, was the van located there at the time y'all walked away from the Scion?

A.   No.

Q.   Is that where you moved -- we're looking now at Government's Exhibit 14.  Is that where you moved the van later in the day?

A.   Yes.

Q.   Does it fairly represent where the log is located where she walked you to?

A.   Yes.

MR. CROSS:  Government's Exhibit 20, please.

Q.   (By Mr. Cross)  Do you recognize this picture?

A.   Yes.

Q.   And is that -- do you see a log in that picture?

A.   (Nods head affirmatively.)

MR. CROSS:  Okay.  Take that down.

Q.    (By Mr. Cross)   Is that the log y'all walked to?

A.    Yes.

Q.    You were telling us when you got to the log she was asking y'all some questions.

A.    She was -- she was asking us the password to our phones and, like, our credit card pin numbers and our banking passwords.

Q.    And did you know she was recording that with your phone?

A.    Yes.

Q.    If we could now -- if you don't mind, we'll play those for you.  Is that okay?

A.    Yes.

MR. CROSS:  Play Government's Exhibit 6 first.

(Audio was played.)

Q.    (By Mr. Cross)   Tell us the voices on that recording.

A.    That's me, Adam, and Yasmine Hider.

MR. CROSS:  Government's Exhibit 7, please.

(Audio was played.)

MR. CROSS:  Government's Exhibit 8, play that, please.

(Audio was played.)

Q.    (By Mr. Cross)   Just so that we're clear, who all is back there beside that log at this time?

A.    Adam and I were against the log and Yasmine was facing us.

Q.   Was anybody else out there that you saw?

A.   I didn't see anybody else.

Q.   Was it very secluded?

A.   Yes.

Q.   What do you recall next?

A.   After asking us for all of our passwords and Adam telling her to just take everything in the van, she lowered her guard a little bit and put her gun to the side and said, "I'm just playing."  And then Adam pulled his gun while she was distracted and told her to drop her gun and get on the ground.

Q.   Did she comply?

A.   She started lowering but she never got on the ground.

Q.   What did she do then?

A.   She was, like, crouching and she was, like, "Are you serious?"  And he told her again, "Drop the gun and get on the ground."  And then she started messing around with her gun, trying to cock it, facing it towards the ground a little bit, turning towards him.  And then Adam stepped to the side and I think she, like, shot the ground first and then he started shooting and they started shooting each other.

Q.   Do you recall how many shots were fired?

A.   I don't.

Q.   More than one?

A.   Yes.

Q.   Several?

A.   Yes.

Q.   Where were you located at that point?

A.   I was still against the log.

MR. CROSS:  If we could look at Government's Exhibit 14, please.

Q.   (By Mr. Cross)  Okay.  Would you tap where you were located when the shooting started?

A.   (Complies.)

Q.   And where was Adam located?

A.   When the shooting started, he was here (indicating).

Q.   Did Adam ever move once the guns were pulled?

A.   As soon as he pulled his gun, he stepped to the side, but once they were pulled, he -- they just more, like --

Q.   Sure.  I don't want to put words in your mouth.  Did he move away from you?

A.   Yes.

Q.   And where was Miss Hider located?

A.   Here (indicating).

Q.   When the shooting stopped, where was Adam?

A.   He was still in the same position.

Q.   Was he still standing at that time?

A.   No.  He was on the ground.

Q.   Okay.  Did he go to the ground during the shooting?

A.   Yes.

Q. Do you know if he was shot or if he was just trying to evade? What -- as much as you recall.

A. They were shooting at each other. He was standing. And then at some point he said, "I'm shot" and then dropped to the ground.

Q. Were any more shots fired?

A. Yes. He then shot at her again.

Q. Was she still standing?

A. I don't remember.

Q. Okay. Did she ever go to the ground?

A. Yes.

Q. Was it soon after the shooting stopped?

A. Yes.

Q. Best you can remember?

A. (Nods head affirmatively.)

Q. Did the shooter say anything after the shooting stopped?

A. She said, "Why did you shoot? It wasn't supposed to be this way. We just -- we have a five-year-old. We just needed food and water."

Q. Say that again, if you don't mind.

A. She said, "Why did you shoot? It wasn't supposed to be this way. We have a five-year-old. We just wanted food and water."

Q. Did she say anything else?

A.   Not directly in that moment but later on.

Q.   Okay.  Did she ever speak to you about the gun?

A.   She said, "This isn't even my gun."

Q.   Where was the gun when she said that?

A.   It was probably, like, 2 feet in front of her on the ground.

Q.   Was she still holding it?

A.   No.

Q.   Did she call for anybody?

A.   Yes.  She yelled into the woods after a couple minutes of us sitting there and said, "Imani, Krystal, they shot me. Help me.  They shot me."

Q.   And she said "Imani" and "Krystal" or just "Imani"?

A.   She said "Krystal" as well.

Q.   And do you know who she was speaking to?

A.   No.

Q.   Did you see anybody else out there that day?

A.   A little bit after her yelling, someone came from directly behind the log and circled around us.

Q.   Did she yell more than once?

A.   Yasmine Hider, yes.

Q.   And did she have to yell several times before anyone appeared?

A.   A couple times.

Q.   And if you will, show us where this other individual

first appeared to you.

A.   The first time I saw her was here (indicating).

Q.   And did she move anywhere after she appeared?

A.   Yes.  Do you want me to draw it?

Q.   Please.

A.   She went like this (indicating).

Q.   I believe, for the record here, the blue dot that's furtherest [sic] down on the diagram?

A.   At the time that I saw the second person, I was next to Adam.

Q.   How long did this second person stay there?

A.   I can't -- I don't know, like, for sure but maybe, like, a minute.

Q.   Is it tough to recall?

A.   Yes.

MR. CROSS:  If we could quickly go to Government's Exhibit 92.

Q.   (By Mr. Cross)  Would you hit the bottom left of your screen -- or let's just leave it for now.  I'm going to go back.  Do you recognize anyone in that picture, Government's Exhibit 92?

A.   Yes.

Q.   Who do you recognize?

A.   The person on the left sitting on the truck.

Q.   The lady?

A.   Yes.

Q.   Is that the person that came from behind you that day --

A.   Yes.

Q.   -- after the shooting?

A.   Yes.

Q.   And is she wearing the same thing she was wearing that day?

A.   I think so.

Q.   May not be -- may not be, as far as you know?

A.   I can't remember for certain.

Q.   But you recognize that that's the person that came behind you that day?

A.   Yes.

MR. CROSS:  We can go back to Government's Exhibit 14.

Q.   (By Mr. Cross)  Did she help Hider in any way or tend to her?

A.   No.

Q.   Did she say anything to Hider that day?

A.   She said, "What do you want me to do?  I don't have anything on me.  What do you want me to do?"

Q.   And so what did -- what did she do?

A.   She was walking around here (indicating) when she was talking and then she got here, stared for a little bit, and then ran.

Q.   In which direction?

A.   This direction (indicating).

Q.   Okay.  Can you carry it a little further out that you remember?

A.   Be like that (indicating).

Q.   Was your attention also focused elsewhere at the time this occurred?

A.   Yes.

Q.   Tell us what you were doing at the time that she came from behind you and then ultimately left.

A.   I was on the phone with 911 making sure that they knew where we were and also making sure that Adam kept breathing.

Q.   Do you remember talking to the 911 operator?

A.   Yes.

Q.   You and I talked several times in preparation for today?

A.   Yes.

Q.   You don't want to listen to that 911 call, do you?

A.   No.

Q.   Have you read a transcript of that 911 call?

A.   Some of it.

Q.   The parts you've read, does it fairly and accurately reflect what was said and done that day?

A.   Yes.

Q.   Do you recall how long you performed CPR on Adam?

A.    It was probably the last ten minutes on the phone.

Q.    Okay.  When did you have to start performing CPR on him?

A.    About 15, 20 minutes after he'd been shot.

Q.    And why did you have to start performing the CPR?

A.    His breathing was slowing down a lot and he wasn't taking breaths on his own.

Q.    Do you remember Hider doing anything during that time that was remarkable?

A.    She put the gun to her head and said she didn't want to go to jail.

Q.    Did she attempt to pull the trigger?

A.    Yes.

Q.    How do you know?

A.    She was right in front of me.  I was yelling at her not to.

Q.    Were you yelling to her to put the gun down?

A.    Yes.

Q.    Have you read that on the transcript, that exchange?

A.    Parts of it.

Q.    Did she appear to be serious in trying to shoot herself?

A.    Yes.

Q.    Were you screaming at her?

A.    Yes.

Q.  Did she finally put the gun down?

A.  Yes.  It got jammed and so she gave up.

Q.  Okay.

MR. CROSS:  If I can have just a moment, Your Honor.

THE COURT:  You may.

Q.  (By Mr. Cross)  Mikayla, not the shooter but the person that came behind you and then left the scene, do you remember talking with her at all or saying anything to her?

A.  I told her to not get closer, to stay away.

Q.  The person that appeared that day after the shooting, are they in the courtroom?

A.  Yes.

Q.  If you don't mind, would you identify her?

A.  She's right there (indicating).

Q.  Seated on the right of the courtroom as we face the Judge?

A.  Yes.

MR. CROSS:  Just about done, at least with the direct. If we could go back to Government's Exhibit 20.

Q.  (By Mr. Cross)  We're looking at Government's Exhibit 20, Mikayla.  You said that was the log where the shooter took you?

A.  Yes.

Q.  And held you at gunpoint?

A.  Yes.

Q.   Do you recognize the blue covering?

A.   Yes.

Q.   And where was Adam located that day when you were performing CPR on him after the shooting took place?

A.   Right there under the blue cover.

Q.   Okay.  And the person under that blue cover, that is Adam Simjee?

A.   Yes.

Q.   Your boyfriend?

A.   Yes.

Q.   And that was the last time you saw him alive that day?

A.   Yes.

Q.   Thank you.

MR. CROSS:  No further questions at this time.

THE COURT:  All right.  Cross-examination?

                    CROSS-EXAMINATION

BY MR. WILSON:

Q.   Can you hear me okay, Miss Paulus?

A.   Yes.

Q.   Okay.  The driver that you stopped to help that flagged you down was Yasmine Hider, not Krystal Pinkins; right?

A.   Yes.

Q.   Okay.  The person that shot Adam was Yasmine Hider, not Krystal Pinkins; right?

A.   Yes.

Q.   How long did y'all try to work on the car?

A.   For about an hour.

Q.   For an hour?

A.   Yes.

Q.   At any point in that entire hour, did you see Krystal Pinkins?

A.   No.

Q.   Okay.  By the time you saw Krystal Pinkins, how long had you been at the scene?

A.   It would have been just a little bit over an hour.

Q.   Okay.  She arrives after -- Miss Pinkins arrives after Yasmine Hider called for help; right?

A.   Yes.

Q.   And you've already testified she didn't help her?

A.   Correct.

Q.   I don't want to play any part of that 911 call --

A.   Thank you.

Q.   -- but do you remember saying to Miss Pinkins, "Don't come near me"?

A.   Yes.

Q.   Okay.  You were already on the phone with 911 when you encountered Miss Pinkins; right?

A.   Yes.

Q.   And at the same time that you're screaming "Don't come

near me," Yasmine Hider is also screaming for help; right?

A.   I don't remember if that happened at the same time.

Q.   Close in time?

A.   Yes.

Q.   Okay.  Did Miss Pinkins tell you, "I don't have anything on me.  I'm not here to hurt you"?

A.   No.

Q.   Okay.  Did she do anything to hurt you in any way?

A.   No.

Q.   Did she show you she was unarmed?

A.   No.

Q.   Okay.  Was she holding a shotgun?

A.   No.

Q.   No.  Did she offer any kind of assistance whatsoever that you could see to Yasmine Hider?

A.   No.

Q.   Matter of fact, she refused to; right?  Told her "I don't know what you want me to do" and then left?

A.   Right.  She said she didn't have anything on her.

Q.   Right.  Is it possible that the "I don't have anything on me" is directed towards you?

A.   I don't think so.

Q.   Okay.  But you said you -- it's been a long time and some stuff's hazy; right?

A.   Not the context that words are said.

Q.   Okay.  And I believe the Government's lawyer showed you a picture of Miss Pinkins and what looked like a small child.

A.   Yes.

Q.   Were you there when that photo was taken?

A.   I believe I was.

Q.   So did you see the small child at the scene that day?

A.   I don't think I did.

MR. WILSON:  Okay.  Thank you, Miss Paulus.

THE COURT:  Any follow-up to that?

MR. CROSS:  No, Your Honor.  May this witness be excused?

THE COURT:  Yes.

You may step down.  You're excused.

THE WITNESS:  Thank you.

THE COURT:  All right.  Ready to call your next witness?

MR. CROSS:  I believe so, Your Honor.  I want to make sure that he's here.  The United States would call Mark Osburn.

THE COURT:  What's your estimated time spent with this witness on direct?

MR. CROSS:  He's -- this is going to be the scene investigator.  We're probably going to go 30, 40 minutes.

THE COURT:  All right.  You all want to take a short

break before we get started with this or take a break after direct and before cross?

MR. CROSS:  I need to get some evidence together real quickly also.

THE COURT:  All right.  You can do that.

MR. CROSS:  Your Honor, may we approach?

THE COURT:  Do you need to go in the hallway or approach me?

MR. CROSS:  I'd like to approach you.  I think it shouldn't take long, just a matter of --

THE COURT:  Folks, let's take a midmorning break. We've got a couple things we're trying to work through here. I know we just got started, but this will make lunch get here quicker.

(Jury exited the courtroom.)

THE COURT:  All right.  Did you-all want to take something up real quick?

MR. WILSON:  Yes, Your Honor.

MR. CROSS:  Thank you, Judge.  We're about to look at some scene photos, so I just wanted to let some people know.

THE COURT:  Okay.  I thought there was something you needed to take up with me, though.

MR. CROSS:  It is but I thought we could do in open court.

THE COURT:  Okay.  That's fine.  You asked me to go

into the hallway.

MR. CROSS:  I'm sorry.  Yeah, when the jury was here, I was just going to come up to the bench and we could look at the photos with our exhibit notebook, but now without the jury being here I think we can put them on the monitor.  I think there are some objections Mr. Wilson wants to make --

THE COURT:  Okay.

MR. CROSS:  -- and I understand that.

THE COURT:  All right.  Let's hear them.

MR. WILSON:  Your Honor --

MR. CROSS:  If you want me to, I'll show them so the Judge can see them.

THE COURT:  Okay.  What exhibits are we talking about?

MR. CROSS:  We're going to be looking at Government's Exhibits, generally, 15 through 44, but I believe the objections are going to be to the body and scenes of -- photos of --

THE COURT:  The what?

MR. CROSS:  The body of Adam.

THE COURT:  All right.  And these are 403 objections?

MR. WILSON:  Yes, Your Honor.

THE COURT:  Okay.

MR. CROSS:  Mr. Wilson, just to the ones of the body?

MR. WILSON:  That's correct.

THE COURT:  All right.  So --

MR. CROSS:  Let's go to Government's Exhibit 22.

THE COURT:  Okay.  20 and 21 look pretty similar to me.  What's the difference?  One's a little closer up.

MR. CROSS:  Right.  20 is a little further back --

THE COURT:  Yes.

MR. CROSS:  -- so it sort of shows the lay --

THE COURT:  Why do you need 20 if you have 21?

MR. CROSS:  I'm sorry?

THE COURT:  Why do you need to introduce Government's Exhibit 20 if I allow you to introduce Government's Exhibit 21?  Anything distinguishable about the --

MR. CROSS:  Right.

THE COURT:  Or it might be the other way around.  You may want 20 rather than 21.

MR. CROSS:  Correct.

THE COURT:  Looks like it's slightly different angles but it's the same scene.  You're focused on the blue tarp and the body; right?

MR. CROSS:  Actually, the purpose of these, as we prepared for trial, was to show the scene and where someone may have been located, Your Honor.  I think, as we've determined where people were located, the relevance of 20 and -- having 20 and 21 no longer exists.  We would move to admit only Government's Exhibit 20.

THE COURT:  All right.  Only 20.

MR. CROSS:  Only 20.

THE COURT:  All right.  Is there an objection to admitting Government's Exhibit 20?

MR. WILSON:  Yes, Your Honor.

THE COURT:  And 403?

MR. WILSON:  If I can elaborate on it.

THE COURT:  I'm waiting.

MR. WILSON:  Okay.  Miss Paulus just testified that Adam was under the blue tarp.  These photographs here are right under the same blue tarp.  So anything that they're showing with him over there in the same location is cumulative.  Also, as far as pictures of injuries for the other pictures, just go ahead and get ahead of it and make my arguments?

THE COURT:  That's fine.

MR. WILSON:  We've already stipulated to cause of death of what his injuries are and we're just going to submit the autopsy report.  So all this is more prejudicial than probative and cumulative.

THE COURT:  Well, I don't think a photograph is cumulative of oral testimony.  One is a visual; one is a description by an eyewitness who was under duress at the time. So I think it's -- I don't think there's any cumulative nature to admitting photos of the scene and the blue tarp; okay?  So -- now, it may be that there's a cumulative issue with respect

to the number of photos admitted, and that's why I asked the Government to choose between 20 and 21, because I think they're basically showing the same thing; okay?  So I'm going to admit Government's Exhibit 20.  My understanding is the -- Government's Exhibit 21 has been withdrawn?

MR. CROSS:  That's correct.

THE COURT:  Not offered?

MR. CROSS:  That's correct.

THE COURT:  Okay.  And that's over -- well, I've already admitted 20; right?

MR. WILSON:  So we would ask that 21 be excluded.

THE COURT:  Yeah.  So 21 was identified.  There was an objection, which is sustained on -- for the reason I just stated.

All right.  What's the next -- what's the next one -- or the next -- tell you what.  Let's just -- tell me which scenes -- which photos -- sorry -- of the body you're offering and let me compare those and let -- hear from Mr. Wilson about a 403 objection as to those.  I take it one of them is 22?

MR. CROSS:  22.

THE COURT:  Okay.  23?

MR. CROSS:  23.  27.

MR. WILSON:  26.

THE COURT:  26 or 27?  I heard that from different people.

MR. CROSS:  26.

THE COURT:  Okay.

MR. CROSS:  27.

THE COURT:  Right.

MR. CROSS:  28.  His feet are still in the picture.

THE COURT:  All right.

MR. CROSS:  And I believe that's all of the body.

MR. WILSON:  30.

MR. CROSS:  30.  I know there's one more.  35.

MR. WILSON:  34, 35.

MR. CROSS:  I'm sorry.  34.

MR. WILSON:  35, 36.

MR. CROSS:  35, 36.

THE COURT:  Okay.

MR. CROSS:  Okay.  I think that's it.

THE COURT:  All right.  You're offering each of those; correct?

MR. CROSS:  That's correct.

THE COURT:  All right.  Mr. Wilson?

MR. WILSON:  Your Honor, we've already admitted Exhibit 20, so the rest of them containing the body are cumulative, more prejudicial than probative.  All they're showing is injuries which caused the death, which is a fact we've already stipulated to.  The only other thing they could be showing is location, which is already established through

Exhibit 20.

THE COURT:  All right.  Government's response?

MR. CROSS:  See the best way to handle this.  The Government's Exhibit 22, 23, and I think the last two we identified.  22, 23, 34, 35, 36.  We have stipulated to the cause of death, Your Honor; however, we've stipulated to an autopsy report that says the cause of death was death by a gunshot wound.  But also, as the Court knows, the jury does not have to accept a stipulation.

THE COURT:  Right.

MR. CROSS:  And these photos --

THE COURT:  And I referenced that in the preliminary instructions I gave them.  I said that you'll have to make sure that the jury accepts the stipulation of parties in a criminal case.  All right.  So let me ask you --

MR. CROSS:  And so we're offering this to corroborate the stipulation that we've entered into.

THE COURT:  All right.  I think you're entitled to put in some exhibits of the body.  The question is at what point, in light of the stipulation and in light of the fairly undisputed testimony in the case, as I understand the parties to be representing what they expect will occur with the Court -- and we can always -- if there becomes a dispute about this, we can always revisit admission of exhibits that otherwise may be cumulative if there's really no disputed evidence

otherwise.  So what does -- what does Exhibit 28 do that other exhibits don't do?  That's just a picture of his feet by a log, but the log's visible.

MR. CROSS:  Correct.  That's evidence.  The orange flags are items of evidence Mr. Osburn is fixing to testify to.

THE COURT:  Are those the casings?

MR. CROSS:  Correct, some are casings.

THE COURT:  But those are from the victim's gun; right?

MR. CROSS:  We don't know.  We don't know.  They were both 9-millimeters.

THE COURT:  Okay.  But they're visible in Exhibit 26, for example, same flags.

MR. CROSS:  Your Honor, you're correct.

THE COURT:  Okay.  All right.  And similar question with respect to Government's Exhibit 30:  What does that add that the other photographs don't already portray?

MR. CROSS:  It shows other shell casings and cartridges that are -- as we're looking at Government's Exhibit 30, in the upper left-hand corner, in relation to the body and the evidence items that were found --

THE COURT:  Okay.

MR. CROSS:  -- at the foot of the victim.

THE COURT:  That's helpful.  Thank you.  All right.

34 and 35, why do you need both of those?

MR. CROSS:  And 36.

THE COURT:  And 36.

MR. CROSS:  Yes.  It shows the bleeding that occurred from the laceration of the iliac artery and shows the exit wound --

THE COURT:  Okay.

MR. CROSS:  -- where it came out.  One's closer up so they can actually see the wound that was documented in the autopsy report.

THE COURT:  Why do you need 35 if you have 36?

MR. CROSS:  Your Honor, I always use -- so that they have a good perspective of what they're looking at and then a close-up of the wound.

THE COURT:  Okay.

MR. CROSS:  And 35, I don't see the wound as well as I do on 36.  And 36, I just want to know what part of the body we're looking at.  I find that's helpful.

THE COURT:  All right.  I'm going to grant, in part, the defendant's motion to exclude exhibits under rule 403 as cumulative and I'm going to exclude two exhibits.  I'm going to exclude Government's Exhibit 28 and -- actually, I'm going to exclude one exhibit, Government's 28.  I think the others actually do bring some different perspective about what occurred at the scene.  And I'm going to otherwise admit, over

objection, Government's Exhibits 22, 23, 26, 27, 30, 34, 35, and 36.  Okay?

MR. CROSS:  Okay.

THE COURT:  I think your point's well taken, Mr. Wilson, but in the context of things, I think each -- I've looked carefully at each of those exhibits.  I think each of them present a little different perspective on the evidence. So I don't -- I understand they're cumulative in terms of showing the body a number of times, but I think they each present something else significant about the scene at the time; okay?  So I'm going to overrule your objections except as to Government's Exhibit 28.  I've also sustained your objection as to Government's Exhibit 21 previously; okay?

MR. WILSON:  Your Honor --

MR. CROSS:  Okay.  So essentially, 21 and 28 are excluded?

THE COURT:  Correct, under Rule 403.

MR. WILSON:  Your Honor, for purpose of preserving the record, can I just leave the objection standing so I don't have to object again and again as they --

THE COURT:  Yeah.  No, you've preserved your objection to admission of each of those exhibits other than the two I sustained.

MR. WILSON:  Thank you, Your Honor.

THE COURT:  Now, I will say this:  I think the

objection to all the exhibits is not well taken, but I understand why you're objecting.  And -- but my -- and as the -- kind of the gatekeeper, I've looked carefully at whether or not there's -- it's unfairly prejudicial and cumulative to allow those exhibits in.  I don't think it is, because each of them present a different evidentiary purpose or value to the Government.  So that's the basis for my ruling.

Let's take a short break for the lawyers now, unless there's anything else we need to take up.

MR. CROSS:  Your Honor, if I may just be heard so that I am clear, do we -- do I want to go ahead and go through the motions and move for admission of each one of these, or could I offer them all on the record at this time?

THE COURT:  Well, I thought we were handling it the same way we did before --

MR. CROSS:  Me too.

THE COURT:  -- just dealing with some exhibits that -- you can say, if you wish to -- and I started to do this but I didn't want to break your stride and the direct of the last witness.  I started to tell the jury that I had admitted certain exhibits while they were on break.  I can certainly say that to them when they come back --

MR. CROSS:  Okay.

THE COURT:  -- say there's a number -- some of the exhibits that were just published to you and some exhibits

that will be published to you I have admitted in conference for the lawyers on the record outside of your presence, so if something comes in that you haven't heard me say was admitted, it was admitted while you weren't in the courtroom; okay?

MR. CROSS:  Very good.  I have several others just real quickly that I don't think there's objections to --

THE COURT:  All right.

MR. CROSS:  -- for the record, with the same witness.

THE COURT:  Okay.

MR. CROSS:  Government's Exhibit 14 we've already admitted.  I'm going to be offering Government's Exhibits -- if I may state it -- 15 through 44, excluding Government's Exhibit 21 and 28.

THE COURT:  All right.  So some of those are already in.  So 15 is a scene photo.

MR. CROSS:  Correct.

THE COURT:  Any objection to that?

MR. WILSON:  No, Your Honor.

THE COURT:  It's admitted.

MR. CROSS:  Government's 16.

THE COURT:  That's been identified but not offered yet; correct?

MR. CROSS:  I believe so.

THE COURT:  Any objection?

MR. WILSON:  No, Your Honor.

THE COURT: Admitted.

MR. CROSS: 17.

THE COURT: Another scene photo. Any objection?

MR. WILSON: No, Your Honor.

THE COURT: Admitted.

MR. CROSS: 18.

THE COURT: Any objection?

MR. WILSON: No, Your Honor.

THE COURT: Admitted.

MR. CROSS: 19.

THE COURT: Any objection?

MR. WILSON: No, Your Honor.

THE COURT: Admitted. I think we're at 24 maybe.

MR. CROSS: That's -- you're correct.

THE COURT: Okay. Any objection?

MR. CROSS: No, wait.

MR. WILSON: To 24, no, Your Honor.

THE COURT: Okay. No objection to 24. It's admitted.

MR. CROSS: What about 22.

THE COURT: 22 I admitted.

MR. CROSS: Okay. I'm sorry. We're just cleaning up.

THE COURT: Yeah. So that's what you have, Mr. Wilson? 22 is in?

MR. WILSON: Right.

THE COURT: Over your objection.

MR. WILSON:  Yes, Your Honor.

MR. CROSS:  24 we've admitted.

THE COURT:  Yes.  We're at 25.

MR. WILSON:  No objection.

THE COURT:  It's admitted.  29?  Is that offered?

MR. CROSS:  It is.

THE COURT:  29 -- yeah, 29.

MR. WILSON:  No objection.

THE COURT:  Admitted.

MR. CROSS:  We had 32; correct?

THE COURT:  I think we're at 31.

MR. CROSS:  Okay.  31.

MR. WILSON:  No objection.

THE COURT:  Admitted.

MR. CROSS:  32.

MR. WILSON:  No objection.

THE COURT:  Admitted.

MR. CROSS:  33.

MR. WILSON:  No objection.

THE COURT:  Admitted.

MR. CROSS:  36.

THE COURT:  36 is in.

MR. CROSS:  Right.  I think we go to 38.

THE COURT:  We're skipping 37?

MR. CROSS:  I thought we had admitted it.

THE COURT:  No.

MR. CROSS:  No, you're correct.

THE COURT:  All right.  37, any objection?

MR. WILSON:  No, Your Honor.

THE COURT:  It's admitted.

MR. CROSS:  38.

MR. WILSON:  No objection.

THE COURT:  Admitted.

MR. CROSS:  39.

MR. WILSON:  No objection.

THE COURT:  Admitted.

MR. CROSS:  40.

MR. WILSON:  No objection.

THE COURT:  Admitted.

MR. CROSS:  41.

MR. WILSON:  No objection.

THE COURT:  Admitted.

MR. CROSS:  43.

MR. WILSON:  No objection.

THE COURT:  Admitted.

MR. CROSS:  44.

MR. WILSON:  No objection.

THE COURT:  Admitted.  Okay.

MR. CROSS:  Then we have a crime scene report, Government's 45.

THE COURT:  Any objection?

MR. WILSON:  No, Your Honor.

THE COURT:  Admitted.

MR. CROSS:  Government's Exhibit 46 is a Sig Sauer 9-millimeter pistol.

THE COURT:  Any objection?

MR. WILSON:  No, Your Honor.

THE COURT:  Admitted.

MR. CROSS:  Government's Exhibit 47 is an SCCY 9-millimeter pistol.

THE COURT:  Any objection?

MR. WILSON:  No, Your Honor.

THE COURT:  Admitted.

MR. CROSS:  Government's Exhibits 48 through 65 are cartridges, cartridge cases, and projectiles.

MR. WILSON:  No objection to any of them.

THE COURT:  All right.  They are each admitted. That's, just for the record, Government's 48 through Government 65 inclusive?

MR. CROSS:  That's correct.

MR. WILSON:  You said some of them were projectiles; correct?  Just for the record.

MR. CROSS:  Correct.

MR. WILSON:  Still no objection.

THE COURT:  Looks like 61, 58, and -- are the two

projectiles; right?

MR. CROSS:  That's correct.

THE COURT:  Okay.

MR. WILSON:  No objection to any of them, Your Honor.

THE COURT:  All right.  Very well.

Are we ready to take a break?

MR. CROSS:  I think so.

THE COURT:  All right.  Let's be in recess.  We'll give you about five minutes or so.

(Recess taken at 10:37 a.m. to 10:54 a.m.)

(Jury entered the courtroom.)

THE COURT:  All right, folks.  Everybody have a seat. Thank you.

All right.  I think the Government's ready to call its next witness.  Folks, on the break -- took a little longer that we thought, but we were working -- I admitted a number of exhibits, just worked it out with the lawyers, ruled on their respective positions, and so we have a number of exhibits in. And I should have told you that this morning before we got started with the first witness today that I admitted some exhibits before her testimony outside of your presence.  Of course, that's my job to decide what comes in and goes out. But, you know, you see exhibits that are being referenced that you don't have in your notes and don't have to make notes about whether something's admitted or not, that's why.

We've got a number of exhibits now, probably 50 or 60 exhibits that are admitted into the record now, and the Government and/or the defendant may be referencing those.  So I just wanted to kind of tell you that so you -- in case you're keeping track at home; okay?

All right.  With that, is the Government ready to call its next witness?

MR. CROSS:  Yes, Your Honor.  United States would call Mark Osburn.

(INVESTIGATOR MARK OSBURN, being first duly sworn, was examined and testified as follows:)

THE COURTROOM DEPUTY:  Thank you.  Be seated, please.  Please state and spell your first and last name for the record.

THE WITNESS:  Mark Osburn, M-A-R-K O-S-B-U-R-N.

THE COURTROOM DEPUTY:  What city and state do you reside in, Mr. Osburn?

THE WITNESS:  I reside in Oxford, Alabama.

MR. CROSS:  May it please the Court.

DIRECT EXAMINATION

BY MR. CROSS:

Q.  Investigator, if you don't mind -- I know we just did it as a formality, but if you would introduce yourself to the jury and let them know where you work.

A.  Mark Osburn.  I'm a forensic science specialist at

Jacksonville State University's Center For Applied Forensics.

Q.   And what is it that you do?

A.   My current assignments are crime-scene processing, when requested, evidence that is submitted to our agency for processing.  I also do instruction and teaching through Center For Applied Forensics as well as Best Practices through JSU.

Q.   And aside from your formal title, is it okay if I call you Investigator?

A.   That would be fine.

Q.   Investigator Osburn, do you have any experience in crime scene investigation?

A.   Yes, I do.

Q.   Let's talk a little bit about that briefly.  Do you have any formal education?

A.   I graduated from Jacksonville State University in 1992 with a degree in forensic investigation.

Q.   And from there, what did you do?

A.   Afterwards, I worked for Anniston Police Department in 1993, where I began as a patrolman and investigator.  Later, in 2001, I was assigned to the crime scene unit, where I remained until I retired in 2014.

Q.   In addition to your law enforcement experience, do you also teach?

A.   Yes, I do.

Q.   And what do you teach?

A.   I primarily teach some crime scene processing as well as latent fingerprint recovery as well as other processes for collecting evidence.

Q.   And how did you get involved in this case?

A.   We were notified by Clay County to assist them at a crime scene that occurred over at the state park.

Q.   Is that August 14, 2022?

A.   Yes, sir.

Q.   About what time of day did you arrive there at the crime scene?

A.   1350 hours.

Q.   Okay.  And that would be 1:50?

A.   1:50.

Q.   P.m.?

A.   Yes, sir.

Q.   All right.  Let's first look at previously-admitted Government's Exhibit 14.  Do you recognize Government's Exhibit 14?

A.   Yes, I do.

Q.   And what is it?

A.   That is a diagram that I drew based on measurements that I calculated at the scene.

Q.   Okay.  You're the creator of Government's Exhibit 14?

A.   I apologize.  Repeat.

Q.   You're the creator --

A.   Yes.

Q.   -- of Government's Exhibit 14?

A.   Yes.

Q.   Okay.  We're going to come back to it.  Right now I'd like to go through the pictures of the scene.  Did you take the pictures of the scene?

A.   Yes, sir, I did.

Q.   Okay.  If we can start with Government's Exhibit 15.  Okay.  What is this?

A.   This is a picture of our photo ID card, which we begin with at all crime scenes, stating my name, the area, road, and the date.

Q.   Okay.  And that's Forest Road 600-3?

A.   Yes, sir.

Q.   Government's Exhibit 16?

A.   That is a picture depicting the area off County Road 600 where the vehicles were parked at.

Q.   Okay.  Off Road 600-3?

A.   Yes, sir.

Q.   Not to get ahead of ourselves, but you said you did some measurements that day?

A.   Yes, I did.

Q.   And did you do a measurement of where the Scion is located in reference to Forest Road 600-3?

A.   Yes, I did.

Q.   Okay.  And what's the distance between the Scion and Forest Road 600-3?

A.   It was determined at 420 feet, 9 inches.

Q.   Okay.  And the white vehicle we're looking at -- when I said Scion, if you will, for the record, identify which vehicle we were referring to in Government's Exhibit 16.

A.   The Scion is the dark black vehicle.

Q.   The white vehicle in Government's Exhibit 16, is that where it was located when you arrived?

A.   Yes, it was.

Q.   Okay.  Government's Exhibit 17.  All right.  What is this?

A.   That's a picture depicting what is like a cordless drill, and I'm not sure what the other object is, basically, in the photograph.

Q.   If we can go to previously-admitted Government's Exhibit 18.

A.   Looks like a battery charger.

Q.   Okay.  And for the record, all exhibits I will be referring to have been previously admitted, as the Judge instructed the jury.  Government's Exhibit 19?

A.   A picture depicting the scene, an overall shot, be right behind where the vehicles were at going back to where the main crime scene was.

Q.   Okay.  So the vehicles are right behind you, taking

this picture?

A.  Yes.  Be to the -- behind me and to the right a little bit.

Q.  Okay.  Government's Exhibit 20?

A.  That's a closer photograph of the main crime scene area depicting where the decedent was as well as some of the medical debris and apparatus.

Q.  All right.  And I think we can see, but if you will, just to be sure we're talking about the same thing, if you would circle the victim in this photograph.

A.  (Complies.)

Q.  Okay.  Thank you.

Government's Exhibit 21.  I'm sorry.  Government's Exhibit 22, please.

A.  That is a picture of the decedent, later identified as Adam Simjee, depicting the front view of him as well as the defect into his lower right abdomen area.

Q.  Okay.  And this is the way he appeared when you arrived on the scene?

A.  That is correct.

Q.  And if you would, circle the wound that you observed that day.

A.  (Witness complies.)

Q.  And are there any firearms depicted in this picture?

A.  Yes, in the -- to the right of him in the picture,

there is a automatic pistol.

Q.   Okay.  Would you circle that pistol?

A.   (Complies.)

Q.   You're going to need to put on your gloves to open up the firearms?

A.   That's correct.

Q.   Okay.  We'll wait about that, then, later in the examination.

Government's Exhibit 23?

A.   That is a closer picture of the previous one, indicating where the defect was found to his lower abdomen.

Q.   All right.  And based upon your experience, is that a entrance wound?

A.   It's a apparent gunshot wound, yes.

Q.   Okay.  Government's Exhibit 24, what is that?

A.   That is a piece of rebar that I inserted into the ground to utilize for measurement of the area since we had no known markers.  And the "RP" stands for reference point.

Q.   All right.  What's the purpose of that?

A.   The purpose is for -- there was -- I had no good landmarks to measure from, and since we could not use GPS markings with our Trimble, we had to insert a known area or a known spot, and we'll do that by inserting metal pieces of rebar where we need it.

Q.   Okay.  That's "Reference Point"?

A.   Yes.

MR. CROSS:  All right.  Ms. Murphy, if you don't mind, let's go back to Government's Exhibit 14 and talk about it just a moment.

Q.   (By Mr. Cross)  Okay.  We're looking at Government's Exhibit 14.

MR. CROSS:  If -- let's see.  Am I able to draw on it? Ms. Murphy, can you just zoom in just a little bit where I'm drawing?  Okay.  Very good.

Q.   (By Mr. Cross)  If you would, touch that reference point, that "RP," piece of rebar.

A.   (Complies.)

Q.   Did you perform measurements of how far the body which is depicted -- or let me first ask you, is the body depicted on here?

A.   Yes, it is.

Q.   Circle it, please.

A.   (Complies.)

Q.   Okay.  And the log we saw in a previous picture, if you would just tap it.

A.   (Complies.)

Q.   Did you perform a measurement of the distance of the body from the Scion?

A.   No.

Q.   Okay.  Let me phrase it this way.  Did you perform a

measurement of how far the Scion is from the reference point?

A. Yes, I did.

Q. And how far is it?

A. In feet, it measured 49 feet, 2 inches.

Q. And did you do a measurement of the body -- the head of the body from the reference point?

A. Yes, I did.

Q. And how far is that distance?

A. 42 feet, 11 inches.

Q. If you add those together, will that give you how far the body is from the Scion?

A. Yes, that would be correct.

Q. Okay. And so how far would that roughly be?

A. 91, almost 92 feet.

Q. Okay. 30 yards?

A. Yes.

Q. All right. Thank you.

MR. CROSS: If we go back to Government's Exhibit 24. Government's Exhibit 25.

Q. (By Mr. Cross) What is this?

A. That is a picture depicting the reference point as well as some of the flags for markers that we inserted for evidence that we had found up to this point.

Q. Did you measure each evidence flag from the reference point as well?

A.   Yes, based on magnetic north as well as distance.

Q.   Okay.  And would you be able to -- and would you be able to recreate the scene and the location of the items of evidence based upon your scene analysis that day?

A.   Yes, I could.

Q.   Okay.  And is that one of the purposes of the reference point?

A.   That is.

Q.   Government's Exhibit No. 26?

A.   That's a overall picture of the scene where the decedent was lying as well as some of the markers located up to this point, indicated by the flags.

Q.   What all were you marking that day as evidence items?

A.   The -- due to the vegetation and the grass around it, I was utilizing a metal detector in order to find most of the evidence, cartridge casings, cartridges, projectiles, and we would mark them with a flag, wanting to help with photography, as well as we could keep searching the area with the metal detector.

Q.   Okay.  So if there's a flag, there's an item of evidence at the base of that flag?

A.   That is correct.

Q.   It's either going to be a firearm, cartridge, cartridge case, or projectile.  Am I missing anything?

A.   There was some -- I believe it was a earlier item.

Some bandanas were marked, some clothing or cloth-like items.

Q.   Okay.  Thank you.  Government's Exhibit 27?

A.   That's a overall picture of the scene with the marker placed beside the firearm, indicating item number B.

Q.   And that's where the firearm was located when you were on the scene?

A.   That is correct.

Q.   You don't know what may have happened before you arrived?

A.   No, I don't.

Q.   But that's where it was when you arrived?

A.   Yes, sir.

Q.   And are those some flags at the base of his feet also?

A.   That's some of the markers, yellow-tipped markers like what's beside item B -- or beside these items that we found as well.

Q.   So that's evidence items as well?

A.   Yes, sir.

Q.   Government's Exhibit 28?  I'm sorry.  Government's Exhibit 29?

A.   It was a picture of a cap.  This was a cap that was located near the decedent.

Q.   Government's Exhibit 30?

A.   Different angle photograph depicting the flags where we had located evidence, including the yellow markers with

them.

Q.   I think the scene diagram will identify this better, but did there seem to be a cluster of shell casings sort of at the feet of Mr. Simjee and then, as we're looking at Government's Exhibit 30, a cluster in the picture above his body?

A.   Yes, there was definitely a cluster above where -- up in the top left corner of the picture, of cartridge cases. Down, there was as well also cartridges, and I believe the firearm was also located in that same area.

Q.   Government's Exhibit 31?

A.   A picture depicting item G and item H.  These items are indicating one being a firearm; the other one was a cartridge case.

Q.   Okay.  And where is the firearm, if you will circle it for us?

A.   (Complies.)

Q.   Government's Exhibit 32?

A.   It's a closer picture of the firearm marked as item H.

Q.   Okay.  And was that firearm red?

A.   Yes, it is.

Q.   And is that an SCCY 9-millimeter?

A.   Yes, sir, it was.

Q.   How would you refer to that firearm?  What would you call it?

A.   9-millimeter pistol.

Q.   Okay.  Thank you.

Government's Exhibit 33?

A.   It's another picture, different angle, of the same item with the marker in place.

Q.   And this is marked by H --

A.   Yes.

Q.   -- evidence item H?

And was it in the -- is that the location it was in when you arrived on the scene?

A.   Yes, it was.

Q.   Okay.  Government's Exhibit 34, what is this?

A.   It's a picture of the decedent, right around the buttocks area, depicting a defect to the -- his pants on the right side.

MR. CROSS:  If we could zoom in on the defect.  If you can zoom in on the stain.

Q.   (By Mr. Cross)  Can you show us the defect?

A.   (Complies.)

Q.   And do you know if that's an exit defect?

A.   Based on my experience, the way the fabric is torn, it is an apparent exit.

Q.   Okay.  Government's Exhibit 35?

A.   That is a picture of the decedent on his right buttocks area depicting the defect.

Q.   Okay.  Is it consistent with the defect that was in the pants?

A.   Yes.  It corresponded with it.

Q.   Thank you.

Government's Exhibit 36?

A.   It was a closer picture of the previous one, indicating the defect.

Q.   Okay.  Government's Exhibit 37?

A.   That is a picture of item B, which was a Sig Sauer 9-millimeter pistol that was located adjacent to the decedent.

Q.   Okay.  Is it the one we observed earlier in a picture with the decedent --

A.   Yes, it was.

Q.   -- Mr. Simjee?

A.   Yes, it was.

Q.   Government's Exhibit 38?

A.   It's a picture of the SCCY 9-millimeter pistol, item H.

Q.   Okay.  Government's Exhibit 39?

A.   That is a --

Q.   What is this?

A.   That is the magazine that was removed from the SCCY 9-millimeter pistol showing that it had one cartridge still in it.

Q.   Okay.  This is what I'd call the red 9-millimeter?

A.   Yes, it is.

Q.   And it had one cartridge left in it?

A.   In the magazine.

Q.   In the magazine.  Did it have any cartridges in the gun?

A.   There was also one chambered in the gun.

Q.   Thank you.

So there were still two bullets in the red 9-millimeter?

A.   That is correct.

Q.   Okay.  Government's Exhibit 40?

A.   That is a picture of the SCCY 9-millimeter pistol, the red one, showing the slide being removed back and the cartridge that was present.

Q.   Government's Exhibit 41?

A.   That is a picture of the serial number to the weapon.

Q.   All right.  If you don't mind, for the record, if you will read that.

A.   The serial number as follows:  C034806.

Q.   Government's Exhibit 42, what is this?

A.   That is a picture of a pistol box that we found in the white van.

Q.   Did the pistol box have any identifying information concerning the manufacturer?

A.   Yes.  It was Sig brand, and it also had a serial

number located on one end with a bar code.

Q.   And this was the white van that we discussed earlier?

A.   That is correct.

Q.   That's an Uplander, Chevrolet Uplander?

A.   Yes, sir.

Q.   Government's Exhibit 43?

A.   That is a picture of the black, or dark-colored, Scion.   There our little scale -- adhesive scales applied to it.   Where the scales are is where I processed the exterior side of the Scion for latent prints.

Q.   Government's Exhibit 44?

A.   That is a picture of the driver's license bearing the name "Adam Simjee" that was recovered from the white Chevrolet van.

Q.   And the person that was deceased that day that you observed, does that appear to be a picture of that same person?

A.   Yes, it is.

Q.   Okay.   Did you draft a report documenting your crime scene investigation?

A.   Yes, I did.

Q.   Do you have a copy of that with you?

A.   Yes, I do.

Q.   All right.

MR. CROSS:   Your Honor, may I approach the witness

with some evidence items?

THE COURT:  You may.

Q.   (By Mr. Cross)  Investigator, I'm going to give you what's previously been marked as Government's Exhibits 48 through 65, hand those to you.  We'll just place them up on the counter.  Talk about the guns more then.

MR. CROSS:  All right.  If we could go to Government's Exhibit 14 -- Kim, I'm going to draw what I'd like to zoom in on, if that's okay.  That area, so we can see the numbers -- or letters.

Q.   (By Mr. Cross)  Investigator, we're going to start with Government's Exhibit 48.  Do you see it in front of you? Should be the first one.

A.   Yes, sir.

Q.   All right.  And I'm going to try not to belabor this, but if you will, tell us what's inside of Government's Exhibit 48.

A.   It is a cartridge case that I recovered at the scene, item number C.  I recognize it.  Has my initials on it as well as my handwriting.

Q.   Okay.  And it's depicted also on Government's Exhibit 14?

A.   That is correct.

Q.   Okay.  And if you will, just touch where it's located on the scene.

A.   (Complies.)  I missed it.

Q.   It's right above that?

A.   It's right above that.

Q.   Okay.  That's a cartridge case?

A.   That is correct.

Q.   All right.  If you will -- I'm not a gun person and I don't want to take anything for granted.  Tell us what a cartridge case is.

A.   A cartridge case is -- when you have a bullet, once the projectile is extended from it, it is what is left over and is commonly known as a shell casing but we call it a cartridge case.

Q.   Okay.  When a gun is fired, what happens to the cartridge case?

A.   It's either ejected -- depending on the type of pistol, it's either ejected out; it can also remain inside the firearm.  Or if it is a revolver, it will remain inside the cylinder.

Q.   Okay.  Thank you.

Let's go to -- you can set that aside and maybe try to keep them in order.  We can rearrange them, if necessary. Government's Exhibit 49?

A.   It's item D, a cartridge case which I recovered at the scene.

Q.   Okay.  And is it depicted on the diagram?

A.   Right there (indicating).

Q.   Okay.  And that's another -- some people would call that another spent shell casing?

A.   Cartridge case, yes, it is.

Q.   Thank you.

Government's Exhibit 50?

A.   Item E, which was -- which I recovered from the scene, which, as of -- based upon my handwriting as well as my initials, and it's containing a cartridge.

Q.   Okay.  What is a cartridge compared and contrasted to a cartridge case?

A.   A cartridge has the projectile still in it and has not been fired or attempted to be fired.

Q.   And was this case inside a gun -- or this cartridge inside a gun?

A.   No.  It was laying on the ground.

Q.   Is there any way to get a cartridge out of a gun without firing it?

A.   You can cycle it through.

Q.   What do you mean by that?

A.   Pulling the slide back, not firing it, and it will automatically kick the -- whatever brand is on top of the magazine out at that point.

Q.   And did you identify that on the diagram?

A.   No, I did not.

Q.   Okay.  If you will, identify that on the diagram.

A.   Right beside that (indicating).

Q.   If you mash anywhere in the lower right-hand corner, if you tap it, it erases.

A.   (Complies.)

Q.   Okay.  Thank you.

Government's Exhibit 51?

A.   It is item F, a cartridge recovered from the ground --

Q.   Okay.

A.   -- located here (indicating), right above that mark.

Q.   Very good.

Government's Exhibit 52?

A.   Item G, which is a cartridge case collected from the ground located in that area right above where I marked (indicating).

Q.   Okay.  Thank you.

Government's Exhibit 53?

A.   Item I, which is a cartridge collected from the ground, located right -- right there (indicating).

Q.   Very good.

Government's Exhibit 54?

A.   It's item J, which is a cartridge case collected from the ground.  Been located in this little squared area right above where I marked (indicating).

Q.   Thank you.

Government's Exhibit 55?

A.   Item K, cartridge case recovered from the ground, located in this little squared area right above where I marked (indicating).

Q.   Government's Exhibit 56?

A.   Item L, which is a cartridge case which I recovered from -- excuse me -- recovered from the ground, located in this box (indicating).

Q.   Okay.  Government's Exhibit 57?

A.   Item M, which is a cartridge case which I recovered from the ground at the scene, located in that area (indicating).

Q.   Okay.  A projectile, what is a projectile?

A.   Projectile is common for the bullet.  It's what expends out from the cartridge once it is fired.

Q.   Did this projectile appear to have been fired?

A.   Which projectile?

Q.   The one we just looked at, 58.

A.   58.  I thought we was on 57.

Q.   Okay.  I apologize.  57, M, you showed us where it was located.  Now let's go to 58.

A.   Item N, projectile which was recovered from the ground, located in this area (indicating).

Q.   Thank you.

And a projectile, you were telling us what it was and

I got ahead of ourselves.

A.   It's the -- commonly known as the bullet.  It's what is expelled from the cartridge once it is fired.

Q.   If you will, explain what Government's Exhibit 59 is and where it's located, as you've been doing.

A.   Item P, which is a cartridge, located in this area at the scene (indicating), which I recovered from the ground area.

Q.   Okay.  Again, would it be fair to say this is an unfired bullet?

A.   Cartridge, yes, that is.

Q.   Okay.  Government's Exhibit 60?

A.   Item Q, which is a cartridge which I recovered from the ground at the scene in that area (indicating).

Q.   Thank you.

Government's Exhibit 61?

A.   Item R.  It's a projectile recovered from the ground at the scene.  Recovered it from this area right above where I marked (indicating).

Q.   Government's Exhibit 62?

A.   Item Y.  It's a cartridge case recovered from the scene.  I recovered it from this area right there (indicating).

Q.   Government's Exhibit 63?

A.   Item Z, cartridge case which I recovered from the

scene in this area (indicating) depicted there.

Q.   Government's Exhibit 64?

A.   Item AA, which is a cartridge case which I recovered from the scene on that day, located at that area (indicating).

Q.   Okay.  Government's Exhibit 65?

A.   Item AB, which is a cartridge which I recovered from the ground area at the scene in this location (indicating).

Q.   Okay.  All right.  Thank you.

Just by way of review and maybe to make some sense of this possibly, what is items R, N, and E on the diagram?

A.   Item R is a projectile.

Q.   Okay.

A.   Item N is also a projectile.  And item E was a cartridge.

Q.   Okay.  What is item -- is it O?

A.   Yes.

Q.   What is item O?

A.   Item O is depicting a defect that we found in a tree that looked suspicious.  We marked it and measured it and its location.  And then we dug around that defect area attempting to find a projectile, but we did not find one.

Q.   All right.  I'm going to circle.  How many cartridge cases were in the green circle?

A.   One.

Q.   Just one?

A.   Cartridge cases?

Q.   Yes.

A.   Item G.

Q.   Just item G?

A.   I believe so, yes.

Q.   What were the rest of those items?

A.   The rest of the items were cartridges.

Q.   All right.  And what was item F?

A.   It was a cartridge as well.

Q.   And then in the green circle, how many cartridge cases?

A.   In that little square block, there appears to be nine -- oops, sorry -- eight cartridge cases.

Q.   Did you match any of the cartridge cases to either firearm -- firearms that were found on the decedent?

A.   I'm not qualified as a firearm expert, so I didn't do any analysis other than documenting what I found, the processes later.

Q.   Right.  The firearms, both 9-millimeters, do they both use the same type of ammunition?

A.   Yes, they can.

Q.   Okay.  And were all the cartridge cases and cartridges that you found that day consistent with 9-millimeter?

A.   Yes, they were.

Q.   How many cartridge cases in all did you find at the

crime scene?

A.   There was eight in a cluster area, one more above it. That's nine.  Ten total.

Q.   Okay.  And the majority of them were at the feet of the decedent?

A.   Yes.

MR. CROSS:  May I approach the witness?

THE COURT:  You may.

Q.   (By Mr. Cross)  I'm going to show you what's previously been marked as Government's Exhibit 46 and Government's Exhibit 47.  We'll first look at Government's Exhibit 46, place them up there, and ask you to open the boxes.

A.   What item number did you say first?  I apologize.

Q.   46.  No apology's necessary.  Okay.  What is Government's Exhibit 46?

A.   It is item B, which is the Sig Sauer 9-millimeter that I recovered that was adjacent to Adam at the crime scene.

Q.   Okay.  And has the Government's Exhibit 46 been made safe?

A.   Yes, sir, it has.

Q.   Okay.  Are you able to safely show it to the jury?

A.   (Complies.)

Q.   Thank you.

And that was found at the scene?

A.   Yes.

Q.   Thank you.  You may close it, and then, if you will, open Government's Exhibit 47.

Okay.  And what is it, Government's Exhibit 47?

A.   It is item H.  It is the red in color CC -- SCCY 9-millimeter I recovered from the scene.

Q.   And has the firearm been made safe?

A.   It has.

Q.   Okay.  If you would, demonstrate or show it to the jury.

A.   (Complies.)

Q.   Okay.  And those were the pistols you found at the scene that day, on August 14th, 2022?

A.   Yes, sir.

MR. CROSS:  Investigator, I believe that's all I have for now.  Thank you.

THE WITNESS:  Okay.

THE COURT:  All right.  Cross-examination?

CROSS-EXAMINATION

BY MR. WILSON:

Q.   Good morning, Investigator.

A.   Good morning.

Q.   SCCY, is that somehow pronounced "SCCY"?

A.   I believe so, yes.

Q.   When you arrived on the scene and found the SCCY

pistol, where was it?

A.   Exactly or just in general?

Q.   Just -- well, let's start with in general.

A.   In general, from the location, if you were looking at the decedent, or Adam, it was located to the left.

Q.   Okay.  Had any of the other first responders moved the gun when you got there?

A.   Not that -- not to my knowledge.

Q.   Okay.  I'm familiar with guns, so I just want to just verify that -- I'm right here; okay?  A revolver doesn't spit out its casings, right, like a semiautomatic does?

A.   That is correct.  You have to manually remove them.

Q.   Right.  Now, when you fire a semiautomatic, it shoots the projectile out the end of the gun and it shoots the casing out the side; right?

A.   That's correct.

Q.   What is a gun jam?

A.   It's usually where either the projectile or the cartridge casing jams into it usually when the slide is going back forward.

Q.   Okay.  When the gun was found, was it jammed?

A.   No, it was not.

Q.   Okay.  And I think you said there was an unspent casing found, like an unfired bullet found, at the scene; right?

A.    There were several.

Q.    Several?

A.    Yes.

Q.    Unfired?

A.    Yes.

Q.    That can indicate a lot of things; right?  So it could indicate somebody dropped some; could indicate that somebody racked the slide with one already in the chamber and it just spit out the unspent shell?

A.    That's right.

Q.    Going back, there was an exhibit you identified where you put some kind of stickers on the Scion car.  What were those for?

A.    I had processed the exterior side of the Scion for latent prints and there were little scales.  So when we photograph, we can reproduce that one to one.

Q.    Did you find any latent prints?

A.    Yes.

Q.    Could you tell who they belonged to?

A.    I was not asked to compare any, so --

Q.    You were not asked to compare any?

A.    No.

Q.    Meaning you had no fingerprints from Yasmine Hider or Krystal Pinkins to compare those to?

A.    No, I had no request for no knowns to compare to.

Q.   Okay.  Did the scene you investigated look consistent with a homicide?

A.   Yes.

Q.   Okay.  Was there anything that you could see that would tie Miss Pinkins to it in any way?

A.   I can't answer that.  I just noticed the decedent, the guns, and the cartridge casings.

Q.   Okay.  Nothing regarding her at the crime scene though, other than she owned the car that was there?

A.   Not to my knowledge, no.

MR. WILSON:  Thank you.  No further questions.

THE COURT:  All right.  Any follow-up to that?

MR. CROSS:  Just quickly.

REDIRECT EXAMINATION

BY MR. CROSS:

Q.   You found the SCCY pistol there, didn't you?

A.   That is correct.

Q.   You found the Scion there?

A.   That is correct.

MR. CROSS:  Nothing further.

THE COURT:  All right.  Any follow-up to that?

RECROSS-EXAMINATION

BY MR. WILSON:

Q.   Investigator, are you familiar with what's sometimes called touch DNA?

A.   That is correct.

Q.   What is it?

A.   It's a generic term for where you get epithelial cells off of rough surfaces.

Q.   Is it sometimes performed or analyzed on pistol grips?

A.   Yes, it can be.

Q.   And what would that show if you were able to remove touch DNA from a pistol grip?

A.   It could possibly show whoever touched it or if there was a transfer of DNA onto the item.

Q.   Okay.  Was any of Krystal Pinkins' DNA on the pistol?

A.   I'm not aware of any.

MR. WILSON:  Thank you.  No further questions.

THE COURT:  Okay.  May he step down?

MR. CROSS:  Yes, Your Honor.

THE COURT:  And he's excused; right?

MR. CROSS:  That's correct.

THE COURT:  All right.  11:43.  How long is your next witness?

MR. CROSS:  Probably at least 30 minutes, Your Honor.

THE COURT:  So you-all want to do direct on this or go ahead and head to lunch now?  You notice I'm being really nice to you-all because you're driving over from east Alabama.

UNIDENTIFIED JUROR:  Let's keep going.

THE COURT:  Keep going?  We'll see where we are at the

end of the direct.

MR. CROSS:  Very good.

United States would call Chris Parker.

(CHRISTOPHER PARKER, being first duly sworn, was examined and testified as follows:)

THE COURTROOM DEPUTY:  Thank you.  Be seated, please. Please state and spell your first and last name for the record.

THE WITNESS:  Christopher Parker, C-H-R-I-S-T-O-P-H-E-R, Parker, P-A-R-K-E-R.

THE COURTROOM DEPUTY:  What city and state do you reside in, Mr. Parker?

THE WITNESS:  Talladega, Alabama.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  You may proceed when you're ready.

MR. CROSS:  Thank you.  May it please the Court.

DIRECT EXAMINATION

BY MR. CROSS:

Q.  Mr. Parker, if you will, introduce yourself to the ladies and gentlemen of the jury and tell them where you are currently working.

A.  My name is Christopher Parker.  I'm currently at -- work for FedEx.

Q.  If you don't mind adjusting the microphone and try to speak into it more directly.

A.   Okay.  Got it.

Q.   Where did you say you were working?

A.   FedEx.

Q.   How long have you been working at FedEx?

A.   Just a few months, about five months.

Q.   About a year ago, August 2022, where were you working?

A.   At Cheaha State Park.

Q.   And what was your job there?

A.   I was events coordinator, so I did most of the planning for different events that were going on in the park.

Q.   How long had you been working there at that time?

A.   I had started in June of '21, so over a year.

Q.   Do you know anyone by the name of Krystal Pinkins?

A.   Yes.

Q.   Okay.  How do you know Krystal Pinkins?

A.   She was one of the females that were living off-grid close to the state park in the national forest.

Q.   Okay.  And is Krystal Pinkins in the courtroom?

A.   Yes.

Q.   Would you just describe what she is wearing, her top?

A.   I can't see her.

MR. CROSS:  With the Court's permission, may he move?

THE COURT:  Yes, he may.

Q.   (By Mr. Cross)  Okay.  If you will be seated and speak into the microphone.

A.   She's wearing a top with a black neck with, like, gold circles on it.

Q.   Okay.  And when was the first time that you met Miss Pinkins?

A.   I would say sometime in the end of October -- I mean October-ish of '21 is when I started seeing them around at the state park.

Q.   Okay.  You said "them."  Who are you referring to?

A.   Well, the group.  I kind of met all of them at that time.  I would see -- I've seen them separately:  Pinkins, Sawhoo was one of the gentlemen living up there, and then there was another gentleman, named Chief.

Q.   Okay.  How would you spell "Sawhoo"?

A.   S-A-W-O-O.  I really don't know.  I didn't ask the spelling.

Q.   All right.  How did you get to know them?

A.   Well, they came into the park several times, and then I spoke to them when I was taking them to their campsite.  Or I think Chief, one time I drove him -- I passed him when he was walking towards the mountain store and picked him up and took him up to the store and dropped him off.  But most of the conversation was in the ride to the campsite.  And with Pinkins, it was -- she actually sat down one day when I was working outside and most of the conversation happened at that point.

Q.   Okay.  About how many times do you think you gave --
did you ever give Miss Pinkins a ride?

A.   Yes.  I gave the -- I gave every one of them a ride
once.  Well, Chief would be twice, I believe.

Q.   Okay.

A.   Besides the -- I didn't give a ride to Hider at all.

Q.   All right.  When did Hider join the group?  When was
the first time you saw Hider?

A.   I would say -- I don't know when.  I would -- it would
be in 2022, maybe after -- it was after I stopped seeing the
guys there, so it was sometime after February.

Q.   Okay.  After -- after you saw the guys?

A.   I stopped seeing the gentlemen around at all, and
that's, I think, when I saw her once come into the store with
Pinkins.

Q.   Okay.  You saw Miss Pinkins and Miss Hider together?

A.   Well, no, I didn't see them together.  I saw them --
I've seen them all at the store.

Q.   Okay.  Miss Pinkins and Miss Hider at the store?

A.   Uh-huh, I've seen them both at the store.  It was
after I stopped seeing the guys.

Q.   All right.  And did you ever see anybody else in this
group?

A.   No.

Q.   Okay.  Do you know where they -- first let's talk

about Chief and Sawhoo.  Do you know where they were staying?

A.  I know the general location that they were staying, but I don't know exactly, you know, how far into the woods that they went to get to their camp.

Q.  Okay.  Explain that.  How do you know the general location but not the exact location?

A.  Well, I would drop them off on a Forest Road 600-3. It's just a little dirt road that went between the state park -- Cheaha State Park Road and the main road off of -- going towards Talladega.  It was -- I would drop them off.  It was also where I do a lot of my hiking.  So there's a trail called the Chinnabee Silent Trail, and I would drop them off pretty close to that trailhead.  The easiest way to describe the location would be a landmark; there's two bridges that you cross over the water.  The bridge that I would drop them off closest to was going to be the one close to the actual trail entrance, and it had reflectors on it.  So the first -- the first bridge did not have reflectors; the second bridge had reflectors.  I would drop them off and they would walk in the opposite direction of the trailhead to the left of the road.

MR. CROSS:  Okay.  If we could look at Government's Exhibit 5.

Q.  (By Mr. Cross)  Do you recognize Government's Exhibit 5?

A.  Yes.

Q.   Okay.  Tell us which road -- where you would drop them off, looking at Government's Exhibit 5.

A.   So the times that I brought them in, I brought them in from the -- not the 281 side.  It would be the -- I get the red label, 13, and I would come in -- the first bridge would be -- their car location would be where the -- right past the creek where you can see where it's at.  But the main spot that I would drop them off of would be -- right at the bridge across from -- right before where the trailhead that you can see going to the left is where I dropped them off.  And they went up to the -- I mean up to the right.  They went up to the left.

Q.   Okay.  Can you show a dot where you would drop them off?

A.   Right here is -- I'm sorry.  (Indicating.)

Q.   That's good.  And which direction would they go when you would drop them off?

A.   They would go to the right on that one (indicating).

Q.   All right.  And just so that we're clear, did you ever give all three of them a ride, Chief, Sawhoo, and Miss Pinkins?

A.   Together?

Q.   Together.

A.   No.  I never saw them all together.

Q.   Okay.  Did you ever see a Scion?

A.   Yes.  I saw it parked -- when I first met them, it was parked on the side of the road on 600-3, and then I also saw when it returned and was parked at the spot it was, you know, when the shooting happened.

Q.   Okay.  Where was it parked the first time you saw it?

A.   It would be more -- let's see.  That's the first bridge.  I would say it would be closer towards the left side of the road, so the -- down here (indicating) is where it was parked.  It was almost across from the location it was parked at but it was on the opposite side of the road and not down a trail.

Q.   Okay.  And who was with the Scion when you saw it for the first time?

A.   That was when I met Chief and the son of Pinkins.

Q.   Okay.  So Chief and Miss Pinkins' son was with the Scion this time that you saw the Scion on the side of the road?

A.   Correct, yes, it was on the side of the road.  I was driving through there.  I don't think I was working at the time.  It was just -- I was doing some hiking at the time and driving through that area.  I used it as a shortcut to go back and forth.  And he had a flat tire, and I stopped and asked if he needed any help.  He did not have the money for a tow truck, so he said he would just figure it out.  So I didn't -- you know, didn't help him out.  I didn't have a jack or

anything to help him and he didn't have the money to get it towed, so I, you know, kind of left it at that.

MR. CROSS:  All right.  If we could look at Government's Exhibits 134 through 138.

Q.  (By Mr. Cross)  Do you recognize Government's Exhibit 134?

A.  I do.

Q.  And what is it?

A.  It's the vehicle that they had parked and that was left on the side of the road.

Q.  Okay.  Government's Exhibit 135?

A.  Yes, I recognize it.

Q.  Different shot of the same vehicle?

A.  Uh-huh.

Q.  Government's Exhibit 134?

A.  Same vehicle.

Q.  Government's Exhibit 137?

A.  Same vehicle.

Q.  And Government's Exhibit 138?

A.  Same vehicle.

Q.  Okay.

A.  And I recognize the location as well.

Q.  And if we could look at Government's Exhibit 92.  Do you recognize anyone in Government's Exhibit 92?

A.  Pinkins and the son.

Q.   Okay.  Is that the same son that was with Chief?

A.   Yes.

Q.   And do you recall roughly when that was that you saw Chief with the son and the flat tire?

A.   I would say the end of '21, like, between -- it was after -- it was sometime between October and February, but I know it was at least October, because we had closed the restaurant and so I wasn't working in the same location.  I was actually at the store.  That's why I had seen these people at that point.

Q.   Okay.  Go back to Government's Exhibit 5.  When did you see the Scion on the other side of the road?

A.   I don't remember specifically.  It was -- it had been there -- it had been there for months but, you know -- so I'm not sure how long it had been there, but I would say sometime around February of '22.

Q.   2022?

A.   Uh-huh.

Q.   And when you say "on the side of the road," do you remember it was parked on the side of the road or was it further in the forest?

A.   I'm sorry.  It was parked in the location where it was when they had the shooting.  It was -- there was a trail that goes off of the main 600-3 that people use --they can drive down and camp at.  It's -- like, a creek intersects it so you

can drive there, camp. And there's actually, I think, two different locations. One's to the right, one's to the left. It kind of forks. They were at the location that forks to the right. But there's -- when the trees are dense, when the leaves are there, you don't really see the car unless you know that that's the location. It's easier to see it, you know, in the fall whenever the leaves are falling.

Q. Okay. And at the time that it was over there on the -- inside the forest -- well, if we could just look at Government's Exhibits 134 through -38 again. 135. If you recall, is that the way it appeared?

A. Yeah. I don't remember it moving. And the only time that I saw it on the actual side of the road was that -- the day with the flat. After that, it was parked there the whole time.

Q. Where we're picturing it right now?

A. Uh-huh, right.

Q. In the woods?

A. Uh-huh.

Q. And the rear left window, did it look like that when you saw it?

A. I don't remember the window.

Q. Okay.

A. I don't.

Q. All right. Do you know if the -- do you know the

relationship that Miss Pinkins had with Chief and Sawhoo?

A.  From what she told me, Chief was her boyfriend and Sawhoo was just an older gentleman that was part of the group. All I know is that her and Sawhoo were supposedly dating at the time.  That was her boyfriend.  But, you know, I just took that as kind of hearsay.  I didn't really know how far to think into it.

Q.  Certainly.  Certainly.  And what was the relationship with Miss Pinkins and Sawhoo?  Did she say?

A.  Well, Sawhoo was -- the conversation that we had, Chief and Sawhoo were arguing because Sawhoo wanted to sleep with Pinkins, but --

MR. WILSON:  Judge, objection.  Hearsay and relevance.

THE COURT:  Mr. Cross?

MR. CROSS:  Your Honor, he's going to be testifying to what the defendant told him, and it goes into --

THE COURT:  Well, then, let's ask him about what the defendant told him, not a hearsay statement.

MR. CROSS:  Certainly.

THE COURT:  Sustained.

Q.  (By Mr. Cross)  What did the defendant tell you about her and Sawhoo and Chief?

A.  Okay.  She told me that her and Sa- -- I mean her and Chief were dating.  Sawhoo was upset because she would not sleep with him and --

MR. WILSON:  Judge, objection.

THE COURT:  Hold on.  What?

MR. WILSON:  Objection.  Relevance as far as --

THE COURT:  Overruled.

A.   The conversation we had about them was they had -- Chief had hurt his foot, so him and Sawhoo went into the woods to find some medicine for his foot and that they didn't come back and that she thinks that Sawhoo killed Chief because Sawhoo was jealous that Chief was getting to sleep with her.

Q.   (By Mr. Cross)  Okay.  And this is what she told you?

A.   Yes.  This is -- we had this -- she set there for a while with me while I was working outside.  We had an air conditioner go out, so I was having to sit outside and work on my computer.  And she set across from me and told me all of this at that point.

Q.   Okay.  And when was this?  Was this summer of 2022?

A.   This was the summer of '22, yes.  I don't know specifically when, but I just remember because I was sitting outside.

Q.   Okay.  And at the time that she's telling you this -- did you ever see Chief or Sawhoo after this conversation?

A.   No, no, I hadn't seen them in a while.

Q.   And it had been a while since you had seen them?

A.   Right.

Q.   This was summer of 2022?

A.   Right.

Q.   Okay.  Do you know if Miss Pinkins had any firearms?

A.   I do know that she -- when this car was parked -- this is another story that she had told me when we were sitting there.  They had allowed someone else to camp there, camp beside their car.  She said that --

Q.   Okay.  And I'm just going to stop you.  Where it's located at where we're looking at here?

A.   Correct.

Q.   Okay.

A.   And I don't know -- the tents that I saw -- the reason -- I saw the tents there, so I'm guess- -- like, the tents that I saw were right there in the location where the car is close to that campsite, not the one adjacent to it.  So I take it as the one that -- the campsite that they allowed the people to camp at was right next to their car.

Q.   Okay.

A.   And she said that whenever they were staying there camping that they tried to break into her car and hot-wire it and that she ran them out of the woods of the campsite with a gun.

Q.   Okay.  Did she say what kind of gun she ran them off with?

A.   I don't remember, you know, if she -- what kind of gun she said.  I just remember that she said she had a gun that

she ran them off with.

Q.   The vandals of the Scion?

A.   Correct.

Q.   And this was in summer of 2022?

A.   Correct, yeah.  And there was still -- there were tents there, so, you know, I'm not sure if that was the place that they camped at or not.  But there were tents that were left there and abandoned.

Q.   Okay.  Do you know whether or not the Scion was working in the summer of 2022?

A.   To my understanding, it wasn't, because of the story that she had told --

Q.   And I want to stop you there.  What do you mean by your understanding?

A.   From what Pinkins had told me.

Q.   Okay.  If you will tell us what Pinkins told you.

A.   She told me that the people that were staying at the campsite broke into it and tore the dash -- like, tore the -- out from under the steering column to make it hot-wired but it was undriveable.

Q.   Okay.  She used that phrase, "undriveable"?

A.   Uh-huh.

Q.   And this was summer of 2022?

A.   Correct.

Q.   Do you have any idea about how many -- how -- how

early, compared to when the shooting took place, did you have this conversation with Miss Pinkins when she told you the vehicle was undriveable?

A.    I don't exactly, but I feel like it was within a month or two.

Q.    Okay.  What do you know about Miss Hider?

A.    I never actually spoke to Hider, so I don't know much about her.  I did not -- you know, I didn't speak to her at all, so -- and I didn't give her a ride, so --

Q.    Did Miss Pinkins ever talk about Miss Hider?

A.    Well, she did talk about her.  And I asked Pinkins, when we had this whole conversation sitting outside --

Q.    And this is in the summer of 2022?

A.    Yeah, in the summer of '22.  I asked her where her child was because I did wonder about the kid because I had only seen it once when we were out there, and then I didn't see the gentlemen anymore and I never saw the kid again.  So I kind of worried about the kid and thought with her being up there, where's her kid.  And she told me that she was -- he was at the campsite with her sister.  So I was under the understanding that Hider and Pinkins were sisters at the time.

Q.    And why did you think they were sisters?

A.    Because Pinkins told me they were sisters and that her sister was actually watching her kid at the camp -- at their camp.

Q.   And this was in the summer of 2022?

A.   Correct.

Q.   When was the next time you saw Miss Hider?

A.   The day before the shooting, on 600-3.  I actually -- I lead -- I was leading hikes every second Saturday of the month, so I would have led a hike on the 13th, I believe, and the Sunday was the 14th when the shooting was happening.  But I drive -- I actually only had one guest show up for my hike, so he was having some issues medically, so we didn't want to do a long hike.  So I was just driving him to different locations to do short hikes and show him waterfalls of different areas.  So we had left a place called Lake Chinnabee and we were going down 600-3.

Q.   Okay.  If you don't mind, I'm going to pause you there and let's go to Government's Exhibit 5.  Okay.  Where would Lake Chinnabee be in reference to Government's Exhibit 5?

A.   Lake Chinnabee would be over in this area (indicating), like, past that -- that way.

Q.   Okay.

A.   So I came up this road (indicating) and then turned right onto 600-3.

Q.   Okay.

A.   So whenever I came down that road, she was actually right in the location, you know -- she wasn't -- she was up from the trail on the actual 600-3.  She was standing on the

side of 600-3, so I stopped to ask her if she needed any help because I did recognize her.  I didn't see Pinkins but I just saw Hider.  And when I stopped and asked her if she needed any help, she said that -- she asked me if I had any jumper cables to jump her off.  I got out of the truck and looked and didn't, you know.  And I didn't.  I wish I'd have thought more about it, but I didn't think, you know -- I thought that the story she had told me didn't make sense because she told me the car was undriveable, but I also had heard so much stuff that I wasn't sure what was true and what wasn't true.

Q.  Okay.  Now, where did she flag you down, if you will tap on the Government's Exhibit --

A.  (Indicating.)

Q.  Okay.

A.  Basically, at the top of the trail from where the car was parked.

Q.  Okay.  Did you go down to the car?

A.  No.

Q.  And she asked you if you would jump her car off the day before the shooting?

A.  Correct.  Yeah, she was standing at the end.  And whenever -- I got out of my truck and I had my work clothes on, so I'm not sure if that's one of the reasons that nothing happened, but I had, you know, state park clothes on.  And I got out of the truck, looked in the bed of my truck, and

didn't have any jumper cables.  So I told her no, and she said, "Okay."  She said, "Thank you, much appreciated," and I turned around and started walking back towards the vehicle.

Q.  Okay.  Just to remind us, their main campsite where you would drop people off and they would go to -- you see it says "Main campsite."

A.  Correct.

Q.  Would that be consistent where you would drop them off and they would walk into the woods?

A.  Right.  Yeah, I would drop them off right past -- there's --

Q.  You can tap it.

A.  If you can see the water line that crosses right here (indicating), there's -- or right up above where my finger is, there's a water line.  That's basically where that bridge is.  So right when I passed that bridge, I stopped and they walked.  And I would watch them walk up to the left of the bridge.

Q.  And you thought it was odd she wanted you to jump her car off why?

A.  Because she had already told me that the car was undriveable.  I mean, the way that I took it, there was -- you know, they had ripped the bottom of the dash -- I mean the bottom of the steering wheel out and there was wires hanging and they had tried to, you know, crank it that way and it wouldn't work.  So I found it odd that all they needed was a

jump.

MR. CROSS:  Appreciate it, Mr. Parker.  That's all I have for now.

THE COURT:  All right.  Cross-examination?

                    CROSS-EXAMINATION

BY MR. WILSON:

Q.  Hello, Mr. Parker.

A.  Hello.

Q.  So what exactly was your job at the park?

A.  Events coordinator.  I mean, I actually worked at the restaurant, and then we closed the restaurant down and I started doing event coordinating.

Q.  Okay.  And roughly what months -- you said multiple times this happened during the summer, but what months are we seeing Chief and Sawhoo?

A.  I saw them between, like, October of '21 to February of '22, and I didn't see them during the summer.

Q.  Okay.  Did you ever see Pinkins and Hider together?

A.  Huh-uh.

Q.  Okay.

THE COURT:  Was that a yes or a no?  I'm sorry.

THE WITNESS:  No.

THE COURT:  Okay.  Just so my court reporter can take things down, just answer yes or no rather than uh-huh or huh-uh.

THE WITNESS:  Yes, sir.

THE COURT:  Thank you.

Q.   (By Mr. Wilson)  So you had given a ride to Chief before; right?

A.   Correct.

Q.   Did he try to steal your car or kill you?

A.   No.

Q.   You've given a ride to Sawhoo before?

A.   Yes.

Q.   Did he ever try to steal your car or kill you?

A.   No.

Q.   You've given a ride to Miss Pinkins; right?

A.   Correct.

Q.   Did she ever try to steal your car or kill you?

A.   No.

Q.   Hider is the only one you haven't given a ride to; right?

A.   Correct.

Q.   You have testified about some relationship between -- some weird love triangle between Sawhoo, Chief, and Miss Pinkins.  If you were scared somebody was dead in the forest, you would report that to somebody; right?

A.   Correct.

Q.   And did you report that Chief may be dead in the forest to anybody?

A.   No.

Q.   Okay.  It's because you didn't think that was true; right?

A.   Correct.

Q.   Okay.  And you said you were worried about Miss Pinkins' son?

A.   Yes.

Q.   And how many phone calls did you place to the Department of Human Resources alerting them that there might be a child in danger?

A.   None.

Q.   How many times did you call 911 and alert them there might be a child in danger in the woods?

A.   None.

Q.   Okay.  And Miss Pinkins had a lot of conversations with you.  Did she ever talk to you about stealing cars?

A.   No.

        MR. WILSON:  Any further questions.

        THE COURT:  All right.  Any follow-up to that?

        MR. CROSS:  No, Your Honor.

        THE COURT:  All right.  You may step down.

        Is he excused?

        MR. CROSS:  Yes, Your Honor.

        THE COURT:  All right.  Folks, I do think this is an excellent time to take our lunch break.  Let's be back by

1:40.  I'm giving you extra time because I know it takes a while to get 12 people lunch.  And I've got a couple things to handle with the lawyers.

So remember my continuing instruction:  Don't discuss the case.  Don't research or investigate the case.  Just take a break from the case.  Come back to us at 1:40 ready to go; okay?  And we'll see you back then.

(Jury exited the courtroom.)

THE COURT:  All right.  Anything we need to take up here?

MR. CROSS:  Not from the United States.

MR. WILSON:  Not from defense, Your Honor.

THE COURT:  All right.  We'll see you-all back about 1:30, ten minutes before, just in case.  So how are we looking on -- how many more witnesses do you think you're going to have from the Government?  Will we -- any chance we'll finish today?

MR. CROSS:  We won't finish today.  I think we'll easily finish tomorrow.

THE COURT:  Okay.

MR. CROSS:  We've got another fact witness that will be very similar to Mr. Parker.  Then we've got Miss Hider.  So I anticipate that's going to go at least two hours.  Then we've got another fact witness that I think should carry us through the day.

THE COURT:  All right.  Very well.  Well, in that case, I'll see you all back about 1:30.

MR. CROSS:  Uh-huh.  And then after that, I think we'll just have one -- four shorter witnesses tomorrow.

THE COURT:  Okay.  And so we probably ought to be talking about some charges at some point today or in the morning --

MR. CROSS:  Okay.

THE COURT:  -- don't you think?  I think I mentioned that we'll do an informal charge conference without a reporter initially.  I'll try to circulate something, maybe give y'all something to take home tonight, grade my homework.  There will be a lot of bolded sections in there.  Bolded sections means I'm not sure about this, whether it ought to stay in or be modified.  And we'll kind of go from there.

MR. CROSS:  Sounds good.

THE COURT:  All right.  See you back.

MR. CROSS:  Thank you.

(Recess taken at 12:13 p.m. to 1:27 p.m.)

THE COURT:  All right.  Anything we need to take up before the jury comes back in?

MR. WILSON:  Your Honor, I believe the Government is going to try to introduce a written statement made by Yasmine Hider.  We would object to it as hearsay.

MR. CROSS:  And I don't think we are.  I'm sorry.

MR. WILSON:  You had it written on your exhibit list, Hider's written statement.

MR. CROSS:  No.

MR. WILSON:  Never mind, Your Honor.

THE COURT:  All right.  If that's all we've got, then --

MR. CROSS:  That's easy.

THE COURT:  -- why don't we get the defendant back in and check on the jury.

(Discussion off the record.)

(Jury entered the courtroom.)

THE COURT:  All right, folks.  Have a seat.  Welcome back.  We're going to keep chopping wood, and Government may call its next witness.

MR. CROSS:  United States calls Auguste Rebarchik.

(AUGUSTE REBARCHIK, being first duly sworn, was examined and testified as follows:)

THE COURTROOM DEPUTY:  Thank you.  Be seated, please. Please state and spell your first and last name for the record.

THE WITNESS:  Auguste Rebarchik.  It's A-U-G-U-S-T-E R-E-B-A-R-C-H-I-K.

THE COURTROOM DEPUTY:  What city and state do you reside in?

THE WITNESS:  Birmingham, Alabama.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  You may proceed when you're ready.

MR. CROSS:  May it please the Court.

DIRECT EXAMINATION

BY MR. CROSS:

Q.  Auguste, if you will again, just introduce yourself to the jury and tell them where you work.

A.  My name is Auguste Rebarchik.  I work at the Kirklin Clinic at UAB Hospital.

Q.  And what do you do there?

A.  I'm an exercise physiologist.

Q.  Okay.  Have you graduated from school?

A.  Yes.  I graduated last spring.

Q.  Okay.  And how long have you lived here in Birmingham?

A.  I've lived here for about two and a half years.

Q.  All right.  Do you enjoy camping?

A.  Yes.

Q.  Okay. Camp a lot?

A.  When I can, yeah.

Q.  Did you go camping last August, 2022?

A.  Yes.

Q.  And do you remember -- did you go camping in Cheaha State Park or near Cheaha State Park?

A.  Yes.

Q.  Okay.  And what was the date in August that you went

camping?

A.   I went on August 11th, that evening.

Q.   August -- and what day of the week is that?

A.   Which was a Friday.

Q.   Okay.  Are you sure that's the 11th?

A.   Yes, I believe so.

Q.   Do you happen to have your cell phone?

A.   Let me double-check.  Sorry.  It was the 12th.  I apologize.

Q.   What you remember is it was a Friday night?

A.   It was.  Yeah, it was Friday night.

Q.   Why do you remember it was a Friday night?

A.   It was convenient for everyone to get off work and --

Q.   Okay.  Who's "everyone"?

A.   There was a group of eight of us.  It was me, my father, my brother, and some friends.

Q.   And where did you-all go camping?

A.   We had initially planned on going to the Turnipseed Campground.  It was a little busier than we anticipated, so we ended up just going down the road a bit, found a new spot.

MR. CROSS:  If we could look at Government's Exhibit No. 5, please.

Q.   (By Mr. Cross)  I'm showing you what's previously been marked and admitted as Government's Exhibit No. 5.  Do you recognize this map?

A.   Yes.  Yes, I do.

Q.   And where would -- on this map, where would the Turnipseed Campground be?

A.   It was just off the main road.

Q.   Okay.  281?

A.   Yes.

Q.   And was there a dirt road across the street from the parking lot?

A.   Yes.

Q.   So would it be at the bottom?

A.   I believe so, yes.

Q.   Okay.  And if you would, just touch -- I think it's -- I think there's a campground symbol down there.

A.   Uh-huh.

Q.   Show us where --

A.   (Indicating.)

Q.   Okay.  That's where y'all intended to go camping?

A.   Yes.  That's where we went initially.

Q.   All right.  And about what time did y'all arrive there?

A.   Around 5:00 p.m., I would say.

Q.   Still daylight?

A.   Yes.

Q.   And what happened to make you change locations?

A.   There were -- there were just a lot of people there

around that area, so we just kind of searched for a less --
less busy area since there was a lot of us, something --

Q.  All right.  So where did you go in search of a campground?

A.  We went down the dirt road --

Q.  Is that 600-3?

A.  Yes, yeah, that's where we went.  We went down that road just searching for something else.

Q.  Okay.  And what, if anything, happened as you were driving down that road?

A.  When we first arrived, it was just me and my cousin. I think at that point there were two other friends who had arrived.  My cousin got in the car with me and we drove down the dirt road.  On our way down the road we saw a female standing on the corner.  She just looked lost maybe.  I asked my cousin if we should stop and ask if she needed help.  He said no, it wasn't a good idea.  So we continued down the dirt road, found a -- what we thought might have been a good camping spot, and then we returned to Turnipseed to collect the rest of our group.

Q.  Okay.  Where did you see this -- is this the woman you would later interact with later in the evening?

A.  Yes.

Q.  Okay.  Where did you first see her?

A.  We first --

Q. On the map, if you will.

A. Sure. Going down the road, she was about right there (indicating) at the intersection.

Q. Okay. 600-3 with the main road?

A. Yes.

Q. All right. And was she hitchhiking or flagging people down or just walking around?

A. It appeared that she was actively looking to speak with someone. I kind of remember her sticking out her thumb almost just like a typical hitchhiker symbol, I guess.

Q. And y'all went by initially?

A. Yes.

Q. And when you say we went down the road -- you're able to draw on your monitor -- if you will show us which road you went down and what direction.

A. Okay. So we left Turnipseed and we went down that road (indicating).

Q. Okay. When did you see this woman again?

A. As we were returning to go back to Turnipseed.

Q. Okay. So you're headed back down toward 281 --

A. Yes.

Q. -- down 600-3?

A. Yes.

Q. Okay. And where did you see her?

A. She was in the same area on that corner.

Q.   Okay.

A.   Yeah.

Q.   Did you talk to her again?

A.   Yeah.  So on the way down the dirt road I asked my cousin if we should stop and ask.  He said, like, "No, I don't think it's a good idea."  So when I went back, I said, "I think I'll stop and ask her if she needs help."

Q.   And were you alone?

A.   No.  He was still with me at that point.  And so I stopped and rolled down the window and just asked her if she needed help or anything.  She said that her car was somewhere down that road and that her battery was dead and she needed help to get it started -- or to get jumped off.  So I just told her that we were going to get the rest of our group to go to our camping spot that we found down the dirt road and that I would get her on the way back and I'd give her a ride to her car, see if I could help her.

Q.   Did you do that?

A.   Yes.  So we returned to Turnipseed.  We collected the rest of our group.  There were a lot of us.  There were eight of us, so there were several vehicles.  My car was in the front of, kind of, the envoy, if you will.  We drove down the dirt road.  I stopped, let her get in my car.

Q.   Was she at the intersection, 600-3?

A.   Correct.

Q. Okay. Sorry to interrupt.

A. Yes. So she got in my car. She had a -- looked like a pretty heavy backpack on her shoulder. She got in. She was wearing just a T-shirt. I think it had, like, Bob Marley on it or something, and she had pretty strong odor.

Q. Did she smell bad?

A. Yeah. I could tell she'd been out -- outside for a while. So she got in my car. We drove down the dirt road.

Q. Is it just the two of you?

A. Just the two of us, but there were several cars behind us kind of following. So we pulled off to the left where I had seen her car and where she indicated her car was. And I pulled into a -- in a way that I could jump her off.

Q. And you said you turned left off of 600-3?

A. Correct.

Q. Do you see where it states "Parked vehicle location"?

A. Yes.

Q. Is that consistent where you went with her that day --

A. Yes.

Q. -- on August the 12th?

A. Yeah, that is correct.

Q. Okay. And what kind of vehicle did y'all come upon?

A. It was a cube-type car, like a Scion or KIA-Soul-type vehicle.

Q. Would you recognize it if I showed you some pictures

of it?

A.   Yes, I believe so.

MR. CROSS:  If we could switch to Government's Exhibits 134 through 138, please.  That's exhibit 134.  Go to 135.  136.  137.  Then 138.

Q.   (By Mr. Cross)  Do you recognize that vehicle?

A.   Yes.

Q.   Does that look like the area it was in when you observed it?

A.   Yes.

Q.   Okay.  Upon arrival, what, if anything, happened?

A.   When we got there, I realized that I didn't have any jumper cables.  So I had parked my car in -- it was kind of a tight spot, so I had -- I had managed to get my car in close enough to jump her car off.  So when I realized I didn't have the jumper cables, I tried -- I called one of my friends to come help us, and they were nearby.  If you look on that map --

Q.   Okay.  Let's go back to Government's Exhibit 5.

A.   Am I able to touch it?

Q.   You can.

A.   So our campsite was about right there (indicating) where that creek --

Q.   Uh-huh.

A.   -- runs into the road.  So it was close.  So I called

one of my friends to come help.  He showed up, my friend Garrett.  He realized he didn't have jumper cables either.  So all during this time I'm making small talk with this -- this woman.

Q.   Okay.  Did Garrett leave at that time?

A.   He did.  He went to go find someone else that had cables.

Q.   Okay.  So it's just the two of you?

A.   Yes.

Q.   All right.

A.   During this time we're just making small talk.  It was pretty awkward.  I didn't know anything about this woman.  So I asked her how long she'd been out there and what she was doing, and she said that she liked camping and that she was just staying off the grid, that she was staying with her sister and her sister's child, or her sister's kid.

MR. WILSON:  Judge, objection.  Hearsay.

THE COURT:  Who -- okay.  I'm sorry.  Who is the -- who is "she," just to be clear?

MR. CROSS:  Miss Hider.

THE COURT:  Miss Hider.  Sustained, unless you offer it for other than the truth of the matter asserted.

MR. CROSS:  Your Honor, I would be offering it as a co-conspirator statement during the course of the conspiracy.

THE COURT:  All right.  You've not alleged -- there's

not a conspiracy charge.

MR. CROSS:  There's not.  I'm not so sure the rule requires that.

THE COURT:  All right.  Mr. Wilson -- I'll tell you what, folks, this is going to take a little bit more time and we're going to get into some things that is legal theory, so I'm going to ask you to go back to the jury room.

Let me just say this:  From time to time, as we're getting closer to the end of the Government's case and the end of this evidentiary portion of the case, we'll have situations like this where I'm going to have to talk with lawyers.  It may be scheduling; it may be an evidentiary issue like this. I assure you that while you're resting, the lawyers are working and moving the ball down the field so we can get this to you as soon as possible in the interest of fairness to both sides; okay?

So if you wouldn't mind heading back to the jury room. Just let me deal with this one issue and I'll bring you right back in a moment.

(Jury exited the courtroom.)

THE COURT:  Caught me working on jury instructions.

So you've not alleged a conspiracy.  Has there been any notice to the defendant that you're contending that there was conspiracy evidence going to be introduced?

MR. CROSS:  Other than just the facts of this case,

Your Honor, which we have alleged all along they were working together, we did not charge a conspiracy.  Nevertheless, this is a conspiracy that is taking place.  I don't think we have to indict it, and we've provided this statement to the defense.

THE COURT:  Mr. Wilson, do you just agree with that general proposition that they don't have to indict a conspiracy offense in order to put forward conspiracy evidence on particularly an aiding and abetting charge?

MR. WILSON:  Your Honor, I agree with them that they don't have to actually charge it as a conspiracy.

THE COURT:  That doesn't make it admissible, but that's the first legal proposition I want to make sure there's no dispute about.  Okay.

MR. WILSON:  Okay.

THE COURT:  All right.  So back to you, then.  Why would it not be appropriate for me to allow this in?  I think the Government's evidence is so far -- at least the Government's theory, based upon the evidence, is that Hider was doing the work in terms of holding the couple by gunpoint, robbing them, kidnapping them, whatever the offenses are here, and your client was on the skirt of the woods watching this, had supplied the gun previously, the day or two before.

Is that correct; Mr. Cross?

MR. CROSS:  That's correct.

THE COURT:  All right.  And that there was some coordination.  In fact, I think there's been evidence that your client came out of the woods after the gunshots.  All right.  So why wouldn't this be something I'd permit in?

MR. WILSON:  One, I believe it violates the hearsay rule.

THE COURT:  Well, if it's conspiracy, that would be an exception to the hearsay rule.

MR. WILSON:  Second, that's their theory, but I don't think they substantiated at all -- presence at a crime scene doesn't establish the aiding or abetting.

THE COURT:  What about supplying the weapon?  And at least the jury could find from the facts right now that your client was on the edge of the woods watching this transpire.

MR. WILSON:  As to the supplying the weapon, the only evidence entered is that the gun belonged to Krystal Pinkins.  Nobody has testified that she gave it to Miss Hider.  And as far as watching at the edge of the woods, I don't think anybody has testified to that.  Miss Paulus testified she came out of the woods, but nobody has seen her lurking in the shadows, so to speak.

THE COURT:  Well, we may be in a position where -- do we need to hear from Hider before I can make a ruling on the conspiracy?

MR. CROSS:  We may, Your Honor.  Definitely after you

hear from Hider.  But also, as you've already alluded to, we're not alleging that they were sisters.  This is an offer to that truth, prove that truth.

THE COURT:  They're not biological sisters.

MR. CROSS:  No.

THE COURT:  Your evidence has been that the defendant has referred to Hider as her sister.

MR. CROSS:  That's correct.

THE COURT:  That could mean different things.

MR. CROSS:  Absolutely.

THE COURT:  All right.  I'm going to sustain the objection for now.  I don't know that you've done enough to show that there's a conspiracy.  I'm -- don't have a lot of -- I could certainly see a situation where more evidence comes in and that it shows sufficiently a conspiracy, but at this point, if I admit it in and the jury hears it, we can't put the cow back in the barn.  So I'm going to sustain that for now.  I'm not going to say you can't re-call this witness and ask that question if you establish more sufficiently that there was a conspiracy between the defendant and Hider; okay?  I'm just saying at this point I don't know that I can -- based upon the evidence the jury's heard, I'm not sure I can make that finding with any clarity right now.

You're contemplating.

MR. CROSS:  Yes, Your Honor, because I don't think we

are clearly going to -- this is not offered for the truth of the matter asserted. This was a complete ruse. So I'm trying to just expedite it. I can re-call this witness after Hider testifies, if that's the Court's preference.

THE COURT: Well, I mean, I think that's the safer bet to make sure that there's not some error that affects us here if there's not sufficient evidence later to tie this statement into a conspiracy; okay?

MR. CROSS: Yes, Your Honor.

THE COURT: You're welcome to go consult the legal team over there and Mr. Felton, see if he has any different views.

MR. FELTON: I see where the Court's going. We can just call him after Miss Hider testifies, but I don't think that the defense is being -- should be candid with the Court and know exactly what Hider's going to say and this is just really keeping this witness here --

THE COURT: There's 101 wrong things that could happen at a trial, and if I'm him, I'm not conceding anything.

MR. FELTON: Very well. That's the way we'll do it. We'll do it that way.

MR. WILSON: Thank you, Your Honor. In light of that, I would ask that his response that he got out before I made my objection be stricken and the jury be instructed to disregard it.

THE COURT: I'll have him disregard -- I didn't catch the response. Let's see. The only thing that really was offered to prove the truth of the matter asserted, other than Hider's presence and that she was camping, was she was staying with her sister and her sister's child, or her sister's kid. Is that what you're referring to as -- we've already had some evidence that your client referred to Hider as her sister and --

MR. WILSON: But I just didn't know where -- how far it was going to go, and I knew Hider --

THE COURT: I think you objected in time before anything that I'd be concerned about. Now, you know, I'm happy to let you come up here and look at the dirty I have just to make sure, the real-time feed, but I don't -- I'll do what you want me to do. I'll just tell him that I've sustained the question as calling for a hearsay response. I'll be glad to tell them to just disregard the answer, but we're going to have that answer later more than likely is what the Government certainly thinks at this point.

MR. CROSS: Absolutely.

MR. WILSON: I don't know what Miss Hider is going to say.

THE COURT: I'm sorry?

MR. WILSON: I said I don't know what Miss Hider is going to say.

THE COURT:  I hear you.

MR. CROSS:  So we're clear, we have provided him with the 302 as to what we anticipate Miss Hider's going to testify to, and this will be addressed in further --

THE COURT:  I don't think he's referring to your lack of disclosure.  I think he's referring more to the witness.

MR. WILSON:  That's correct, Your Honor.

THE COURT:  He's not commenting upon your lawyering. He's commenting upon that witness.  Okay?

MR. CROSS:  Very well.

THE COURT:  All right.  So I'm going to sustain the objection.  We'll revisit this if there's evidence that -- from which the Court could make a determination that there was sufficient evidence of a conspiracy between the two; okay?

MR. WILSON:  Thank you, Your Honor.

MR. CROSS:  Before we bring the jury back, I'm not asking any more questions until Hider testifies, so --

THE COURT:  Of this witness?

MR. CROSS:  Of this witness.

THE COURT:  Okay.  Well, I'll just tell the jury that, then, that we're going to call this witness back after the Hider testimony, is what the Government's told me, and -- is there cross-examination that you want to do right now?

MR. WILSON:  As of right now, I would just ask him if he's ever seen Miss Pinkins before, but that would take just a

second.

THE COURT:  All right.  Let's do that, then.

MR. CROSS:  Okay.

THE COURT:  And that won't preclude you from -- you won't be on redirect within the scope of your direct when you call back.  That's just a continuation, correct, ordering things so if there is evidence of conspiracy, we'll be able to go into that next subject area you wanted to address.

MR. CROSS:  Certainly.

THE COURT:  Am I right, though, in terms of categorizing the conspiracy evidence right now?  I guess that's what I meant to ask before I finalized my rule.  I think -- I've given you a catalog of what I understand you're relying upon to understand a conspiracy at this point.  There may be more after the Hider testimony, there may not, but we'll just have to see.  Fair?

MR. CROSS:  Fair enough.

THE COURT:  Okay.

(Jury entered the courtroom.)

THE COURT:  Okay.  Folks, have a seat.  So here's where we are.  I've made a ruling on the last question and answer that it is hearsay and you have to you disregard the answer that the defendant gave; okay?  Now, there may be a way that -- there may be an exception to the hearsay rule.  The Government's going to explore that through other evidence with

other witnesses.  And if that occurs, I'm going to allow them to re-call this witness to the stand and then go down the line of questioning they were about to go to, because then there would be an exception to hearsay rule and I'd permit the evidence to come in.

Having informed the Government of that ruling, the Government's decided that what they're going to do is not ask any further questions of the witness for now, reserve the right to have him come back -- after our next witness?

MR. CROSS:  Yes, Your Honor.

THE COURT:  Okay.  And then we're going a little out of order, but that's fair to both sides.  I'm sustaining the objection, to be fair to the defendant, but I'm not -- I'm going to allow the Government to tie things together a little bit for me to make sure that -- give them one more chance to make sure that this would be hearsay evidence.  But I do think -- I've told Mr. Wilson that he's welcome to go ahead and do his cross-examination on what you've heard so far, and he will also reserve the right to cross-examine the witness on anything that takes place when the Government recalls the witness during its case.  Makes perfect sense; right?

Okay.  So that's how we're going to proceed.  I just wanted you to know we've had a little bit of a detour.  We're going to have cross-examination of the witness.  Unfortunately for him, he gets to stick around a little longer with us and

then he may be called back, depending upon what my next ruling is after I hear the next witness's testimony, and then we'll just go out of order a little bit that way if that happens; okay?

All right.  With that, Mr. Wilson, I think you're up on any cross-examination you'd like to do on anything the jury's heard to this point.

MR. WILSON:  Thank you, Your Honor.

If it please the Court.

CROSS-EXAMINATION

BY MR. WILSON:

Q.   Mr. Rebarchik -- am I saying that right?

A.   Yes.

Q.   So the lady that stopped you that was on the side of the road, was it this lady right here?

A.   No.

Q.   Have you ever seen this lady before?

A.   No.

MR. WILSON:  Thank you.  No further questions.

THE COURT:  All right.  Any follow-up to that?

MR. CROSS:  No, Your Honor.

THE COURT:  All right.  You can step down, sir. You're not excused yet.  Please let the Government and its case agent figure out how to coordinate about getting you back, if necessary; okay?  But just please follow the

Government's case agent's instructions about that.

All right.  Ready to call your next witness?

MR. CROSS:  Yes, Your Honor.  United States would call Yasmine Hider to the stand.

THE COURT:  And, folks, give them a minute.  It will take them a minute to get Ms. Hider available.

THE U.S. MARSHAL:  It will be momentarily.

THE COURT:  All right.  That's what I just told them.  That's fine.

MR. WILSON:  Your Honor, may we approach?

THE COURT:  Yeah, come on up.

(Sidebar discussion.)

MR. WILSON:  I think they all expect Miss Hider's testimony to be lengthy -- lengthy, long.  Miss Pinkins is requesting a bathroom break, which I don't have a problem with, but I'm skeptical about the jury seeing her being handled by the marshals.  I'm sorry.

(End of sidebar discussion.)

THE COURT:  Okay.  So, folks, after further review, we're going to let you go back in the jury room for a moment.  There's one other thing we've got to take up in the courtroom.  Sorry, but again, I'm glad I gave you that instruction earlier that as we get closer today and tomorrow, this is going to happen.  Don't be frustrated with us.  Understand that you're relaxing while they're working.

(Jury exited the courtroom.)

THE COURT: I think Ms. Hider [sic] needs a rest-room break. Let's let her do that. We just didn't want to have her escorted out that door in front of the jury. I'm sorry. Ms. Pinkins needs a rest-room break.

Can we arrange Ms. Hider coming in at the same time? We've got more than one ball in the air here.

THE U.S. MARSHAL: We got you.

MR. CROSS: Your Honor, we have an agreement as to additional exhibits for this witness.

THE COURT: All right. As far as admission of exhibits?

MR. CROSS: That's correct.

THE COURT: All right. Let me get my handy dandy exhibit list out. All right. To save some time, you call the exhibit, Mr. Wilson, you tell me there's no objection, then I'll say admitted.

MR. CROSS: First is Government's Exhibit 88, which is a shotgun, Your Honor.

MR. WILSON: No objection.

THE COURT: 88 is admitted.

MR. CROSS: And then photographs -- Government's Exhibits 123 through 132.

THE COURT: 123 through 132. Any objection?

MR. WILSON: No objection.

THE COURT:  Government's Exhibits 123 through 132 inclusive are admitted.

MR. CROSS:  And that's it.

THE COURT:  Okay.  Karen, we just admitted -- I'll write this down for you -- 123 through 132, 88.  Is that right?  Yes.  You got that?

THE COURTROOM DEPUTY:  Yes.  Ready?

THE COURT:  Yes.  Thank you.

(Jury entered the courtroom.)

THE COURT:  All right, folks.  While you were out, I admitted some more exhibits, 88 and 123 through 132.  So if you hear reference to those, they're in.  You-all can go ahead and have a seat.  Just wanted to let you know.  Just wanted to make sure you know I am good on my word, that we're not in here taking it easy while you-all are taking a break.

All right.  So with that said, announce your next witness.

MR. CROSS:  Your Honor, the United States calls Yasmine Hider.

THE COURT:  All right.

(YASMINE HIDER, being first duly sworn, was examined and testified as follows:)

THE COURTROOM DEPUTY:  Please state and spell your first -- you can put your hand down, Miss Hider.  Please state and spell your first and last name for the record.

THE WITNESS:  Yasmine Hider, Y-A-S-M-I-N-E H-I-D-E-R.

THE COURT:  All right.  You may proceed when you're ready, Mr. Cross.

MR. CROSS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. CROSS:

Q.  Miss Hider, you're here to testify today about what took place on August the 14th, 2022?

A.  Yes.

Q.  And where are you currently residing?

A.  Morgan County jail.

Q.  Okay.  Have you been in jail since this shooting?

A.  Yes.

Q.  I want to talk a little bit about your background, if that's okay.

A.  Okay.

Q.  Where were you born and raised?

A.  I was born in Tulsa, Oklahoma, and after my father passed, I moved with my auntie to Edmond, Oklahoma.

Q.  How old were you when your father passed?

A.  12.

Q.  How long did you live with your aunt?

A.  Till I was 19.

Q.  And where did you go after living with your aunt?

A.  I stayed with my sister for a couple months, and then

I drove down to Georgia.

Q.  What part of Georgia?

A.  I stayed in south Fulton for a little bit and then Lawrenceville.

Q.  Is that near Atlanta?

A.  Yes.

Q.  Okay.  Did you stay near a church?

A.  I'm not sure.

Q.  Okay.  Where were you living when you moved to Georgia?

A.  I was living in a -- in and out of houses at first, and then I stayed in a tent -- in a close -- behind a church so I could get to and from work.  It was close by.

Q.  Okay.  Was it on church property, this tent you were staying in?

A.  Yes.

Q.  How old are you currently?

A.  21.

Q.  Okay.  Were you 20 last year in August of 2022?

A.  Yes, sir.

Q.  How long did you stay in the tent in Atlanta, Georgia?

A.  Two months.

Q.  And do you know Krystal Pinkins?

A.  Yes, sir.

Q.  How do you know Miss Pinkins?

A.   We met briefly when I first moved -- well, when I first came down to Atlanta for a -- like a meet and greet. I'm not really sure.  I think it was in October or September, September or October.  And then I met her again through another person from the Internet.  We met up again around late April.

Q.   Okay.  What year is this?

A.   2023.

Q.   April of 2023?

A.   April of 2022.

Q.   Okay.

A.   Oh.  Yes, April 2022.

Q.   Okay.  April of the same year -- April before August of the shooting?

A.   Yes.

Q.   Okay.  So you had just been with her a -- several months or a few months?

A.   Yes.

Q.   Not over a year?

A.   No, yes.  Sorry.

Q.   I just wanted to clarify.

Okay.  And then what was this meet and greet when you first met her?

A.   We were meeting to support somebody online.  His name was Rashad.  We supported his -- or I supported his cause.

And he was going through some things legally, and he just wanted to meet up and, I guess, meet people.

Q.   What was his cause?

A.   I -- he was going through some court battle, but he was, like, teaching, like, a lot of spiritual things that looked -- was getting more knowledge in.  And I looked up to him because he was telling a lot of information -- he knew a lot of information about that.  And I really liked that because I was very -- I was trying to get more into my spirituality, just self-healing and things like that.

Q.   All right.  And you met Miss Pinkins there?

A.   Yes.

Q.   Okay.  Is Miss Pinkins in the courtroom?

A.   Yes.

Q.   Can you see her?

A.   Not really.  I can't really see that well.

Q.   So even if you stood up, that wouldn't help you see her?

A.   It's blurry.

Q.   And I believe you wear glasses.

A.   Yes.

MR. CROSS:  Okay.  Just so that we can get this out of the way, permission of the Court, could she be escorted down to identify the defendant?

THE COURT:  Yes.

Q.   (By Mr. Cross)  You see her?

A.   Yes.

Q.   Okay.  What is she wearing?

A.   Orange or gold and black shirt.

Q.   Okay.  If you will, you can have a seat and I'll ask you to restate that just so everybody can hear.  You just saw the defendant in the courtroom, Miss Pinkins?

A.   Yes, sir.

Q.   And describe what she has on.

A.   A gold and black shirt.

Q.   Okay.  How old is -- I'm going to call her the defendant.  How old is the defendant?

A.   36, 35.  I mean 37 -- 36, 37.

Q.   Was she 36 last year, in August?

A.   Yes.

Q.   Okay.  Do you know where she's from?

A.   Memphis, Tennessee.

Q.   Okay.  And correct me if I'm wrong.  You -- when was it that you met her in Atlanta?

A.   September or August.  I'm not really sure.  I can't remember the dates.

Q.   Okay.  Would that have been before the April --

A.   Incident -- oh, yeah.  Yes.

Q.   Okay.  So that would have been 2021?

A.   Yes.

Q.   First met her in Atlanta and then you saw her in April again?

A.   Yes.

Q.   Was that in Atlanta also?

A.   Yes.

Q.   Okay.  In April, when she was in Atlanta, do you know why she was in Atlanta?

A.   She said that she was scared in Alabama because her boyfriend went missing and stuff started -- she started smelling, like, a dead body and she got nervous and she left.

Q.   Okay.  Do you know what her boyfriend's name was?

A.   She called him Chief.

Q.   Okay. All right.  And what did she tell you about Chief?

A.   They met online.  They met up in March, I believe.

Q.   2022?

A.   Yes.

Q.   Okay.

A.   It was her boyfriend.  He was teaching her how to live off the grid.  He had, like, this setup that he was making in Talladega where he was, like, growing vegetables and he was just living in the woods with a tent and stuff like that. Then he went missing after, like, he went to go clean the dishes and he was looking for something for his foot.  And he never came back and she started getting sketched out.

Q.   I'm sorry?  She started getting what?

A.   She started getting -- she was getting scared.

Q.   Okay.

A.   She was with another man; his name was Sawhoo.  And they -- they were both getting scared because Chief was missing for a couple days, so they decided to leave.  She drove Sawhoo to Birmingham to his mom's house, and then she got in contact with this guy named Zeke to -- who was in Atlanta.  And Zeke contacted me and said that she needed a spot to stay at because I guess he knew I was, like, camping or living in a van and stuff.  And that's how we got in contact.

Q.   All right.  So at the time she came to you in April, she was getting away from Alabama, Chief, and Sawhoo; is that correct?

A.   Yes.

Q.   I just want to summarize.  And at that time you were living in a tent?

A.   Yes.

Q.   And did she talk about this campsite where they lived in Alabama?

A.   Yes, a little bit.  She just said they had tents, they had, like, a food tent and things like that, they had, like, arts and craft table, blow-up mattress -- mattresses, there was a waterfall, stuff like that.

Q.   Okay.  Did you ever see this campsite?

A.   Yes.

Q.   Okay.  Is this the campsite -- did she carry you to this campsite?

A.   Yes.

Q.   Okay.  How would you describe your relationship with the defendant?

A.   I thought we -- I mean, I thought we were friends.  I kind of looked up to her a little bit of how she was --

Q.   Why did you look up to her?

A.   I liked how she carried herself and how she was taking care of her kid.  Like, nutritional-wise, she was very concerned about certain things that were in food and that what could happen to her son if he consumed it.

Q.   Okay.  And how old was her son in August of 2022?

A.   Four.  Well, no, he turned five.  He just turned five.

Q.   Do you know his birthday?

A.   No.

Q.   Okay.  Did you get close to her son?

A.   Yes.

Q.   Okay.  When did you first meet her son?

A.   I saw him briefly in our first meeting in September or August.  I mean September or October.

Q.   Okay.  That's of 2021?

A.   Yes.

Q. Okay. Did you see him again in April of 2022?

A. Yes.

Q. Was he with her when she came to Atlanta?

A. Yes.

Q. Did y'all ultimately move from Atlanta to this campsite in the Talladega National Forest?

A. Yes.

MR. CROSS: If we could look at Government's Exhibit 5, please.

Q. (By Mr. Cross) Do you recognize Government's Exhibit No. 5?

A. Yes.

Q. Okay. On Government's Exhibit 5, I'll draw your attention to the main campsite. Does that look familiar?

A. Yes.

Q. Okay. Do you wear glasses --

A. I do.

Q. -- or contacts?

A. I do.

Q. Is it hard for you to see sometimes?

A. Yes.

Q. Okay. But you can see that main campsite?

A. Yes.

Q. Off 60-3 [sic]?

A. Yes.

Q.   That's where you-all ultimately went?

A.   Yes.

Q.   Where she had previously been with Chief and Sawhoo?

A.   Yes.

Q.   At the time y'all -- when did y'all arrive there in 2022?

A.   Late May.

Q.   Okay.  And how did y'all get there?

A.   She drove her car.

Q.   And what kind of car did she have?

A.   It was a blue Scion.

Q.   Okay.  At the time y'all first arrived, did the defendant have any source of income?

A.   She was selling herbs on Etsy.

Q.   Okay.  And how often would she sell herbs on Etsy?

A.   I'm not sure.  I only saw her sell one item -- or one -- she sent off one item to the post office.  I don't know how many was in that package, though.

Q.   Okay.  Back in May of 2022, would y'all occasionally go to the store to get food and supplies?

A.   Yes.

Q.   And whose money would y'all use in order to get food and supplies?

A.   We would use my EBT card.

Q.   Okay.  What is your EBT card?

A. It's food stamps.

Q. Okay. And you would get that replenished every month?

A. Yes.

Q. Would you always pay when y'all went to the store?

A. Yes.

Q. Okay. Did she ever pay?

A. Not that I can recall.

MR. CROSS: Okay. If we could look at Government's Exhibits 134 through 138, please.

Q. (By Mr. Cross) I'm showing you what's previously been marked as Government's Exhibit 134. Then we're going to go to 135, 136, 137, 138. Do you recognize this vehicle?

A. Yes.

Q. Whose vehicle is that?

A. The defendant.

Q. Okay. Is that the vehicle y'all traveled, ultimately, from Atlanta to the campsite in the forest?

A. Yes.

MR. CROSS: Okay. If we could go back to Government's Exhibit 134. And then to Government's Exhibit 135.

Q. (By Mr. Cross) Looks like the back window is missing.

A. Yes.

Q. When did that happen?

A. A month previous.

Q. A month prior to August --

A.   Yes.

Q.   -- 2022?

And what happened?

A.   The car got vandalized.  I know that the -- something was wrong with the steering wheel.  We couldn't start the car and the window was broken out.  There was stuff taken out.

Q.   Okay.  And that was about a month before the shooting?

A.   Yes.

Q.   After the car was vandalized, did it ever start again?

A.   No.

Q.   Did y'all try to get several people to help you to get it started?

A.   Yes.

Q.   Was anybody able to get the vehicle operating?

A.   No.

Q.   Around August 14th of 2022, was the car inoperable?  Could you drive it?

A.   No.

Q.   Could you crank it?

A.   No.

Q.   Did you know that?

A.   Yes.

Q.   Did the defendant know that?

A.   Yes.

MR. CROSS:  If we could go to Government's Exhibit 92.

Q.   (By Mr. Cross)  Do you recognize anybody in this picture in Government's Exhibit 92?  And if you can see.  If you need to lean close, feel free.

A.   Yes.

Q.   Who do you recognize in that picture?

A.   The defendant and her son.

Q.   Okay.  Were they -- was it just the three of you at the campsite?

A.   Yes.

Q.   From the time y'all arrived in May of 2022 until August 14th, 2022, did anyone else live with y'all at the campsite?

A.   No.

Q.   Okay.  Did y'all have any firearms at the campsite?

A.   Yes.

Q.   What did y'all have?

A.   I didn't have any weapons, but the defendant had a shotgun and a pistol.

Q.   Okay.  Do you remember that shotgun?

A.   Yes.

Q.   Okay.  I imagine you remember the pistol.

A.   Yes.

Q.   We'll talk about the pistol in just a little bit, but if I showed you the shotgun, would you recognize it?

A.   Yes.

MR. CROSS:  May I approach?  Or I'll stay some distance from the witness, Your Honor.

THE COURT:  You may.

Q.  (By Mr. Cross)  Do you recognize this shotgun?

A.  Yes.

Q.  Is that the shotgun that the defendant had at the campsite?

A.  Yes.

MR. CROSS:  For the record, that's Government's Exhibit 88.

Q.  (By Mr. Cross)  Back to when the Scion was vandalized, did the defendant suspect somebody of -- did she have anybody that she suspected of vandalizing the Scion?

A.  Yes.

Q.  Who?

A.  There was a couple there camping out.  They had their stuff scattered around.  There was a -- they had a truck that was also missing a tire.  When we got to the -- where the car was, they explained to us, like, how they thought the car got vandalized.  And she assumed they did it because they explained how it was done, how they moved the car and what they thought how it happened.

Q.  Okay.  Did they say they did it?

A.  No.

Q.  But they had some inside knowledge as to what had

happened to the vehicle?

A. Yes.

Q. Did the defendant suspect them of vandalizing the vehicle?

A. Yes.

Q. Okay. In relation to when this vehicle was vandalized, did she ever go and get her shotgun and go down to where the vehicle was located?

MR. WILSON: Judge, objection. Leading.

THE COURT: Overruled.

A. Yes.

Q. (By Mr. Cross) Okay. And what happened when she went and got her shotgun?

A. Before we went down there, she assumed that it was a jam and she let off a shot towards the woods.

Q. Okay.

A. And then she told -- she showed me how to pull back the -- the top part of the pistol before giving it to me.

Q. Okay. Before we get there, she fired the shotgun?

A. Yes.

Q. Okay. Did the vandals leave the campsite?

A. We weren't at the vehicle yet. We were still at the main, like, area of the main camp.

Q. Okay. Did she ever carry the shotgun to --

A. Yes.

Q.   -- where the vandals were located?

A.   Yes.

Q.   Okay.  And did they leave thereafter?

A.   Yes.

Q.   Okay.  Let's talk about the pistol.  Have you ever fired a -- prior to August 14, 2022, had you ever fired a pistol before?

A.   Yes.

Q.   When?

A.   When I was living in Oklahoma a couple years back when we were -- my family has a lot of land, so we went shooting sometimes.

Q.   How often would you go?

A.   I've only been twice.

Q.   In your life?

A.   Yes.

Q.   Okay.

     MR. CROSS:  May I approach the witness again?

     THE COURT:  You may.

Q.   (By Mr. Cross)  I'm going to show you what's been marked as Government's Exhibit 47.  Is that the defendant's pistol?

A.   Yes.

Q.   Did she ever give you that pistol?

A.   Yes.

Q.   Okay.  And when she gave it to you, did she show you how to work it?

A.   Yes.

Q.   Did you know how to work it before she gave you the pistol?

A.   A little bit.

Q.   What did she teach you about the pistol?

A.   She taught me how to pull back -- I don't know what the top part is called, but to pull that back to make sure --

Q.   The slide?

A.   -- the slide -- to make sure there was a bullet in the chamber, I guess.

Q.   Okay.  And do you know why she was showing you how to operate that pistol?

MR. WILSON:  Objection, Judge.  It calls for speculation that he's asking her to testify on the mental operation of Miss Pinkins.

THE COURT:  Sustained.  I think you can ask that a different way.

MR. CROSS:  Sure.

Q.   (By Mr. Cross)  Tell us about when she showed you how to operate the pistol.

A.   What -- what do you mean?

Q.   When she showed you how to operate the pistol, tell us what took place when that happened.

A.    So it was the day that we -- I got my food stamps supplied and that was the day the car got vandalized.  And she was upset and she thought the people at the -- in the tents did it and they took her phone and credit cards.  So she went and got her shotgun and pistol and gave me the -- gave me the pistol.  And we were going to go down there and get her stuff back.

Q.    Okay.  To confront the vandals?

A.    Yes.

Q.    That's when she first gave you the pistol?

A.    Yes.

Q.    And that was about a month before the shooting in August?

A.    Yes.

Q.    And you had just gotten your food stamps again?

A.    Yes.

Q.    Same food stamps you used to buy groceries and supplies?

A.    Yes.

Q.    The vandals left thereafter?

A.    Yes.

Q.    Did you keep the pistol?

A.    No.

Q.    When did you give her back the pistol?

A.    After they left, I -- they said they were going to

come back to take us to the grocery store.  So I stayed in the car overnight with -- she let me keep the gun.  And when she came back the next day to see if I was okay, I gave her it back then.

Q.  Okay.  So a month before the shooting she gave you the pistol.  After the vandalism, you kept the gun because you were staying in the car by yourself that night?

A.  Yes.

Q.  And the next day you gave it back to her?

A.  Yes.

Q.  When is the next time that she gave you that pistol?

A.  Friday, two or three days before the incident happened.

Q.  We're getting close to the incident.  It was on August 14th?

A.  Yes.

Q.  A Sunday?

A.  Yes.

Q.  So she gave it to you on Friday?

A.  Yes.

Q.  And why did she give you the pistol on that Friday, which would have been August the 12th?

MR. WILSON:  Okay, Judge.  He's just asking generally why she did something.  He's again asking her to comment on the mental operation of --

THE COURT: All right. Let's rephrase.

MR. CROSS: I'll rephrase.

Q. (By Mr. Cross) What was the occasion of her giving you that pistol?

A. To take a car.

Q. Okay. When you say "take a car," what do you mean?

A. We needed a car to go to the grocery store and get some other supplies, and we were going -- we were going to force somebody to give us the car. Well, I was going to force somebody to give me the car.

Q. Okay. Did she know that?

A. Yes.

Q. How did she know that?

A. We talked about it.

Q. When did y'all first start talking about taking a car?

A. The weeks before. We -- well, we tried to get people to stop and things like that and it didn't work. And then I suggested that we just take one because there was, like -- close to Devil's Den there was always cars, or sometimes there were cars parked next to the waterfall, the hiking area, and it seemed easy to take. But we didn't know how to hot-wire a car, so we knew we were going to need the keys. So we would need the person to be close or in their vehicle.

Q. Okay. And this was a week, two weeks prior to August 14?

A.    Yes.

Q.    Okay.  Let's go back to that time, and you made mention of this.  Were y'all trying to get rides into town to get food and supplies?

A.    Yes.

Q.    Would anybody give you a ride?

A.    No.

Q.    And I don't mean to be ugly about this, but y'all were staying out in this forest?

A.    Yes.

Q.    Did y'all smell?

A.    Yes, I --

Q.    Okay.

A.    -- perhaps.

Q.    Did anybody give you a ride?

A.    No, not to the store.

Q.    Okay.  Did they give you a ride anywhere?

A.    We got some rides to the Cheaha store at the top of the hill --

Q.    Uh-huh.

A.    -- sometimes or we got rides back to where our camp was.

Q.    Okay.  Were you not able to get food and supplies at the Cheaha Mountain store?

A.    No.  They wouldn't take my EBT card, my food stamps.

Q.   Okay.  Were y'all ever able to hitch a ride or get a ride into town or to another store for food?

A.   No.

Q.   Were y'all running out of food?

A.   Yes.

Q.   Her son, the five-year-old boy, did she ever make mention that he's getting hungry?

A.   Yes.  I mean, he would say it himself.

Q.   Okay.  Would she point it out as well?

A.   I'm not sure.

Q.   Would she ever make mention that y'all didn't have any food?

A.   She -- she would say we were running low.

Q.   Okay.  What were you eating?

A.   We had beans and rice left.  We couldn't -- she didn't like to eat certain rice, like the white rice, because it was bleached.

Q.   Okay. Would she tell you that she didn't like to eat the white rice?

A.   Yes.

Q.   Is this rice that y'all had?

A.   Yes.

Q.   Would she let Lucas -- would she let her five-year-old son eat the white rice?

A.   No.

Q. So y'all were needing food.

A. Yes.

Q. Y'all first discussed taking the car by force one to two weeks before August 14, 2022?

A. Yeah.

Q. Did y'all discuss being -- how to avoid being caught?

A. Yes. We talked about when we did get the car, we were going to paint it or we were just going to get it back and, like, leave it somewhere on the mountain so they could find it later.

Q. Okay. What were you going to use the car for that you were going to take?

A. We were going to go to the grocery store and the library.

Q. Why the library?

A. So we could look up some different -- growing, like, food -- gardening books and books that, like, repel insects, because we were trying to figure out, like -- we were getting, like, attacked by a lot of bugs, so we were trying to figure out, like, different home remedies or things that we could find at Walmart that we could mix together and put on us or put around us that would repel the bugs.

Q. Whose idea was it to go to the library to do this research?

A. The defendant's.

Q.   Okay.  When did y'all get serious about taking someone's car?

A.   Friday, at the beginning of Saturday, Friday night, Saturday.

Q.   The Friday before the Sunday when the shooting took place?

A.   Yes.

Q.   Okay.  On that Friday, did you attempt to flag anyone down, possibly taking their car?

A.   Yes.

Q.   When did that take place?

A.   I tried on the bridge.  It's a little further than where the car was parked.  It was, like, a little bridge.  And then I was on the main paved road.  I flagged some people that were camping to ask them for help, if they could jump the car.

Q.   Okay.  And let me stop you there.  To "jump the car." Did you really want them to jump the car?

A.   No.

Q.   Okay.  Did you know that jumping the car would not work?

A.   Yes.

Q.   But you flagged someone down that Friday evening or afternoon?

A.   Evening.

Q.   Okay.  Was it a man?

A.   Yes.

Q.   Did the defendant know you were going to do this?

A.   Yes.

Q.   Okay.  Was she with you?

A.   No.

Q.   Where was she?

A.   At the main campsite.

Q.   Did you have the gun with you at that time?

A.   Yes.

Q.   She had given you the gun on that Friday?

A.   Yes.

Q.   Where was the gun located?

A.   In my backpack.

Q.   You were carrying a backpack?

A.   Yes.

Q.   All right.  Did somebody give you a ride that night, or evening?

A.   Yes.

Q.   Was it a guy?

A.   Yes.

Q.   Don't let me put words in your mouth.  I think you said you told him you needed a jump.

A.   I did.

Q.   Did he have friends with him?

A.   Yes.

Q.   Okay.  Did y'all go down to where the Scion was located?

A.   Yes.

Q.   How long were y'all together?

A.   Not long.  I'm not sure about the time.  Not that long.

Q.   Did you get in the car with him and drive down to the Scion?

A.   Yes.

Q.   And it was just the two of you?

A.   He had a friend with him.

Q.   Okay.  Was his friend with him the entire time?

A.   Yes.

Q.   Did the friend ever leave y'all to go get some jumper cables?

A.   I don't believe so.  I think another one of his friends came who had jumper cables.

Q.   Okay.  Was his friend in a separate vehicle?

A.   Yes.

Q.   Okay.  But it was just the two of you in his vehicle?

A.   Oh, no.  There was another person in another car that came, after he called them, with jumper cables.

Q.   Okay.  So it was just the two of you for a little bit?

A.   No.

Q.   Okay.  Did anyone else give you a ride on that Friday?

A.   No.

Q.   Okay.  Could you be mistaken about some of the details?

A.   Possibly.

Q.   Okay.  Did you go back to the campsite?

A.   Yes.

Q.   Did you tell the defendant what happened?

A.   Yes.

Q.   Okay.  And prior to going down on that Friday to take someone's car, had you and the defendant discussed that?

A.   Yes.

Q.   Okay.  And were you given the gun so that you could take someone's car?

A.   Yes.

Q.   Tell us what y'all discussed when you got back to the campsite that evening.

A.   I told her that there were people at the further campsite from ours, that they offered to give us food, and we could go down there if we were hungry, because I told them that we were just trying to get a jump so we could get our car started so we could go to the store that offered for us to come down there.  And when I told her that, she just -- she said we probably couldn't eat any of their food.

Q.   Okay.  Did you want to go eat their food?

A.   Yes.

Q.   Okay.  But she didn't want y'all to go eat their food?

A.   Yes.

Q.   Okay.  Did y'all discuss anything else that night?

A.   We talked about still going down there while they were sleeping, trying to take one of their cars if we could.  We talked about -- see if, like, we could get, like, one of their credit cards, but we decided against it because there was too many of them.

Q.   What happened on Saturday?  Did you try to take anybody's car on Saturday?

A.   Yes.

Q.   Whose?

A.   I left, like, in the early morning and I was walking down close to Devil's Den.  And I -- this man stopped in, like, a white or gray car and asked if I needed some help.  And I said, "I need my car jumped."  He helped me -- well, he tried to jump the car.  I told him about the -- we needed to go to the grocery store.  He offered to take us, but I was nervous to get in -- well, to, like, go to the store with him or to take the car, so I asked him if we could -- if I could stop and get my sister and his son -- I mean her son.

Q.   You called -- go ahead.

A.   And when I got out to go get the defendant, he left.

Q.   Okay.  You said you called her your sister?

A.   Yeah.

Q. Did you call her your sister?

A. Yeah.

Q. Did she call you her sister?

A. Yeah.

Q. Why didn't you take his car that day?

A. I was nervous.

Q. You told the defendant that you were nervous?

A. Yes.

Q. Did you tell her anything else?

A. That I was -- I was going to try harder throughout the day. Then -- yeah.

Q. Why would you tell her you were going to try harder?

A. Because I -- I felt like I failed.

Q. I'm sorry?

A. I felt like I -- I felt like I failed.

Q. You failed the defendant?

A. (Nods head affirmatively.)

Q. Failed her son?

A. Yes.

Q. Okay. Did you approach anybody else that day, on Saturday?

A. Yes.

Q. Who?

A. I stopped a couple people.

Q. Did you ever ask the defendant to join you?

A.   She came down there one time to check up on me maybe around noon, and I asked her if she could stay and, like, just hide in the woods while I tried to take a car.

Q.   And this is on Saturday?

A.   Yes.

Q.   Okay.

A.   I stopped a car, was, like, a red sedan or something like that.  But they were nervous to come back there to where the car was, so they went to, like, Devil's Den and got an older couple, and the older couple came back and tried to jump the car.

Q.   Okay.  Was she still hiding at that time?

A.   Yes.

Q.   Why didn't you take their car?

A.   I don't know.  I couldn't.

Q.   I'm sorry?

A.   I'm not sure.  I just couldn't.

Q.   Did you stop any other women that day?

A.   I stopped another couple, yeah, but she wasn't there. She -- after the -- that one that I just spoke about, she left to go check up on her son.  And after that, I stopped another couple.

Q.   Okay.  Did you stop anyone else while she was hiding?

A.   Yeah.  Well, the -- just the one -- the one -- the one in the red sedan, that's it.  She was too nervous to go back

there.

Q.   Who was too nervous?

A.   The lady in the car.

Q.   Okay.  So you stopped a different woman than the couple that actually went out there and tried to jump?

A.   Yeah.

Q.   And maybe I'm confused.

A.   So there was a lady that was trying to find the waterfall, and I flagged her down.  She stopped and I asked her if she could jump our car back there.  And she said she was scared to go back there because she didn't know us.  So she said that she was going to go up ahead to, like, where Devil's Den was, the waterfall, and see if another couple would come help us.

Q.   Okay.  And then the other couple came down?

A.   Yes.

Q.   All right.  That woman, was the defendant hiding when you were talking to her?

A.   Yes.

Q.   Do you know where she was hiding?

A.   No.

Q.   Okay.  Was it near where your car was located?

A.   Yes.

Q.   Okay.  Did you try to stop anybody else that day?

A.   Yes.

Q.   Okay.  Tell us about it.

A.   I just flagged them down and asked them to jump the car.  When they couldn't, they just left.

Q.   Okay.  Did y'all discuss taking a car Saturday night?

A.   Yes.

Q.   Tell us the discussion, how it went.

A.   I just told her that I'll try again tomorrow, if she could go down there with me in the morning, maybe I'll have a better shot.

Q.   Did you still have the gun at this time?

A.   Yes.

Q.   Okay.  And when you said you'd "have a better shot," a better shot at what?

A.   At taking a car, having more confidence to do it.

Q.   Okay.  Using the gun, if necessary?

A.   Yes.

Q.   Did y'all go down there on Sunday?

A.   Yes.

Q.   When did y'all go down there?

A.   Early in the morning, 9:00 or 10:00, whenever the sun was just about to come over the trees, the canopy.

Q.   Okay.  And did you-all go together?

A.   Yes.

Q.   Where is her son when y'all went down there?

A.   At the camp- -- main campground.

Q.   Did anybody stay with him?

A.   No.

Q.   You had the pistol?

A.   Yes.

Q.   Where was the shotgun?

A.   At the main campground.

Q.   With her son?

A.   Yes.

MR. CROSS:  Okay.  If we could look at Government's Exhibit No. 5, please.

Q.   (By Mr. Cross)  Have you ever seen this before?

A.   Yes.

Q.   Okay.  Did you try to flag anybody down before Adam and Mikayla came up?

A.   Yes.

Q.   Were you able to stop anybody?

A.   No.

Q.   Where were you attempting to flag people down?

A.   On the dirt road, 600 -- 600-3.

Q.   Near where your vehicle was located?

A.   Yes.

Q.   Can you touch 600-3 where you were attempting to flag people down?

A.   (Complies.)

Q.   Where was the defendant when you were trying to flag

people down?

A.   She went into the woods to hide.

Q.   Which way did she go into the woods to hide?

A.   I'm not sure.  I was at the -- I was still at the main road.  I couldn't -- I couldn't see the car from where I was.  I don't know where she was.

Q.   Okay.  When did y'all split?  Did y'all walk down together?

A.   Yeah, we walked down the dirt road together, and once we got to the main entrance of where the car was parked, we separated.

Q.   Okay.  The little dirt road that went down to where the cars parked?

A.   Yes.

Q.   To the left of 600-3?

A.   Yes.

Q.   And y'all separated.  Which way did she go?

A.   She just went down the dirt road.

Q.   And can you draw which direction she went?

A.   (Complies.)

Q.   And until after the shooting, the last time you saw her, she was walking that way into the woods?

A.   She was -- she was walking down the road, like, the droven [sic] road, and then after that curve, I couldn't see where she went.

Q. Okay. So she walked down the road where the Scion was parked?

A. Yes.

Q. Or if you kept walking down that road, you would run into the Scion?

A. Yes.

Q. And you stayed on 600-3?

A. Yes.

Q. And you knew she was on that road --

A. Yes.

Q. -- when you flagged down Mikayla and Adam?

A. Yes.

Q. You remember the bug-out bag?

A. Yeah.

Q. Was the bug-out bag already inside?

A. No. I had it with me but at the road.

Q. Okay. Where did you have the gun?

A. In the bag.

Q. So when did you -- when was the bug-out bag put in the Scion?

A. When I was walking towards the car with Mikayla and them driving behind me.

Q. Okay. You walked down and they followed you in their white vehicle?

A. Yes.

Q.   Okay.  And did you -- when did you part with the bug-out bag?

A.   I just set it in the car.

Q.   When y'all got down there?

A.   Yes.

Q.   And they started helping?

A.   Yes.

MR. CROSS:  Okay.  If we could pull up Government's Exhibits -- going to start with 123.

Q.   (By Mr. Cross)  Is that the bug-out bag?

A.   Yes.

Q.   Is that where you put it in the Scion that morning?

A.   Yes.

Q.   After the defendant had walked on into the woods?

A.   Yes.

MR. CROSS:  Okay.  Government's Exhibit 124.

Q.   (By Mr. Cross)  Is that the five-year-old's car seat?

A.   Yes.

MR. CROSS:  Okay.  Government's Exhibit 125.

Q.   (By Mr. Cross)  What is this?

A.   It's my wallet, purification tablets, a lighter, and my -- it's a crystal.  It's, like, a purification crystal.

Q.   Okay.  And crystals are a part of your belief system?

A.   Yes.

Q.   And there's also a lighter?

A.   Yes.

Q.   Purification tablets; is that right?

A.   Water purification tablets.

MR. CROSS:  All right.  Go to Government's Exhibit 126.

A.   My wallet.

Q.   (By Mr. Cross)  Was it in the bug-out bag?

A.   Yes.

Q.   And I'm calling it the bug-out bag.  Is that what you called it?

A.   Yes.

Q.   Okay.  Is that what the defendant called it?

A.   Yes.

MR. CROSS:  Okay.  Government's Exhibit 127.

Q.   (By Mr. Cross)  Are those your IDs?

A.   Yes.

Q.   Were they in the bug-out bag?

A.   Yes.

MR. CROSS:  Government's Exhibit 128.

Q.   (By Mr. Cross)  Is that a phone that was in the bug-out bag?

A.   Yes.

MR. CROSS:  Government's Exhibit 129.

Q.   (By Mr. Cross)  What's that?

A.   A first-aid kid, wipes.

MR. CROSS:  Government's Exhibit 130.

Q.  (By Mr. Cross)  What's that?

A.  It's my knife.

MR. CROSS:  Government's Exhibit 131.

A.  It was my book and a list that we made for the grocery store.

MR. CROSS:  If we could blow up the book so that we can see the list better.

Q.  (By Mr. Cross)  Okay.  You said "that we made."

A.  Yes.

Q.  And what do you mean by that?

A.  Well, we talked about a list we were going to need when we went to the grocery store.

Q.  I see wild rice.

A.  Yes.

Q.  A lot of other items.

A.  Yes.

Q.  Once y'all took this car, were you planning to stay away from Cheaha or Talladega National Forest?

A.  No.

Q.  Okay.  Y'all were going to come back?

A.  Yes.

Q.  And what were you going to do with the car?

A.  We were going to leave it somewhere on the mountain, not close to where our campsite was but just leave it

somewhere.

Q.   Okay.

MR. CROSS:  Government's Exhibit 132, please.

Q.   (By Mr. Cross)  Are we still looking inside the bug-out bag?

A.   We would use, like, these extension cords when we went to the library or when we went up to the store up there and charged our phones or our headlamps, a lantern, her radio.

Q.   Okay.  Once you took a car, what was the plan?  Were you going to carry the bug-out bag with you?

A.   Yes.

Q.   Okay.  Were you going to go alone once you took a car?

A.   No.

Q.   Okay.  What were you going to do after you took a car?

A.   I was going to go get the defendant and her son.

Q.   Okay.  And where do you think the defendant is at the time you were talking to Mikayla and Adam and they're trying to help?

A.   I thought she was where she was previously that Saturday, in the woods somewhere.

Q.   Did you know where she had hidden previously on that Saturday?

A.   No.  But I knew the direction where she came from when I called out her name.

Q.   Okay.  And was it down that road?

MR. CROSS:  If we could go to Government's Exhibit No. 5, please.

A.  It was a little further than that.

Q.  (By Mr. Cross)  Okay.  Can you touch where she was on the Saturday before?

A.  (Complies.)

Q.  Okay.

A.  I believe somewhere right here.

Q.  All right.  Off the road but away from the vehicles?

A.  Yes.

Q.  And I may have asked you this.  If I did, I'm sorry. Was the plan to carry the bug-out bag with you?

A.  Yes.

Q.  With those list of items?

A.  Yes.

Q.  Okay.  Whose idea was it to have a bug-out bag?

A.  The defendant.

Q.  Okay.  Adam and Mikayla tried to help you?

A.  Yes.

Q.  And were they able to help you?

A.  No.

Q.  But you knew that?

A.  Yes.

Q.  Did you ask them for a jump?

A.  Yes.

Q.   But you knew the car wouldn't jump off?

A.   Yes.

Q.   The defendant knew the car wouldn't jump off?

A.   Yes.

Q.   What happened when they started to leave?

A.   I pulled the gun on them.

Q.   What did you tell them?

A.   I told them to walk towards the woods.  They asked if they could drop the stuff that was in their hands.  I picked up --

Q.   Did they ask if they could drop it or did you tell them to empty their pockets?

A.   Both, 'cause I remember he asked -- 'cause he was still holding the battery jump device and he asked if he could put it on the ground.

Q.   Okay.  Was he holding, like, a device to jump the car off?

A.   Yes.

Q.   He didn't hook the cables up to his vehicle?

A.   No.

Q.   Okay.  He had a jump device?

A.   Yes.

Q.   Okay.  He put that down on the ground?

A.   Yes.

Q.   What, if anything, did she put on the ground?

A.  Her cell phone and the car keys.

MR. CROSS:  Okay.  If we could go to Exhibit 14.

Q.  (By Mr. Cross)  Have we looked at this before?

A.  Yes.

Q.  Okay.  And you and I have met twice?

A.  Yes.

Q.  Talked about your testimony?

A.  Yes.

Q.  What did I tell you to do?

A.  To tell the truth.

Q.  All right.  Okay.  Which way did you get them to walk once you pulled your gun on them?

A.  (Indicating.)

Q.  And how far did y'all go?

A.  I'm not sure.  It was --

Q.  Did you all go down to the log?

A.  Yes.

Q.  Okay.  If you will, touch where the log's located.

A.  (Complies.)

Q.  All right.  And did you pick up Mikayla's phone?

A.  Yes.

Q.  And what did you do with the phone?

A.  I asked her for the password and then I started recording.  And I asked them for their banking information.

Q.  Did they give it to you?

A.    Yes.

Q.    And you recorded it?

A.    Yes.

Q.    Then what happened?

A.    I looked away and he pulled out a gun.

Q.    And what did you do?

A.    I pulled the slide back.  Then I shot off a bullet.

Q.    Okay.  Were you pointing the gun at him?

A.    Yes.

Q.    Did you keep shooting?

A.    No.

Q.    How many times did you fire?

A.    Once.

Q.    Did he start shooting?

A.    Yes.

Q.    Do you remember how many times he fired?

A.    No.  A lot.

Q.    Just tell us what happened then.

A.    When he -- when he started firing, I tried to get out of the way.  I fell.  I broke my femur.  And he was still shooting, and I asked him -- asked him to stop.  When he stopped, he collapsed on the ground and Mikayla ran to him. She -- she tried to find her phone.  She called 911.  I started calling for the defendant for help.

Q.    And what were you calling her?

A.   Imani.  I was calling her Imani and then I started calling her Krystal, too.  I asked for help and I said, "I broke my leg."  She said she couldn't help me.

Q.   Do you remember exactly what she might have said?

A.   Not word for word, but I do remember she said she couldn't help me because she couldn't -- no, I don't remember word for word.

Q.   And were you hollering for her before she came out?

A.   Yes.

Q.   And when she came out, were y'all hollering back and forth?

A.   Yes.

Q.   And where did she go?

A.   She left.

Q.   If you will, show us which way she left the scene.

A.   (Complies.)

Q.   Okay.  When was the last time you saw her?

A.   Last time I saw her was at -- well, at Talladega, the jail.

Q.   I'm sorry.  That day.

A.   Oh.  That -- when she left, that was the last time I saw her.

Q.   Okay.  And what are you doing as she's -- did she walk away?  Run away?  How would you describe?

A.   She -- she, like, just walked away.

Q.   Was Mikayla on the phone on the 911 call --

A.   Yes.

Q.   -- when she left the scene?

A.   Yes.

Q.   Could you see Mikayla on the 911 call?

A.   Yes.

Q.   Did you know she was on the 911 call?

A.   Yes.

Q.   Are you also talking to Mikayla during this time?

A.   Yes.

Q.   Did you ever try to shoot yourself that day?

A.   Yes.

Q.   And why?

A.   Because I knew I was going to be in trouble.

Q.   Did you attempt to pull the trigger?

A.   Yes.

Q.   And what happened?

A.   It was jammed.

Q.   Did you try to operate the slide?

A.   Yes.

Q.   Did cartridges or bullets come out of the gun while you were trying to operate the slide?

A.   Yes.

MR. CROSS:  May I have just a moment?

THE COURT:  You may.

Q.   (By Mr. Cross)  Miss Hider, you've agreed to plead guilty in your case.

A.   Yes.

Q.   And part of that plea agreement is that you would testify against the defendant?

A.   Yes.

Q.   And part of that plea agreement is that you will tell the truth?

A.   Yes.

Q.   Have you pled guilty yet?

A.   No.

Q.   When are you scheduled to plead guilty?

A.   October 4th.

Q.   Okay.  Next week?

A.   Yes.

Q.   And unless you tell the truth, you don't get that plea agreement?

A.   Yes.

Q.   And you have agreed with the United States, pled guilty to all charges, and you will receive a 35-year sentence; is that correct?

A.   Yes.

Q.   But you understand that if you don't tell the truth, you don't get that deal?

A.   Yes.

MR. CROSS:  That's all I have, Your Honor.

THE COURT:  All right.  Folks, we're going to take a short break before cross, so this is our midafternoon break. We'll call you back in five or ten minutes; okay?

(Jury exited the courtroom.)

THE COURT:  All right.  Folks, we're going to take a short recess.  Anything we need to take up before we do that?

MR. CROSS:  Not from the United States.

MR. WILSON:  Not from the defense, Your Honor.

(Recess taken at 3:36 p.m. to 3:57 p.m.)

(Jury entered the courtroom.)

THE COURT:  All right, folks.  Have a seat.  We're about to begin cross-examination of Ms. Hider.

And, Mr. Wilson, you may proceed when you're ready.

MR. WILSON:  Thank you, Your Honor.  Please the Court.

                    CROSS-EXAMINATION

BY MR. WILSON:

   Q.  Miss Hider, you're in jail; correct?

   A.  Yes.

   Q.  It's because you killed somebody, didn't you?

   A.  Yes.

   Q.  Okay.  I want to go over some things you testified about.

       MR. WILSON:  Ms. Murphy, could you pull up Government's Exhibit No. 5 for me, please?

Q.   (By Mr. Wilson)  You said you recognize this image?

A.   Yes.

Q.   And do you see the person -- or where it says "Parked vehicle location" and this part where it says "Main campsite"?

A.   Yes.

Q.   How long does it take to walk between those two points?

A.   I'm not really sure.  Like, maybe ten minutes, maybe, give or take.

Q.   You said you're not sure?

A.   Yes.

Q.   You made that hike Friday, Saturday, and Sunday the weekend you killed somebody, and you don't remember how long it took you?

A.   I do not.

MR. WILSON:  Thank you, Ms. Murphy.

Q.   (By Mr. Wilson)  Did you call Krystal your sister?

A.   Yes.

Q.   And you lived in the woods with just her and her son?

A.   Yes.

Q.   For how many months?

A.   Almost two.

Q.   Y'all were real close; right?

A.   Yes.

Q.   Okay.  And you testified earlier you couldn't remember

her kid's name?

A. No.

Q. You didn't say that?

A. No.

Q. Okay. You said Krystal was selling things on Etsy and had a source of income; right?

A. Yes.

Q. Okay. Did her dad ever send her money on the phone?

A. Yes.

Q. Okay. Y'all could have paid to get the car fixed, couldn't you?

A. Yes.

Q. Okay. You didn't do that, though, did you?

A. No.

Q. Okay. You had a food stamp card. Where did you get that?

A. In Georgia.

Q. Okay. Did you live in Georgia?

A. Yes.

Q. Did you live in Georgia when you was living in Talladega National Forest?

A. No.

Q. What were you doing to get food stamp cards? Were you lying about where you lived?

A. No. I was living in Georgia when I got the food

stamps card and I moved to Alabama.

Q. Okay. How did they reload it every month?

A. Yes.

Q. How did they reload it? Do you not have to make an application where you live in Alabama in order to do that?

A. No.

Q. Okay. Let's talk about the car vandals. Did you ever get a good look at them?

A. Yes.

Q. Okay. You said Krystal shot her shotgun off at camp to make sure it wasn't jammed; right?

A. Yes.

Q. Did you ever see Krystal kill anybody?

A. No.

Q. Okay. Jumping the car off. You kept asking people for a jump, didn't you?

A. Yes.

Q. Okay. And sometimes it's hard to get people to want to deal with you and spend a lot of time with you when you're out there trying to ask for favors on the side of the road; right?

A. (No audible response.)

Q. You had a lot of people stop for you when you just wanted them to jump the car; right?

A. Kind of.

Q.   How many people did you stop and ask to jump the car off?

A.   Give me a second.  How many people I asked or how many people --

Q.   Both.

A.   Give me a second.  I'm trying to remember.  Six or more.

Q.   Okay.  Six people said they'd help you jump the car off?

A.   I asked six people if they would.  About four helped.

Q.   So most helped; right?

A.   Yes.

Q.   All right.  Do you think they would have stopped and helped you if you said, "Hey, my car needs the entire ignition switch rewired"?

A.   I'm not sure.

Q.   Probably not; right?

A.   Yes.

Q.   Okay.  You've hitchhiked with other people that weekend, didn't you?

A.   Yes.

Q.   You didn't kill any of them, though, did you?

A.   No.

Q.   You said you felt like you had failed somebody?

A.   Yes.

Q.   None of them -- nobody told you you failed them, did they?

A.   No.

Q.   Okay.  So let's go through the weekend that you murdered Adam Simjee.  When you left the campsite Friday, you had the gun with you; right?

A.   Not at the beginning of the day.

Q.   Were you not there to carjack cars or were you really there to hitchhike, then, if you didn't have the gun with you?

A.   At the beginning of Friday, I was there, like, hitting --

Q.   What?

A.   I didn't have the gun at the beginning of Friday.  I didn't start out with the gun.  I was just waving people down at first.

Q.   To do what?  You don't have the gun with you, so what are you waving them down for?

A.   I was just trying to get them back there.

Q.   To do what?

A.   To jump the car.

Q.   You knew the car wouldn't jump off.  You said that several times.  If you don't have the gun and you're not carjacking them, you're hitchhiking, aren't you?

A.   No.  I was stopping them to jump the car.

Q.   You said over and over you knew the car wouldn't jump.

So what were you trying to accomplish?

A.   I was trying to get their car.

Q.   How were you going to do that without your gun?

A.   It wasn't going to work.

Q.   Then why did you try all morning?

A.   I didn't start doing it until late afternoon.

Q.   Okay.  What were you doing out there that morning?

A.   I wasn't out there in the morning time.

Q.   Okay.  How many hours were you out there Friday?

A.   I'm not sure.

Q.   A lot?  Several hours?

A.   A couple.

Q.   How many cars did you try to flag down on Friday?

A.   It wasn't busy Friday, so there wasn't a lot of cars.

Q.   Miss Pinkins never tried to flag down any cars with you, did she?

A.   No.

Q.   No.  You said you felt like it was your responsibility to get a car?

A.   Yes.

Q.   Okay.  Did anybody tell you it was your responsibility?

A.   No.

Q.   No.  You took it upon yourself; right?

A.   Yes.

Q.  It was your idea, wasn't it?

A.  Yes.

Q.  Okay.  Matter of fact, every time you talked about stealing a car, Krystal told you you shouldn't do that, didn't she?

A.  No.

Q.  Are you sure?

A.  Yes.

Q.  Okay.  You've already stated to other people, I believe, that she never pushed you to steal a car; is that correct?

A.  Yes.

Q.  Okay.  So on Saturday you went back out there.  You got the pistol this time; right?

A.  Yes.

Q.  Okay.  And you hitchhiked with somebody; right?

A.  Yes.

Q.  And you got back with Pinkins, didn't steal anybody's car, didn't kill anybody on Saturday; right?

A.  Yes.

Q.  And you got Pinkins there with you and you've got the gun with you and you're still not killing anybody; correct?

A.  Yes.

Q.  Okay.  You started getting frustrated when nobody would let you hitchhike, didn't you?

A.   I wasn't trying to hitchhike.

Q.   All right.  Let's go to the day of the shooting.  You still had the gun, didn't you?

A.   Yes.

Q.   You'd had it for days at that point, hadn't you?

A.   Yes.

Q.   At that point you had tried multiple times, I guess, to work up the nerve to carjack somebody, hadn't you?

A.   Yes.

Q.   You never did it, did you?

A.   No.

Q.   Krystal never felt frustrated or told you you really need to get out there and do it or push you, did she?

A.   No.

Q.   As a matter of fact, she never came out with you to ever help you flag any motorist down or tell them that you need a jump; right?

A.   That's not correct.

Q.   Huh?

A.   That's not correct.

Q.   Okay.  So Sunday, when you're kidnapping two people and you're walking them out towards this log, was Krystal out there?

A.   I didn't see her.

Q.   Okay.  When you did see her, was she armed?

A.    No.

Q.    And you know she has a shotgun back at the camp, don't you?

A.    Yes.

Q.    She didn't have it with you, did she?

A.    No.

Q.    It was because she wasn't going to help you carjack anybody, was she?

A.    That's not true.

Q.    How long did Mikayla Paulus and Adam Simjee help you work on that car?

A.    I'm not sure.  Maybe -- maybe an hour.

Q.    Maybe an hour?  Okay.  No point for a whole hour did you pull a gun on them, did you?

A.    No.

Q.    You pulled the gun after they figured out that whatever they do, they're not going to be able to give you a ride and they're not going to be able to fix your car.  That's when you pulled the gun out; right?

A.    Yes.

Q.    Okay.  You never yelled for Krystal until you got shot; right?

A.    Yes.

Q.    Okay.  So if you're there armed for an hour with these people, trying to steal their car, you never once yelled for

help at any point during that hour, do you?

A. No.

Q. Okay. Did you ask Mikayla Paulus to lie to the police so you wouldn't get in trouble?

A. Yes.

Q. Why did you do that?

A. Because I was scared. I was nervous.

Q. You were willing to lie to keep from going to prison, weren't you?

A. In that brief period, yes.

Q. You've changed your -- okay. You asked an investigator when he arrived on the scene, "How much time am I going to get for this?" didn't you?

A. Yes.

Q. You didn't ask, "How's Adam Simjee doing? He's not dead or anything, is he?" No, you were worried about how much time you were going to get; right?

A. Yes.

Q. Matter of fact, you about shot yourself in the head. You were willing to die to not go to prison, weren't you?

A. Yes.

Q. Do you remember officers coming to the hospital to interview you?

A. Yes.

Q. Do you remember shutting that interview down and

telling them you wasn't talking to them?

A.   No, I talked to them a little bit.

Q.   Okay.  How did the interview end, then?

A.   After I talked to them, I said I wanted -- I would wait for my lawyer.

Q.   Okay.

MR. WILSON:  Miss Murphy, could you pull up Exhibit 5 one more time?

Q.   (By Mr. Wilson)  You've seen this before?

A.   Yes.

MR. CROSS:  And, Miss Murphy, could you pull up Exhibit 14?

Q.   (By Mr. Wilson)  Have you ever seen this before?

A.   Yes.

Q.   Nobody showed you those that day, did they?

A.   No.

Q.   You didn't make either of these documents, did you?

A.   No.

Q.   Where have you seen them before?

A.   When I was talking to the Government.

Q.   What were y'all talking about?

A.   They were just asking me questions about that day, how it all went down.

Q.   Okay.  And this is when you're negotiating your plea deal; right?

A.   No.

Q.   Okay.  When was it, then?  What was the purpose of the meeting?

A.   To get the truth out.

Q.   Okay.  Had y'all already started discussing plea deals at that point?

A.   Yes.

Q.   Okay.  And you're doing this to try to get a better plea deal when you're talking to them?

A.   Yes.

Q.   And you knew that if you couldn't give them anything against any other person charged with a crime, you wouldn't get a plea deal, would you?

A.   No, I didn't know that.

Q.   Well, it makes sense, wouldn't it?  What are you offering them if you can't offer testimony?

A.   I guess.

Q.   Okay.  You've already negotiated a 35-year sentence; right?

A.   Yes.

Q.   How many of them are you actually going to do, do you think?

A.   They said 30.

Q.   At least 30?  All right.  What's the maximum that you could have done?

A.   I'm not -- I'm not sure.  48 years.

Q.   Are you sure it wasn't life without parole?

A.   Isn't -- isn't 48 years life?

Q.   No.  I know a lot of people older than 48.

A.   That's how they worded it to me.

Q.   Who?

A.   My lawyer.

MR. WILSON:  Your Honor, may I approach the witness?

THE COURT:  You may.

Q.   (By Mr. Wilson)  Miss Hider, do you recognize what I just gave you?

A.   Yes.

Q.   What is it?

A.   My charges.

Q.   Okay.

A.   My plea.

Q.   Your plea deal; right?

A.   Yes.

Q.   All right.  Can you go to the second page?  And can you tell me the maximum sentence for each charge?

A.   Imprisonment for not more than life.

Q.   Thank you.  So you understand you're looking at a life sentence?

A.   Yes.

Q.   Thank you.

MR. WILSON:  Your Honor, may I approach to get the exhibit back?

THE COURT:  You may.

Q.   (By Mr. Wilson)  You made a statement at some point that you felt like Miss Pinkins was upset with you even though she showed no signs of it, didn't you?

A.   Yes.

Q.   There seems to be a disconnect between what you think Miss Pinkins wants and what's in reality; isn't that right?

A.   I guess, yes.

Q.   Okay.  You said you had conversations about carjacking?

A.   Yes.

Q.   You initiated every one of them, didn't you?

A.   Yes.

Q.   Thank you.

Oh, one more thing.  You're going to walk out of prison and you're going to have a life after this, aren't you?

A.   Yes.

Q.   Adam Simjee won't, will he?

A.   No.

MR. WILSON:  Thank you.

THE COURT:  All right.  Any follow-up to that?

MR. CROSS:  No, Your Honor.

THE COURT:  All right.  She may step down.

All right.  Are we going to re-call that previous witness?

MR. CROSS:  Yes, Your Honor.

THE COURT:  All right.  I do find there's sufficient evidence to justify admission of a hearsay objection based upon Ms. Hider's testimony.

MR. WILSON:  Understood, Your Honor.

THE COURT:  But I, nevertheless, wanted to be careful and measure twice, cut once; okay?

MR. CROSS:  May it please the Court.

THE COURT:  Yes.  Let me just remind the witness you're still under oath.  I'm not going to re-swear you in.

Yes, you may proceed when you're ready.

(AUGUSTE REBARCHIK, being previously duly sworn, was examined and testified as follows:)

                    DIRECT EXAMINATION
BY MR. CROSS:

Q.  Auguste, you were telling us about running into an individual that Friday, August the 12th.  I want to go back to that.  I believe y'all were down around the Scion?

A.  Yes.

Q.  Okay.  And I apologize.  Let's go ahead and look at the Scion again.  Start off with Government's Exhibit No. 132 -- or 134.  Did we look at this previously?

A.  Yes.

Q.   Okay.  This was the vehicle that you drove down and were trying to help --

A.   Yes.

Q.   -- the woman that was driving that vehicle?

A.   Correct.

Q.   Okay.  And I believe you were waiting on the jumper cables?

A.   Yes.

Q.   And y'all had a conversation?

A.   Yes.

Q.   Tell us about that conversation.

A.   So where I last left off, I believe, my -- one of my friends, Garrett, he had showed up.  He was going to help us start the car off.  She said her battery was dead when I picked her up initially.

Q.   And I want to stop there.  You remember she said her battery was dead?

A.   I believe so.

Q.   Okay.  Did she ask you to -- for a ride somewhere?

A.   Just to her car.  She just said she needed help with her car.

Q.   Okay.  And the battery was dead?

A.   Yeah.

Q.   Okay.  Continue.

A.   So Garrett showed up.  He didn't have jumper cables.

He went back down that dirt road where the rest of our group was. He told another friend of ours, Enrique, and Enrique came with the jumper cables and -- he had jumper cables. So we popped the hood on my car and opened the hood of her car and we hooked them up. And all -- you know, between -- when Enrique showed up -- well, between when Garrett left and Enrique showed up, we were still just conversing, just having a conversation.

I noticed, when I was talking to her -- it seemed as if she was kind of looking behind her shoulder, almost like looking for somebody or waiting for something. I didn't really know what she was looking at. I was kind of also just, like, what-are-you-looking-at sort of deal.

Q. Are y'all in the vehicle or outside of the vehicle?

A. At this point we're outside of the vehicle just conversing, waiting for the jumper cables. So my friend Enrique shows up. We hook up the car. She gets the key to turn but her steering column was locked. I believe that the headlights came on, from what I remember, but the car wouldn't turn over. It wouldn't even, you know -- there was no ignition happening. So she climbs back out of the car and she says, "Well, here, why don't you try it." She hands me the keys and I'm thinking, Well, this is a little weird because there's nothing that I can do that she can't; right? I'm not a mechanic. I don't know anything about cars except for

jumping it off.

Q.   Who is present at that time?

A.   So this is me, Enrique, and the female.

Q.   All right.

A.   So she climbs out and hands me the keys.  Then I climb into her car and I start trying to do essentially the same thing she was doing, just trying to get it started.  And, you know, I was unable to.  I had no luck.  While I was doing it, though, I noticed that she was standing very close to me, like, uncomfortably close.  So if I'm in the driver's seat, she's just behind my shoulder.  And it made me feel kind of -- I was feeling pretty uncomfortable at this moment, but Enrique was also behind her.  So it was very awkward and uncomfortable, but I didn't necessarily feel threatened at this moment.

I tried to do what I could.  No luck.  I climb out of her -- her car and I give her keys to Enrique.  Because it's very awkward, I'm kind of just trying to hurry this along.  I give the keys to Enrique and I said, "Hey, you can try it; I had no luck."  He gets in to try it.  Same thing.  No luck there.  While he's in there, she's again very close to Enrique, and I kind of make a point to get closer to him to, like, listen just to be safe, I guess.

Well, he climbs out of the car.  He's, like, "Well, I don't know," and we kind of shrug our shoulders.  I tell her,

you know, "We're not mechanics.  We don't know what's wrong with your car.  It's clearly not the battery.  There's other issues going on."

During our conversation prior to this, she had mentioned that she was out there for some time and that she and another individual liked staying off the grid.  Well, I thought that was kind of strange, so I asked her, "What are you doing for food?"  She said, "Well, we tried to start a garden" and this and that.  She mentioned they had a child with them.  I thought maybe -- this story was getting more and more weird.  Things didn't quite add up, but I didn't think too much of it.

Well, when Enrique gets out of the car and we kind of just tell her there's nothing we can do.  I tell her that we're camping just down the road and if she wants to come say hello, more or less, and ask for food that we would give it to her.  You know, there was eight of us.  We had plenty of food.  We were just camping from our cars.  And I want to say that was about it.

Q.   Okay.  When she was talking about the other people she was with living off the grid, how did she refer to it?

A.   She said -- when I was talking to her initially, she said something about hiking earlier that day, going to this place called Devil's Den.  She said, "Oh, it's a nice place.  You should go visit it."  I was, like, "Well, yeah, we haven't

been here that long.  I think I've been there before."  And I was still talking to her and I said, "Is it just you out here?"  She looked kind of lonely, lost.  And she said, "No. I'm out here with my sister, her kid.  We found a nice spot." She just kind of pointed at a general spot down this direction (indicating).  And that's when she said they liked staying off the grid.  So it was a little strange but I didn't press too much.  I didn't even get her name.

Q.  Would you recognize her if you saw her?

A.  Yes.

MR. CROSS:  Okay.  If we can go ahead and pull up Government's Exhibit 4.

Q.  (By Mr. Cross)  Okay.

A.  Yes, that is her.

Q.  Seated on the ground in Government's Exhibit No. 4?

A.  Yes.

MR. CROSS:  Auguste, I think that's all the questions I have for you.

THE COURT:  All right.  Cross-examination?

CROSS-EXAMINATION

BY MR. WILSON:

Q.  Mr. Rebarchik, you said she looked lonely; is that right?

A.  Yes.

Q.  As in no one was with her?

A.   Yes.

MR. WILSON:  Thank you.  No further questions.

THE COURT:  All right.  I take it there's no follow-up to that.

MR. CROSS:  No, Your Honor.

THE COURT:  All right.  You may step down.  Thank you for your patience with us today.

Have we hit what you thought was going to be the finish line today?

MR. CROSS:  One more, if that's okay.

THE COURT:  That's fine.  Y'all want to hear another one, don't you?  This is a hardworking group, let me tell you.  I told them I could tell that when I first laid eyes on them Monday morning.

MR. CROSS:  Government would call Sergeant Brandie Smith.

(SERGEANT BRANDIE SMITH, being first duly sworn, was examined and testified as follows:)

THE COURTROOM DEPUTY:  Thank you.  Be seated, please.

THE WITNESS:  Yes, ma'am.

THE COURTROOM DEPUTY:  Please state and spell your first and last name for the record.

THE WITNESS:  Brandie Smith.

THE COURTROOM DEPUTY:  Could you spell it for me, Miss Smith?

THE WITNESS:  B-R-A-N-D-I-E S-M-I-T-H.

THE COURTROOM DEPUTY:  What city and state do you reside in?

THE WITNESS:  St. Clair.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  You may proceed when you're ready.

MR. CROSS:  Please the Court.

<u>DIRECT EXAMINATION</u>

BY MR. CROSS:

Q.  Sergeant Smith, if you will introduce yourself to the jury and tell them where you are employed.

A.  I am Sergeant Brandie Smith.  I am employed with Alabama Department of Corrections K9.

Q.  What was that last part?

A.  I'm with the K9 unit.

Q.  Okay.  And what do you do with the K9 unit?

A.  Tracking and also narcotic.

Q.  Do you remember August 14th, 2022?

A.  Yes, sir.

Q.  Were you working that day?

A.  Yes, sir.

Q.  Do you remember which day of the week that is?

A.  I do not.

Q.  Okay.  What do you remember about that day?

A.  We got a call to track a fugitive, and when we

arrived, they kind of told us where to go.  We put the dogs down.  We went across the road and they picked up a track.

MR. CROSS:  Okay.  Government's Exhibit 5.

Q.  (By Mr. Cross)  Did you arrive late that afternoon?

A.  Yes, sir.

Q.  About what time was it?

A.  Probably around 4:00 or 5:00.

Q.  Okay.  And I'm showing you what's been marked as Government's Exhibit No. 5.  Do you recognize it?

A.  Yes, sir.

Q.  Okay.  Is that where you responded on that day?

A.  Yes, sir.

Q.  And where did you first go when you arrived?

A.  We went to the -- I guess where the -- the incident happened on the right side.

Q.  That's marked "Location of deceased"?

A.  Yes, sir.

Q.  Okay.  And you say "we."  Who is "we"?  Or who are "we"?

A.  So we also had three other tracking members with me that I'm on the unit with.

Q.  Okay.  Is that counting the dog?

A.  No.

Q.  Okay.  So who else was accompanying you that day?

A.  There would be Captain Hill, Sergeant Jason Norris,

and then we had our three dogs.

Q. Okay. Three dogs?

A. It's about three dogs.

Q. And where did you start tracking?

A. We started tracking right there where -- kind of across from where the incident happened, the location of the deceased.

Q. All right.

A. And we didn't pick up a track. We went across the street and there was a -- pretty much like a trail to the campsite. Our dogs hit that and took us straight to them.

Q. All right. On your monitor, you're able to draw with your finger. If you will, sort of draw the path you took that day to get to the campsite.

A. Here (indicating), and we kind of went around and came across.

Q. Okay. When you went around, were y'all tracking then or were you looking for the scent?

A. We were tracking. They really didn't, like, get on it until we actually came across the road. Excuse me. And as soon as we crossed the road right there and got into the wood line, they -- I mean, we were running.

Q. Okay. So looking at this, it looks like y'all tracked -- this is a topo map, I believe, around that hill the way you've drawn the blue line?

A.    Yes, sir.

Q.    Y'all were tracking at that time?

A.    Yes, sir.

Q.    And when I say "tracking" -- what do you mean when you say "tracking"?

A.    It's hard to explain.  They're tracking, but when they get on scent, they'll start barking and they will -- they'll take off.  So we pretty much had control of them trying to figure out -- pick up a -- the scent, because we were told that she had kind of went over this way.  And that's when we put the dogs down, right there.

Q.    Where you've drawn?

A.    Yes, sir.

Q.    When did they hit?  And I think you've told us, and I appreciate you explaining it.

A.    It was right across the road.  And as soon as we got in the wood line, there was, like, a trail and they pretty much stayed right on that trail and it took us pretty much straight to the camp where the tents were.

Q.    Okay.  About how many tents were out there?

A.    At least five.

Q.    All right.  And was anybody present when y'all arrived?

A.    As soon as we got there, the female stepped out.  We told her to get down.  And then the little boy actually came

out kind of behind where the tent was that she came out of and started kind of running to her.

Q.   Okay.  Do you remember anything in particular about the little boy?

A.   He was holding a shotgun.  And when he started coming, he was yelling like he was scared maybe.  As soon as he, kind of, got to her and we gave him a few, like, commands to drop the gun, he did, and he got down.

Q.   Okay.  Would you recognize the shotgun if I showed it to you?

A.   Yes, sir.

MR. CROSS:  May I approach the witness?

THE COURT:  You may.

Q.   (By Mr. Cross)  Showing what's been marked as Government's Exhibit 88, do you recognize this?

A.   It was about that size.

Q.   Okay.  Is this the shotgun you saw that day with him?

A.   Yeah, it was -- yeah.

Q.   Okay.  Once he put it down, what, if anything, did you do with the shotgun?

A.   We didn't touch it.  He kind of laid it right there by the tree, and that's where it was left.

Q.   Okay.  Do you remember Chief Adams arriving on the scene?

A.   Yes, sir.

Q.   Okay.  Do you know whether or not he took it into custody?

A.   I do not know that.

Q.   All right.

MR. CROSS:  If we could look at Government's Exhibit No. 92.

Q.   (By Mr. Cross)  Do you recognize anybody in Government's Exhibit No. 92?

A.   That's the lady that came out of the tent and that's the little boy.

Q.   Is that the little boy that was holding the shotgun?

A.   Yes.

Q.   Okay.

MR. CROSS:  Sergeant, I appreciate it.

THE COURT:  Cross-examination?

MR. WILSON:  If it pleases the Court.

CROSS-EXAMINATION

BY MR. WILSON:

Q.   Sergeant Smith, how are you?

A.   Good.  How are you?

Q.   Good.

The little boy holding the shotgun, do you remember how he was holding it?

A.   He wasn't pointing it at anybody.  He was just kind of holding it, running.

Q.  Was he -- was he holding it like he was hunting with it or, like, by the strap?

A.  No, he was holding it like he was hunting with it.

Q.  Finger on the trigger?

A.  I don't know that.

Q.  Okay.  Did he point it at anybody?

A.  No, sir.

Q.  Did any of you have on body cameras?

A.  Our guys don't.  I don't know about --

Q.  Okay.

A.  -- the county or anybody else.

Q.  Okay.  Did he threaten anybody with it?

A.  No.

Q.  Okay.  And you saw Miss Pinkins there?

A.  (Nods head affirmatively.)

Q.  Did she -- did you ever hear her order him to get the shotgun or anything like that?

A.  No.

Q.  Okay.  What was she doing when y'all arrived?

A.  I want to think she was in the tent, because when we arrived, she kind of stepped out.

Q.  Was she cooking?

A.  I don't know that.

Q.  You don't remember if there was a meal going or not?

A.  No, sir.

Q.   When you all got there, did she attempt to flee in any way?

A.   No, sir.

MR. WILSON:  Thank you.  No further questions.

THE COURT:  All right.  Any follow-up to that?

MR. CROSS:  Nothing further, Your Honor.

THE COURT:  Okay.  You may step down.

All right.  Any further evidence from the Government today?

MR. CROSS:  Not today, Your Honor.

THE COURT:  All right, folks.  We arrived -- we are running the train right on time.  This is where the Government thought they would finish up today.  Actually looks like it's before 5 o'clock, so that means you get to go home a little early today.  So see you back at 9:00 a.m. in the morning.

Remember my continuing instruction, which you can recite back to me by memory right now.  Don't investigate the case.  Don't research the case.  Don't discuss the case.  In fact, take a break from the case.  Just come back to us safe and sound at 9:00 a.m. in the morning and we'll get back going.  Thank you-all.

(Jury exited the courtroom.)

THE COURT:  All right, folks.  I am going to have these instructions in just a moment, I think.  Sharon's been working on them for me.  Anything we need to take up besides

that?

MR. CROSS:  Not from the United States.

MR. WILSON:  Not from the defense, Your Honor.

THE COURT:  Okay.  Let me be very clear.  This is just a very rough first draft of the instructions.  It's been kind of fluid on some things.  I'm not sure that all the instruction is what's ultimately going to be given, and I suspect we'll be modifying some of the instruction.  But this is going to be a good first-step start for us.

So what I'm going to say is, Mr. Wilson and either Mr. Felton or Mr. Cross, hang around and get a copy of these.  You can take them home tonight and live with them a little bit.

MR. CROSS:  Yes, sir.

THE COURT:  Okay?  All right.  If there's nothing further, I'll see you back at -- let's say at 8:30 in the morning.  We probably won't get going about 8:30 but I'd like to start getting some feedback from you on the instruction.

MR. FELTON:  Yes, sir.

MR. CROSS:  Yes, sir.

(Adjourned accordingly at 4:41 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated:  February 24, 2024

*Pamela G. Weyant*
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter