FILED
2024 Feb-28 PM 02:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

UNITED STATES OF AMERICA,   |    CASE NO. 1:22-cr-417-RDP
                       |
         Plaintiff,    |
                       |
v.                     |
                       |
KRYSTAL DIANE PINKINS,    |
                       |
         Defendant.    |

\* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF SENTENCING HEARING**

\* \* \* \* \* \* \* \* \*

FOR THE PLAINTIFF:    Jonathan S. Cross
                        John B. Felton
                        UNITED STATES ATTORNEY'S OFFICE
                        1801 Fourth Avenue North
                        Birmingham, Alabama 35203

FOR THE DEFENDANT:    Justin C. Wilson
                        LAPLANTE, MERRITT, FAULKNER & CLAY, LLC
                        1207 Noble Street
                        Anniston, Alabama 36201

ALSO PRESENT:         Mary Bennett, Probation Officer

BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES DISTRICT JUDGE, at Birmingham, Alabama, on Thursday, January 4, 2024, commencing at 9:49 a.m.

The proceedings were reported by a stenographic court reporter. The transcript was produced using computer-aided transcription.

**Transcript prepared by:**
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter

(Proceedings commenced at 9:49 a.m. in open court.)

THE COURT:  All right.  We're here in United States versus Pinkins, 22-cr-417.  We're here for purposes of a sentencing hearing.

Mr. Wilson, have you and your client had 35 days in which to review the presentence investigation report?

MR. WILSON:  Yes, Your Honor.

THE COURT:  And, Ms. Pinkins, have you read and discussed the presentence report with your attorney, Mr. Wilson?

THE DEFENDANT:  Yes.

THE COURT:  And, Mr. Wilson, there are objections to the report; correct?

MR. WILSON:  Yes, Your Honor.

THE COURT:  And you have some other objections you wanted to assert with respect to any sentencing issues in the case, as I understand it.  Why don't you just give us an overview of those and then we'll dig into the guideline objection in particular before I make guideline findings.

MR. WILSON:  You want me to do the -- you're asking me to argue my statutory objection first?

THE COURT:  You said you were going to assert it is what you told me in chambers.  You're going to assert that today.

MR. WILSON:  Okay.

THE CORT:  So I just thought you wanted to make a record of it.

MR. WILSON:  Oh, yes, sir.  We're here -- Miss Pinkins is facing a life sentence that is mandatory.  She's charged with aiding and abetting murder one.  Under the statute, anybody convicted of aiding and abetting is treated the same as the principal actor.  However, we would argue that a mandatory minimum of life in a aiding and abetting murder case is cruel and unusual punishment under -- which is -- Miss Pinkins is protected from under the Eighth Amendment.  We would argue that a mandatory life sentence when there was no finding from the jury that she caused the death of another person, intended to cause the death of another person, intended that someone else cause the death of an individual, or had any criminal history or criminal behavior whatsoever is excessive and a violation of the Eighth Amendment.

THE COURT:  All right.  Thank you.  I think you've articulated that well.  I'm going to overrule it.  I think that, under current case law, that is not a violation of the Eighth Amendment, but I understand that I'm not the authority on that.  You'll take that issue up or someone will take that issue up on appeal and let a court of -- the Court of Appeals and/or the Supreme Court make a ruling on it; correct?

MR. WILSON:  That is the intention, Your Honor.

THE COURT:  All right.  So I think you've preserved

that.  I've overruled it but you have preserved it.

All right.  Now, I think it -- I take it you would like to go ahead and articulate your objections to the guidelines, in particular, mitigating role in the offense; correct?

MR. WILSON:  Yes, Your Honor.  All of my objections stem from an assertion that Miss Pinkins is due a mitigating role calculation, and then all the other objections coming off of that are just recalculations for her -- the offense level is calculated.

If you will recall, at trial Miss Hider, the codefendant, testified that every time they spoke about a carjacking that Miss Hider was the initial one to bring it up. The Government asserted throughout the trial that Miss Pinkins was some kind of mastermind.  We do not agree with that fact pattern, nor do we believe that was proven at trial.  I think the evidence shown at trial was that Miss Pinkins went to the scene of the crime for some sort of moral support and there was evidence that Miss Pinkins gave her the gun.  I think that was the extent of Miss Pinkins' involvement.  I don't think that Miss Pinkins intended for any of these other things to happen.

And when looking at Miss Pinkins when compared to any other defendant charged with aiding and abetting murder one, we would assert that she is due a mitigating role as she is

not a mastermind or putting anyone up to this, nor was she planning on anyone getting killed, Your Honor.

THE COURT:  All right.  Government want to respond to that?

MR. FELTON:  Just briefly, Your Honor.  It's the Government's position, as the Court heard during trial with the testimony, that neither Miss Hider nor Miss Pinkins intended for this to go that way.  In fact, Miss Pinkins' statement, she says, "This is not how it was intended to go." But the way it was intended to go was specifically the facts and elements that are required for felony murder in that the defendant understood what was going on, the complexities of the action that was to rob someone, and as the elements relate to the felony murder that they had ample understanding that that is something that could happen when you provide a firearm to a confederate or co-conspirator in relation to a crime of robbery, that she exercised the decision-making authority and influenced the decision-making authority.

There was testimony from Miss Hider, as well as other people that were surrounding the incident, that Miss Pinkins was the instigator of all this.  She recognized that they were in dire need and needed to do something to have transportation to get food and supplies and, therefore, she provided the gun, although, from the Government's perspective, it was in a cowardly way, that she did not keep the gun herself but it

actually is worse that she gave it to someone else to commit the crime and that -- the degree that she had to benefit from this.  By standing in the shadows, she had the ability to benefit from it.  If it all went well, she could gather supplies.  If it didn't go well, then just -- she could just run away.

Based on all of this and the facts that you heard from the witness stand, Your Honor, we believe that not only was she a participant and -- but a co-conspirator or aider and abettor and had pretty much good planning and organization activities throughout the facts at this trial.

THE COURT:  All right.  Mr. Wilson, do you want the final word?

MR. WILSON:  Your Honor, that has been their contention throughout this entire case; however, it is contradicted by Miss Hider's own testimony when she testified that every time a carjacking came up, it was Hider's idea. Miss Pinkins, according to the evidence, gave her the gun days before a carjacking had even been discussed, and the day of, Miss Pinkins' total involvement was walking to the scene of the crime with Miss Hider.

THE COURT:  All right.  I'm going to overrule the objection for a number of reasons:  First, each of these arguments were presented to the jury, and the jury, nevertheless, convicted Pinkins of felony murder.  That's kind

of the helicopter ride over the evidence, but more -- digging down into more specifics, Pinkins acknowledged to law enforcement that she and Hider lived together at a campsite on Cheaha Mountain about a half-mile from where the shooting occurred.  It was her car that had been disabled for at least a month, and the jury -- there's evidence that -- I'm making a finding; the jury, I think, also made a finding -- that that was used as a prop to cause an unsuspecting victim to pull over and help with the car even though Pinkins knew and Hider knew that it could not be repaired by a pedestrian or passerby in a car.

The -- Pinkins admits the pistol was hers; she supplied it to Hider, and I think that occurred two or three days prior to the shooting.  The two discussed using the firearm to carjack someone to get food.  You know, I understand the defense position is that that was Hider's idea. I think the evidence was that -- though, that Pinkins was the dominant personality, Hider was the subservient personality, the younger one, who had some intellectual challenges, at least in the -- at that point, in terms of the power of the relationship is what I would -- how I would characterize it. Pinkins obviously knew it was possible that Hider could use the firearm during a carjacking or some type of robbery.

Pinkins told law enforcement she waited in the woods so that people would not be nervous about stopping.  Of

course, if there was innocent motives on her part just to get someone to stop and help people in need, one thing would have been to have the six-year-old available so that people would not feel threatened.  If that was really Pinkins' mind set, I would think that most folks are more willing to pull over and help someone with a small child.  But she had left her child seemingly alone a half-mile away at a camping area while she and Hider waited on someone to pull up.

THE DEFENDANT:  Excuse me, Your Honor.  That's --

THE COURT:  All right.

MR. WILSON:  I'm sorry.

THE COURT:  Why don't you find out what I need to hear.  No problem with the interruption.  I'm just --

MR. WILSON:  Sorry about that, Your Honor.

THE DEFENDANT:  Sorry.

THE COURT:  Well, that's all right.  Look, I'm not offended in any way.  I want to get it right.  If there's something I need to back up on and reconsider, Mr. Wilson, why don't you let me know what it is.

MR. WILSON:  Your Honor, we've already made our objection.  You're overruling our objection and stating your grounds.  I'm explaining to her that all of the counterpoints that she is wanting to make have already been made --

THE COURT:  Yes.

MR. WILSON:  -- and will continue to be made on an

appeal.

THE COURT:  All right.  So in other words, there's nothing that I haven't already heard or that you haven't presented to the jury that I would have heard or -- to this -- today?

MR. WILSON:  That's correct, Your Honor.

THE COURT:  All right.  Well, the reason I believe the evidence shows the child was left unattended in the camp area is that the child was not at the scene.  At least there is no evidence the child was at the scene of the shooting.  And when law enforcement, hours later, finally tracked Pinkins to the campsite a half-mile away, the child came out of the woods with a shotgun, is what the evidence was, unattended and Miss Pinkins was in the tent area and the child was entering the tent area -- camping area from the wood line.  So that's what leads me to understand that Ms. Pinkins intentionally did not want the child around the scene when the carjacking occurred -- or the robbery occurred.

Also, Pinkins was in the area when the shooting occurred, responded when Hider called out immediately after the shooting, did not render any aid or assistance to either Hider or victim number one, and -- who had been shot -- who had each been shot -- and fled the area and was not found until hours later.

All these things, in addition to what Hider's

testimony was, which I think the jury credited, about the aiding and abetting of the crime and the planning of the crime indicate that Ms. Pinkins is not a minimal or minor participant, she is equally culpable.  Certainly she was not the one who pulled the trigger, she's not the one who held the gun, but the evidence indicates that she persuaded or encouraged Hider to be the one to do that, just as the Government said, so that she would have an explanation that she wasn't involved.  That's what I think the evidence indicates, after sitting through this trial.  So I'm going to overrule the objection.

In doing so, I make specific findings that the factual -- I adopt the factual statements contained in the presentence report and make specific findings that the offense level is 43.  The criminal history category is I.  The advisory guideline imprisonment range is life.  The supervised release period is two to five years as to Count 1 and 4 and one to three years as to Count 3.  The fine range is 50,000 to $250,000.

Restitution seemingly would be an issue, but I'm not sure there's been a claim of restitution, as I understand it; correct?

MR. FELTON:  That's correct, Your Honor.

THE COURT:  All right.  So the Court will not deal with restitution today.

I think we're at the point where I'd be glad to hear from you, Mr. Wilson, about anything you'd like to say in mitigation or otherwise before I pronounce sentence in this case.

MR. WILSON:  Nothing to add, Your Honor.

THE COURT:  Nothing further?

MR. WILSON:  Would you like to say anything?

THE COURT:  Yeah, I'm going to ask Ms. Pinkins, anything you'd like to say before I pronounce sentence?

MR. WILSON:  I have no other argument to make, Your Honor.

THE COURT:  And Ms. Pinkins doesn't care to address the Court?

THE DEFENDANT:  I'm very sorry that this happened.

THE COURT:  All right.  Thank you.

All right.  Be glad to hear from the Government.

MR. FELTON:  Your Honor, the victim, Miss Paulus, as you know, is ill today and has asked us to read --

THE COURT:  But she's still available on the Zoom call; correct?

MR. FELTON:  She is, Your Honor.  She asked us if we could -- if the Court would --

THE COURT:  I'd be glad to hear anything she'd like to say through the Government.

MR. FELTON:  Your Honor, from Miss Paulus, she says:

Listening to your interview -- and she's addressing Miss Pinkins -- listening to your interview after you were in custody the day Adam was murdered, you said, "Holy hell, that was not the way it's supposed to go."  What way did you think it would go when you provided your so-called associate with a gun?  You murdered the Simjees' only son.  All they have left is a piece of stone with his name on it.  Your son will -- your son will grow up without a mother all because you couldn't eat white rice.

        Adam being murdered didn't mean I just lost my boyfriend; it meant I lost my entire life and any hope I had for it.  Before I met him, I was depressed and believed that the world was an inherently negative place full of pain, but Adam was such a bright light, he made it obvious there was still good in the world.  He made me fall in love with life and all it had to offer.  He was my best friend and my soulmate.  We did everything together, but now I have to live the rest of my life without him.  I got lucky meeting him so young only to have him taken away from me before we could even legally share a drink together.

        I grew up totally against the idea of having children, but Adam changed my mind just by being the amazing person he was.  I wanted nothing more than to raise a family with him and to live a fairy-tale domestic life, and now I'll never get to fulfill that dream.  Adam was and still is the smartest

person I've ever met.  He could have single-handedly changed the world and made it a better place, but that opportunity was taken from him because he was kind enough to offer help to a stranger on the side of the road.

I'm sure people say all the time that the person they lost was perfect, but Adam genuinely was.  He was an angel on earth, the embodiment of everything good in the world.  He was selfless, always putting his needs aside to help anyone and everyone he came across.  We have pulled over on the side of the road to help people numerous times before that fateful day in August when he took his last breaths in my arms.  I don't know if you have any human emotions, but you took a very meek, kindhearted girl and she took someone's entire life away just to make you proud.

THE COURT:  All right.  Anything further from the Government?

MR. FELTON:  Do we talk about forfeiture now or --

THE COURT:  Yes.  I take it there's no objection to a forfeiture order on the pistol?

MR. WILSON:  No objection to forfeiture, Your Honor.

THE COURT:  Okay.

MR. FELTON:  Forfeiture of the firearm I think is the --

MR. CROSS:  And the shotgun.

MR. FELTON:  And the shotgun.

THE COURT:  And the shotgun both, that's right.

MR. WILSON:  No objection to either, Your Honor.

THE COURT:  All right.  Anything further from the Government?

MR. FELTON:  No, Your Honor.

THE COURT:  Mr. Wilson, anything further from you?

MR. WILSON:  No, Your Honor.

THE COURT:  All right.  Mr. Wilson, I'm going to say publicly what I've said privately to you, both directly and in the presence of the Government:  You did an outstanding job representing your client in this case.  You continue to do that in this hearing, and I want to acknowledge that and commend you for that.

I'm going to address the defendant in a moment.  What I'd like to do first, though, is address Miss Paulus, who is available by Zoom and just -- I don't think there's any words I'm going to have today that will give you any peace or comfort, but I would like to make a couple remarks that I think over time you may choose to consider and think about.

And I guess my question for you today -- and I think it may be a question you're asking yourself, too -- is, what would Adam say to you today?  I think he'd tell you that life is filled with good and bad.  You know him infinitely better than I do, but from my limited vantage point, I think he would tell you to choose life.  There will be pain.  It will dull

over time but it will never go completely away.  But you've said that Adam was the embodiment of everything good in the world, and I think that acknowledges that there is good in the world, good and bad.  And what I'm going to really challenge you to do today is to choose life, choose to pursue what's good, in honor of Adam or because that's the right thing to do in any event.

So again, I'm not saying those things to you -- I'm just trying to help you with this -- at least this -- this closing chapter of this part of the story.  And I wish you well and wish you the best.

I'm going to ask Ms. Pinkins to stand so I can address her now and pronounce the sentence in this case.

Ms. Pinkins, one of the things that struck me during the playing of your interview was just the lack of remorse that you had for this situation.  I know you just said you're sorry here -- and I think you really are sorry -- but I do believe that you were the one who put all these actions in motion.

Now, having said that, I'm not going to dwell on that today either.  I think it's important for you to hear that from the Court.  But what I would tell you is you still have a six-year-old son who you're going to be in communication with, who's going to -- and you have an opportunity to show him, What does it look like when someone makes a grave violation of

the law?  What does it look like to bounce back from that and to resume life in some way and be a -- even a distant beacon for him?  What can you do to pour into your six-year-old?

And I appreciate your parents stepping up and taking custody, and I know they are -- they are probably some of the most affected -- they and Ms. Paulus are probably some of the most affected people by all this.  I certainly fee for them.  But I'm going to just challenge you to ask yourself, What's the next right thing I can do in this situation?

I am going to sentence you to life as to Counts 1 and 4 and 180 months statutory maximum as to Count 3, each to be served separately and concurrently with each other.  This imprisonment term will be -- run concurrently with your imprisonment pursuant to the judgment in Clay County Case No. DC22-319 through 324.  I find this is a reasonable sentence under the circumstances, sufficient but not greater than necessary to achieve the statutory purpose of sentencing.

I'm going to order that you be -- to the extent that you would ever be released from prison, you would be placed on supervised release for a period of five years as to Counts 1 and 4, three years as to Count 3, separately and concurrently.

You must cooperate in the collection of DNA under the administrative supervision of the probation office, submit to random mandatory drug testing.  It's suspended based upon the Court's determination you pose a low risk of future substance

abuse, but you will be required to participate in a mental health treatment program under the administrative supervision of the probation office and contribute to the cost of that treatment unless the probation office determines you don't have the ability to do so.  And you must comply with the rules and requirements of the program.

In addition, I'm not imposing a fine.  I find that you don't have the ability to pay a fine.  But you are required to pay a special assessment fee of $300, which is due immediately.

I think I have pronounced a complete sentence in this case.  Any objection from any parties as to findings of fact, the calculations of the sentence, or the manner in which the sentence has been pronounced or imposed other than those already indicated on the record?

MR. FELTON:  Not from the Government.

MR. WILSON:  We'll just remake our objection that we argued earlier.

THE COURT:  All right.  And that's both to the sentence generally, to the mandatory minimum aspect -- not the -- the life aspect of the sentence, I should say, and to the guideline calculation and particularly the mitigation role?

MR. WILSON:  That is correct.

THE COURT:  All right.  Ms. Pinkins, you have the right to appeal the sentence I just imposed within 14 days,

and I think your lawyer is going to indicate you wish to appeal this sentence.  Are -- where are we with that, Mr. Wilson?

MR. WILSON:  At this time Miss Pinkins would give oral notice of appeal and I would ask to allow -- the Court to allow me to withdraw and appellate counsel to be appointed.

THE COURT:  All right.  I'm going to ask Judge Danella to handle that.  I'll call him when we get off the bench -- when I get off the bench and tell him to expect that.  I think you probably ought to submit something in writing, though, just a motion to withdraw and a request to appoint appellate counsel.

And, Ms. Pinkins, that makes sense for a lot of reasons:  One, you want fresh eyes on the record, fresh eyes on any arguments that ought to be asserted to the Court of Appeals.  And as good a job as Mr. Wilson has done, I think he would prefer that someone else come back behind him and see if there's anything that needs to be raised at this point and how it ought to be raised.

Do you agree with all that, Mr. Wilson?

MR. WILSON:  Yes, Your Honor.

THE COURT:  You have the right to appeal the sentence within 14 days.  You have indicated you wish to take this appeal.  Remember, it has to be filed within 14 days.  There's a cost -- there's a filing fee for -- taking an appeal is

expensive.  You can apply for leave to appeal in forma pauperis; that is, I don't have the money to pay the filing fee.  And the Court would waive that for you if you're declared to be in forma pauperis.  You can also ask for appointment of counsel.  I think we're going to go ahead and take care of that by asking Judge Danella to appoint appellate counsel for you.  And you can also -- if you need the help, you can ask the clerk of court to assist you in preparing and filing a notice of appeal.

Do you understand all these rights I've just explained to you?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Anything further from the Government?

MR. FELTON:  No, Your Honor.

THE COURT:  Anything further from you, Mr. Wilson?

MR. WILSON:  No, Your Honor.

THE COURT:  All right.  We'll be adjourned.

(Adjourned accordingly at 10:15 a.m.)

C E R T I F I C A T E


      I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

                    Dated:  February 28, 2024




*Pamela G. Weyant*
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter